# EXHIBIT A
## Part 3

EXHIBIT C

1  EDMUND G. BROWN JR.,
     Attorney General of the State of California
2  ALBERT NORMAN SHELDEN
     Senior Assistant Attorney General
3  RONALD REITER
     Supervising Deputy Attorney General
4  KATHRIN SEARS (Bar No. 146684)
   ROBYN SMITH (Bar No. 165446)
5  BENJAMIN G. DIEHL (Bar No. 192984)
   LINDA HOOS (Bar No. 217620)
6    Deputy Attorneys General
   300 S. Spring Street, Suite 1702
7  Los Angeles, CA 90013

8
   Attorneys for Plaintiff,
9  the People of the State of California

10

11            SUPERIOR COURT OF THE STATE OF CALIFORNIA

12             FOR THE COUNTY OF LOS ANGELES COUNTY

13                        NORTHWEST DISTRICT

14  THE PEOPLE OF THE STATE OF          Case No.:
    CALIFORNIA,
15                                      **COMPLAINT FOR RESTITUTION,**
16                    Plaintiff,        **INJUNCTIVE RELIEF, OTHER**
                                        **EQUITABLE RELIEF, AND CIVIL**
17              v.                      **PENALTIES**

18  COUNTRYWIDE FINANCIAL
    CORPORATION, a Delaware corporation;
19  COUNTRYWIDE HOME LOANS, INC., a
    New York corporation; FULL SPECTRUM
20  LENDING, INC., a California Corporation;
    ANGELO MOZILO, an individual; DAVID
21  SAMBOL, an individual; and DOES 1-100,
    inclusive,
22
                      Defendants.
23

24  ///

25  ///

26  ///

27  ///

28                         **COMPLAINT**

                              1
                           COMPLAINT

1       Plaintiff, the People of the State of California, by and through Edmund G. Brown Jr.,

2 Attorney General of the State of California, alleges the following, on information and belief:

3 **I.    DEFENDANTS AND VENUE**

4     1.    At all relevant times, defendant Countrywide Financial Corporation ("CFC"), a

5 Delaware corporation, has transacted and continues to transact business throughout the State of

6 California, including in Los Angeles County.

7     2.    At all relevant times, defendant Countrywide Home Loans, Inc. ("CHL"), a New

8 York corporation, has transacted and continues to transact business throughout the State of

9 California, including in Los Angeles County.  CHL is a subsidiary of CFC.

10     3.    At all relevant times, until on or about December 15, 2004, Full Spectrum

11 Lending, Inc. ("Full Spectrum"), was a California corporation that transacted business throughout

12 the State of California, including in Los Angeles County, and was a subsidiary of CFC.  On or

13 about December 15, 2004, Full Spectrum was merged into and became a division of CHL.  For

14 all conduct that occurred on or after December 15, 2004, any reference in this complaint to CHL

15 includes reference to its Full Spectrum division.

16     4.    Defendants CFC, CHL, and Full Spectrum are referred to collectively herein as

17 "Countrywide" or "the Countrywide Defendants."

18     5.    At all times pertinent hereto, defendant Angelo Mozilo ("Mozilo") was Chairman

19 and Chief Executive Officer of CFC.  Defendant Mozilo directed, authorized, and ratified the

20 conduct of the Countrywide Defendants set forth herein.

21     6.    At all times pertinent hereto, defendant David Sambol ("Sambol") is and was the

22 President of CHL and, since approximately September, 2006, has served as the President and

23 Chief Operating Officer of CFC.  Sambol directed, authorized and ratified the conduct of CHL,

24 and after, September, 2006, the Countrywide Defendants, as set forth herein.  Defendant Sambol

25 is a resident of Los Angeles County.

26     7.    Plaintiff is not aware of the true names and capacities of the defendants sued as

27 Does 1 through 100, inclusive, and therefore sues these defendants by such fictitious names.

28 Each of these fictitiously named defendants is responsible in some manner for the activities

1   alleged in this Complaint. Plaintiff will amend this Complaint to add the true names of the
2   fictitiously named defendants once they are discovered.

3       8.    The defendants identified in paragraphs 1 through 7, above, shall be referred to
4   collectively as "Defendants."

5       9.    Whenever reference is made in this Complaint to any act of any defendant(s), that
6   allegation shall mean that each defendant acted individually and jointly with the other
7   defendants.

8       10.   Any allegation about acts of any corporate or other business defendant means that
9   the corporation or other business did the acts alleged through its officers, directors, employees,
10  agents and/or representatives while they were acting within the actual or ostensible scope of their
11  authority.

12      11.   At all relevant times, each defendant committed the acts, caused or directed others
13  to commit the acts, or permitted others to commit the acts alleged in this Complaint.
14  Additionally, some or all of the defendants acted as the agent of the other defendants, and all of
15  the defendants acted within the scope of their agency if acting as an agent of another.

16      12.   At all relevant times, each defendant knew or realized that the other defendants
17  were engaging in or planned to engage in the violations of law alleged in this Complaint.
18  Knowing or realizing that other defendants were engaging in or planning to engage in unlawful
19  conduct, each defendant nevertheless facilitated the commission of those unlawful acts. Each
20  defendant intended to and did encourage, facilitate, or assist in the commission of the unlawful
21  acts, and thereby aided and abetted the other defendants in the unlawful conduct.

22      13.   At all relevant times, Defendants have engaged in a conspiracy, common
23  enterprise, and common course of conduct, the purpose of which is and was to engage in the
24  violations of law alleged in this Complaint. This conspiracy, common enterprise, and common
25  course of conduct continues to the present.

26      14.   The violations of law alleged in this Complaint occurred in Los Angeles County
27  and elsewhere throughout California and the United States.

28  **II.   DEFENDANTS' BUSINESS ACTS AND PRACTICES**

15.     This action is brought against Defendants, who engaged in false advertising and unfair competition in the origination of residential mortgage loans and home equity lines of credit ("HELOCs").

16.     Countrywide originated mortgage loans and HELOCs through several channels, including a wholesale origination channel and a retail origination channel. The Countrywide employees who marketed, sold or negotiated the terms of mortgage loans and HELOCs in any of its origination channels, either directly to consumers or indirectly by working with mortgage brokers, are referred to herein as "loan officers."

17.     In Countrywide's wholesale channel, loan officers in its Wholesale Lending Division ("WLD") and Specialty Lending Group ("SLG") (now merged into the WLD) worked closely with a nationwide network of mortgage brokers to originate loans. In its wholesale channel, Countrywide often did business as "America's Wholesale Lender," a fictitious business named owned by CHL. In Countrywide's retail channel, loan officers employed by Countrywide in its Consumer Markets Division ("CMD") sold loans directly to consumers. In addition, loan officers employed by Full Spectrum up until December 14, 2004, and thereafter by Countrywide's Full Spectrum Lending Division ("FSLD"), sold loans directly to consumers as part of Countrywide's retail channel.

18.     Countrywide maintained sophisticated electronic databases by means of which corporate management, including but not limited to defendants Mozilo and Sambol, could obtain information regarding Countrywide's loan production status, including the types of loan products, the number and dollar volume of loans, the underwriting analysis for individual loans, and the number of loans which were approved via underwriting exceptions. Defendants used this information, together with data they received regarding secondary market trends, to develop and modify the loan products that Countrywide offered and the underwriting standards that Countrywide applied.

19.     The mortgage market changed in recent years from one in which lenders originated mortgages for retention in their own portfolios to one in which lenders attempted to generate as many mortgage loans as possible for resale on the secondary mortgage market. The

1 │ goal for lenders such as Countrywide was not only to originate high mortgage loan volumes but
2 │ also to originate loans with above-market interest rates and other terms which would attract
3 │ premium prices on the secondary market.

4 │     20.    In 2004, in an effort to maximize Countrywide's profits, Defendants set out to
5 │ double Countrywide's share of the national mortgage market to 30% through a deceptive scheme
6 │ to mass produce loans for sale on the secondary market. Defendants viewed borrowers as
7 │ nothing more than the means for producing more loans, originating loans with little or no regard
8 │ to borrowers' long-term ability to afford them and to sustain homeownership. This scheme was
9 │ created and maintained with the knowledge, approval and ratification of defendants Mozilo and
10 │ Sambol.

11 │     21.    Defendants implemented this deceptive scheme through misleading marketing
12 │ practices designed to sell risky and costly loans to homeowners, the terms and dangers of which
13 │ they did not understand, including by (a) advertising that it was the nation's largest lender and
14 │ could be trusted by consumers; (b) encouraging borrowers to refinance or obtain purchase money
15 │ financing with complicated mortgage instruments like hybrid adjustable rate mortgages or
16 │ payment option adjustable rate mortgages that were difficult for consumers to understand; (c)
17 │ marketing these complex loan products to consumers by emphasizing the very low initial
18 │ "teaser" or "fixed" rates while obfuscating or misrepresenting the later steep monthly payments
19 │ and interest rate increases or risk of negative amortization; and (d) routinely soliciting borrowers
20 │ to refinance only a few months after Countywide or the loan brokers with whom it had "business
21 │ partnerships" had sold them loans.

22 │     22.    Defendants also employed various lending policies to further their deceptive
23 │ scheme and to sell ever-increasing numbers of loans, including (a) the dramatic easing of
24 │ Countrywide's underwriting standards; (b) the increased use of low- or no-documentation loans
25 │ which allowed for no verification of stated income or stated assets or both, or no request for
26 │ income or asset information at all; (c) urging borrowers to encumber their homes up to 100% (or
27 │ more) of the assessed value; and (d) placing borrowers in "piggyback" second mortgages in the
28 │ form of higher interest rate HELOCs while obscuring their total monthly payment obligations.

1    23.    Also to further the deceptive scheme, Defendants created a high-pressure sales
2 environment that propelled its branch managers and loan officers to meet high production goals
3 and close as many loans as they could without regard to borrower ability to repay. Defendants'
4 high-pressure sales environment also propelled loan officers to sell the riskiest types of loans,
5 such as payment option and hybrid adjustable rate mortgages, because loan officers could easily
6 sell them by deceptively focusing borrowers' attention on the low initial monthly payments or
7 interest rates. Defendants also made arrangements with a large network of mortgage brokers to
8 procure loans for Countrywide and, through its loan pricing structure, encouraged these brokers
9 to place homeowners in loans with interest rates higher than those for which they qualified, as
10 well as prepayment penalty obligations. This system of compensation aided and abetted brokers
11 in breaching their fiduciary duties to borrowers by inducing borrowers to accept unfavorable loan
12 terms without full disclosure of the borrowers' options and also compensated brokers beyond the
13 reasonable value of the brokerage services they rendered.

14    24.    Countrywide received numerous complaints from borrowers claiming that they
15 did not understand their loan terms. Despite these complaints, Defendants turned a blind eye to
16 the ongoing deceptive practices engaged in by Countrywide's loan officers and loan broker
17 "business partners," as well as to the hardships created for borrowers by its loose underwriting
18 practices. Defendants cared only about selling increasing numbers of loans at any cost, in order
19 to maximize Countrywide's profits on the secondary market.

20 **III.   THE PRIMARY PURPOSE OF DEFENDANTS' DECEPTIVE BUSINESS
        PRACTICES WAS TO MAXIMIZE PROFITS FROM THE SALE OF LOANS TO
21      THE SECONDARY MARKET**

22    25.    Defendants' deceptive scheme had one primary goal – to supply the secondary
23 market with as many loans as possible, ideally loans that would earn the highest premiums. Over
24 a period of several years, Defendants constantly expanded Countrywide's share of the consumer
25 market for mortgage loans through a wide variety of deceptive practices, undertaken with the
26 direction, authorization, and ratification of defendants Sambol and Mozilo, in order to maximize
27 its profits from the sale of those loans to the secondary market.

28

1   26.    While Countrywide retained ownership of some of the loans it originated, it sold
2   the vast majority of its loans on the secondary market, either as mortgage-backed securities or as
3   pools of whole loans.
4   27.    In the typical securitization transaction involving mortgage-backed securities,
5   loans were "pooled" together and transferred to a trust controlled by the securitizer, such as
6   Countrywide.  The trust then created and sold securities backed by the loans in the pool.  Holders
7   of the securities received the right to a portion of the monthly payment stream from the pooled
8   loans, although they were not typically entitled to the entire payment stream.  Rather, the holders
9   received some portion of the monthly payments.  The securitizer or the trust it controlled often
10  retained an interest in any remaining payment streams not sold to security holders.  These
11  securitizations could involve the pooling of hundreds or thousands of loans, and the sale of many
12  thousands of shares.
13  28.    Countrywide generated massive revenues through these loan securitizations.  Its
14  reported securities trading volume grew from 647 billion dollars in 2000, to 2.9 trillion dollars in
15  2003, 3.1 trillion dollars in 2004, 3.6 trillion dollars in 2005, and 3.8 trillion dollars in 2006.
16  (These figures relate to the ostensible values given to the securities by Countrywide or investors,
17  and include securities backed by loans made by other lenders and purchased by Countrywide.)
18  29.    For the sale of whole (i.e., unsecuritized) loans, Countrywide pooled loans and
19  sold them in bulk to third-party investors, often (but not exclusively) Wall Street firms.  The sale
20  of whole loans generated additional revenues for Countrywide.  Countrywide often sold the
21  whole loans at a premium, meaning that the purchaser paid Countrywide a price in excess of
22  100% of the total principal amount of the loans included in the loan pool.
23  30.    The price paid by purchasers of securities or pools of whole loans varied based on
24  the demand for the particular types of loans included in the securitization or sale of whole loans.
25  The characteristics of the loans, such as whether the loans are prime or subprime, whether the
26  loans have an adjustable or fixed interest rate, or whether the loans include a prepayment penalty,
27  all influenced the price.
28

1      31.    Various types of loans and loan terms earned greater prices, or "premiums," in the

2  secondary market. For example, investors in mortgages and mortgage backed securities have

3  been willing to pay higher premiums for loans with prepayment penalties. Because the

4  prepayment penalty deters borrowers from refinancing early in the life of the loan, it essentially

5  ensures that the income stream from the loan will continue while the prepayment penalty is in

6  effect. Lenders, such as Countrywide, typically sought to market loans that earned it higher

7  premiums, including loans with prepayment penalties.

8      32.    In order to maximize the profits earned by the sale of its loans to the secondary

9  market, Countrywide's business model increasingly focused on finding ways to generate an ever

10  larger volume of the types of loans most demanded by investors.   For example, Countrywide

11  developed and modified loan products by discussing with investors the prices they would be

12  willing to pay for loans with particular characteristics (or for securities backed by loans with

13  particular characteristics), and █████████████████████████████████████

14  ███████████████████████████████████   This enabled Countrywide to determine

15  which loans were most likely to be sold on the secondary market for the highest premiums.

16      33.    Further, rather than waiting to sell loans until after they were made, Countrywide

17  would sell loans "forward" before loans were funded. In order to determine what loans it could

18  sell forward, Countrywide would both examine loans in various stages of production and

19  examine its projected volume of production over the next several months.

20      34.    Loans that were sold forward were sold subject to a set of stipulations between

21  Countrywide and the purchaser. For example, in a sale of whole loans, Countrywide might agree

22  on October 1 that on December 1 it would deliver 2000 adjustable rate mortgage loans with an

23  average interest rate of 6.0%, half of which would be subject to a prepayment penalty, among

24  other characteristics. (None of these loans would have been made as of October 1.)  Based on

25  these stipulations regarding the characteristics of the loans to be included in the pool, an investor

26  might agree to pay a price totaling 102.25% of the total face value of the loans. In other words,

27  the purchaser agreed in advance to pay a premium of 2.25%. Then, if the loans actually delivered

28

1    on December 1 had a slightly higher or lower average interest rate, the terms of the stipulation
2    would specify how much the final price would be adjusted.

3         35.    The information regarding the premiums that particular loan products and terms
4    could earn on the secondary market was forwarded to Countrywide's production department,

5    ███████████████████████████████████████████████████████████████████████████.

6    [Redacted description of production department's responsibilities.]

7         36.    Countrywide originated as many loans as possible not only to maximize its profits
8    on the secondary market, but to earn greater profits from servicing the mortgages it sold.
9    Countrywide often retained the right to service the loans it securitized and sold as pools of whole
10   loans. The terms of the securitizations and sales agreements for pools of whole loans authorized
11   Countrywide to charge the purchasers a monthly fee for servicing the loans, typically a
12   percentage of the payment stream on the loan.

13        37.    Tantalized by the huge profits earned by selling loans to the secondary market,
14   Defendants constantly sought to increase Countrywide's market share: the greater the number
15   and percentage of loans it originated, the greater the revenue it could earn on the secondary
16   market. Countrywide executives, including defendant Mozilo, publicly stated that they sought to
17   increase Countrywide's market share to 30% of all mortgage loans made and HELOCs extended
18   in the country.

19        38.    In its 2006 annual report, Countrywide trumpeted the fact that "[w]hile the overall
20   residential loan production market in the United States has tripled in size since 2000, from $1.0
21   trillion to $2.9 trillion at the end of 2006, Countrywide has grown nearly three times faster, going
22   from $62 billion in loan originations in 2000 to $463 billion in 2006."

23        39.    In addition, Countrywide directly and indirectly motivated its branch managers,
24   loan officers and brokers to market the loans that would earn the highest premiums on the
25   secondary market without regard to borrower ability to repay. For example, the value on the
26   secondary market of the loans generated by a Countrywide branch was an important factor in
27   determining the branch's profitability and, in turn, branch manager compensation. Managers
28   were highly motivated to pressure their loan officers to sell loans that would earn Countrywide

1   the highest premium on the secondary market, which resulted in aggressive marketing of such
2   loans to consumers.

3       40.     The secondary market affected Countrywide's pricing of products and, in order to
4   sell more loans on the secondary market, Countrywide relaxed its underwriting standards and
5   liberally granted exceptions to those standards. Countrywide managers and executives, including
6   but not limited to defendants Mozilo and Sambol, had access to information that provided
7   transparency and a seamless connection between secondary market transactions, the loan
8   production process, and managerial and sales incentives.

9   **IV.   COUNTRYWIDE ENGAGED IN DECEPTIVE PRACTICES IN THE SALE OF
        COMPLEX AND RISKY LOANS TO CONSUMERS**

10      41.     Countrywide offered a variety of loan products that were both financially risky
11  and difficult for borrowers to understand, including in particular payment option and hybrid
12  adjustable rate mortgages and second loans in the form of home equity lines of credit.

13      **A.     The Pay Option ARM**

14      42.     Particularly after 2003, Countrywide aggressively marketed its payment option
15  adjustable rate mortgage ("Pay Option ARM") under the direction, authorization and ratification
16  of defendants Mozilo and Sambol. The Pay Option ARM, which Countrywide classified as a
17  "prime" product, is a complicated mortgage product which entices consumers by offering a very
18  low "teaser" rate – often as low as 1% – for an introductory period of one or three months. At
19  the end of the introductory period, the interest rate increases dramatically. Despite the short
20  duration of the low initial interest rate, Countrywide's Pay Option ARMs often include a one,
21  two or three-year prepayment penalty.

22      43.     When the teaser rate on a Pay Option ARM expires, the loan immediately
23  becomes an adjustable rate loan. Unlike most adjustable rate loans, where the rate can only
24  change once every year or every six months, the interest rate on a Pay Option ARM can change
25  every month (if there is a change in the index used to compute the rate).

26      44.     Countrywide's Pay Option ARMs were typically tied to either the "MTA,"
27  "LIBOR" or "COFI" index. The MTA index is the 12-month average of the annual yields on

1   actively traded United States Treasury Securities adjusted to a constant maturity of one year as
2   published by the Federal Reserve Board. The LIBOR (London Interbank Offered Rate) index is
3   based on rates that contributor banks in London offer each other for inter-bank deposits. Separate
4   LIBOR indices are kept for one month, six-month, and one-year periods, based on the duration of
5   the deposit. For example, the one-year LIBOR index reported for June 2008 is the rate for a
6   twelve-month deposit in U.S. dollars as of the last business day of the previous month. The
7   COFI (11th District Cost of Funds Index) is the monthly weighted average of the interest rates
8   paid on checking and savings accounts offered by financial institutions operating in the states of
9   Arizona, California and Nevada.

10          45.     Although the interest rate increases immediately after the expiration of the short
11  period of time during which the teaser rate is in effect, a borrower with a Pay Option ARM has
12  the option of making monthly payments as though the interest rate had not changed. Borrowers
13  with Pay Option ARMs typically have four different payment options during the first five years
14  of the loan. The first option is a "minimum" payment that is based on the introductory interest
15  rate. The minimum payment, which Countrywide marketed as the "payment rate," is the lowest
16  of the payment options presented to the borrower. Most of Countrywide's borrowers choose to
17  make the minimum payment.

18          46.     The minimum payment on a Pay Option ARM usually is less than the interest
19  accruing on the loan. The unpaid interest is added to the principal amount of the loan, resulting
20  in negative amortization. The minimum payment remains the same for one year and then
21  increases by 7.5% each year for the next four years. At the fifth year, the payment will be
22  "recast" to be fully amortizing, causing a substantial jump in the payment amount often called
23  "payment shock."

24          47.     However, the loan balance on a Pay Option ARM also has a negative amortization
25  cap, typically 115% of the original principal of the loan. If the balance hits the cap, the monthly
26  payment is immediately raised to the fully amortizing level (i.e., all payments after the date the
27  cap is reached must be sufficient to pay off the new balance over the remaining life of the loan).
28  When that happens, the borrower experiences significant payment shock. A borrower with a

1  Countrywide Pay Option ARM with a 1% teaser rate, who is making the minimum payment, is
2  very likely to hit the negative amortization cap and suffer payment shock well before the standard
3  5-year recast date.

4       48.    Instead of making the minimum payment, the borrower has the option of making
5  an interest-only payment for five years.  The borrower then experiences payment shock when the
6  payment recasts to cover both principal and interest for the remaining term of the loan.
7  Alternatively, the borrower can choose to make a fully amortizing principal and interest payment
8  based on either a 15-year or a 30-year term.

9       49.    The ever-increasing monthly payments and payment shock characteristic of Pay
10  Option ARMs are illustrated by the following example of a Countrywide loan.  The loan had an
11  initial principal balance of $460,000.00, a teaser rate of 1%, and a margin of 2.9% (such that
12  after the one-month teaser rate expired, the interest would be the 1-month LIBOR index plus
13  2.9%, rounded to the nearest 1/8th percent).  After the teaser rate expired, based on the 1-month
14  LIBOR rate as of the date the borrower obtained the loan, the interest rate would increase to
15  7.00%.  Assuming the 7.00% interest rate remained in place, and the borrower chose to make the
16  minimum payment for as long as possible, the payment schedule would be approximately as
17  follows:

18            a.    $1,479.54 per month for the first year;
19            b.    $1,590.51 per month for the second year;
20            c.    $1,709.80 per month for the third year;
21            d.    $1,838.04 per month for the fourth year;
22            e.    $1,975.89 per month for the first nine months of the fifth year; and
23            f.    approximately $3747.83 per month for the remaining twenty-five years
24            and three months on the loan.

25       50.    Once the payments reach $3747.83, this Pay Option ARM will have negatively
26  amortized such that the balance of the loan will have increased to approximately $523,792.33.
27  At that point, the borrower will be faced with a payment more than two-and-a-half times greater
28  than the initial payment and likely will be unable to refinance unless his or her home has

<p style="text-align:center">12<br>COMPLAINT</p>

1  increased in value at least commensurately with the increased loan balance. In addition,
2  increases in the LIBOR rate could cause the borrower to hit the negative amortization cap earlier,
3  and also could result in even higher payments. If the interest rate reached 8%, just 1% higher, the
4  negative amortization cap would be reached sooner and payments could reach $4,000.00 per
5  month, or higher.

6      51.    During the underwriting process, Countrywide did not consider whether
7  borrowers would be able to afford such payment shock. Further, depending on the state of the
8  his or her finances, even the interim increases in the minimum payment may well have caused
9  dramatic hardship for the borrower.

10     52.    Even if the borrower elects to make interest-only payments, he or she still will
11 experience payment shock. Again assuming the interest rate stays constant at 7.00% over the life
12 of the loan, the borrower's initial payments would be approximately $2,683.33 for five years.
13 Thereafter, the payment will increase to approximately $3,251.18 per month, an increase of over
14 20%.

15     53.    Nearly all Countrywide's Pay Option ARM borrowers will experience payment
16 shock such as that illustrated in paragraphs 49 through 52 above.  As of December 31, 2006,
17 almost 88% of the Pay Option ARM portfolio held by Defendants consisted of loans that had
18 experienced some negative amortization.  This percentage increased to 91% as of December 31,
19 2007.

20     54.    Countrywide sold thousands of Pay Option ARMs, either through its branches or
21 through brokers.  For example, on a national basis, approximately 19% of the loans originated
22 by Countrywide in 2005 were Pay Option ARMs. Countrywide made many of these loans in
23 California.

24     55.    These loans were highly profitable. Countrywide had a gross profit margin of
25 approximately 4% on Pay Option ARMs, compared to 2% on mortgages guaranteed by the
26 Federal Housing Administration.

27     56.    Countrywide retained ownership of a number of loans for investment purposes,
28 including thousands of Pay Option ARMs. Countrywide reported the negative amortization

amounts on these Pay Option ARMs (i.e., the amount by which the balances on those loans increased) as income on its financial statements. The negative amortization "income" earned by Countrywide totaled 1.2 billion dollars by the end of of 2007.

57.   Moreover, Pay Option ARMs with higher margins could be sold for a higher premium on the secondary market, because the higher margins would produce a greater interest rate and therefore a larger income stream.  To insure an abundant stream of such loans, Countrywide pushed its loan officers to sell Pay Option ARMs and paid loan brokers greater compensation for selling a Pay Option ARM with a higher margin, or above-par rate, thus encouraging them to put consumers into higher cost loans.  Countrywide also used a variety of deceptive marketing techniques to sell its Pay Option ARMs to consumers.

58.   Countrywide deceptively marketed the Pay Option ARM by aggressively promoting the teaser rate. Television commercials emphasized that the payment rate could be as low as 1% and print advertisements lauded the extra cash available to borrowers because of the low minimum payment on the loan.  Television advertisements did not effectively distinguish between the "payment rate" and the interest rate on the loans, and any warnings about potential negative amortization in Countrywide's print advertisements were buried in densely written small type.

59.   Borrowers, enticed by the low teaser rate, were easily distracted from the fine print in the loan documents and did not fully understand the terms or the financial implications of Countrywide's Pay Option ARMs.

60.   When a borrower obtained a Pay Option ARM from Countrywide, the only initial monthly payment amount that appeared anywhere in his or her loan documents was the minimum payment amount.  In other words, documents provided to the borrower assumed he or she would make only the minimum payment. Thus, a borrower would not know the monthly payment necessary to make a payment that would, for example, cover accruing interest, until he or she received the first statement after the expiration of the teaser rate, well after all loan documents were signed.

61.     Countrywide and the brokers it accepted as its "business partners" misrepresented or obfuscated the true terms of the Pay Option ARMs offered by Countrywide, including but not limited to misrepresenting or obfuscating the amount of time that the interest rate would be fixed for the loan, misrepresenting or obfuscating the risk of negative amortization and the fact that the payment rate was not the interest rate, and misrepresenting or obfuscating that the minimum payment would not apply for the life of the loan.

62.     Countrywide and its business partner brokers also misrepresented or obfuscated how difficult it might be for borrowers to refinance a Pay Option ARM loan. In fact, after making only the minimum payment, because of negative amortization the borrower likely would not be able to refinance a Pay Option ARM loan unless the home serving as security for the mortgage had increased in value. This is particularly true in cases for borrowers whose loans have a very high loan-to-value ratio.

63.     Countrywide and its business partner brokers often misrepresented or obfuscated the fact that a particular Pay Option ARM included a prepayment penalty and failed to explain the effect that making only the minimum payment would have on the amount of the prepayment penalty. If a borrower seeks to refinance after having made the minimum payment for an extended period, but while a prepayment penalty is still in effect, the negative amortization can cause the amount of the prepayment penalty to increase. Prepayment penalties typically equal six months worth of accrued interest. As negative amortization causes the loan principal to increase, it also causes an increase in the amount of interest that accrues that each month, thereby increasing the prepayment penalty.

64.     Countrywide and its business partner brokers also represented that the prepayment penalty could be waived if the borrower refinanced with Countrywide. However, Countrywide sells most of the loans it originates, and Countrywide has at most limited authority to waive prepayment penalties on loans it does not own, even when it controls the servicing (and is often required to pay the prepayment penalties on loans it does not own in the instances where it is not able to collect the penalty from the borrower).

B.      **Hybrid ARM Loans**

1    65.    In addition to the Pay Option ARMs, Countrywide offered "Hybrid" ARM loans.
2    Hybrid ARMs have a fixed interest rate for a period of 2, 3, 5, 7, or 10 years, and then an
3    adjustable interest rate for the remaining loan term. The products described below were offered
4    with the approval, direction and ratification of defendants Sambol and Mozilo.

5        **(1) 2/28 and 3/27 ARMs**

6    66.    Countrywide typically offered "2/28" Hybrid ARMs through its Full Spectrum
7    Lending Division. These 2/28 ARM loans have low, fixed interest rates for the first two years
8    (the "2" in "2/28"). The loans often only required interest-only payments during the period the
9    initial rate was in effect, or sometimes for the first five years of the loan.

10    67.    After the initial rate expires, the interest rate can adjust once every six months for
11    the next 28 years (the "28" in "2/28"). During this period, the interest rate typically is
12    determined by adding a margin to the one-year LIBOR index, except that the amount the interest
13    rate can increase at one time may be limited to 1.5%. Because the initial rate is set independent
14    of the index, the payment increase can be dramatic, particularly if the loan called for interest-only
15    payments for the first two or five years.

16    68.    Countrywide also offered "3/27" ARMs, which operate similarly to 2/28 ARMs,
17    except that the low initial rate is fixed for three rather than two years, and the interest rate then
18    adjusts for 27 rather than 28 years.

19    69.    Countrywide underwrote 2/28 and 3/27 ARMs based on the payment required
20    while the initial rate was in effect, without regard to whether the borrower could afford the loan
21    thereafter. And, like Pay Option ARMs, Countrywide's 2/28 and 3/27 ARMs typically contain
22    prepayment penalties.

23    70.    A borrower with a 2/28 ARM, like a borrower with a Pay Option ARM, is
24    subjected to steadily increasing monthly payments as well as payment shock. For example, a
25    Countrywide borrower obtained a 2/28 ARM for $570,000, with an initial rate of 8.95% for the
26    first two years. Thereafter, the interest rate was to be calculated by adding a margin of 7.95% to
27    the six-month LIBOR index. The promissory note for this 2/28 ARM provides that the interest
28    rate can never be lower 8.95% and can go as high as 15.95%. Based on the LIBOR rate that

1  applied at the time the borrower received the loan and the terms of the note governing interest
2  rate (and therefore payment) increases, the anticipated payment schedule was:

3          a.      $4,565.86 per month for two years;

4          b.      $5,141.98 per month for six months;

5          c.      $5,765.48 per month for six months; and

6          d.      payments of $6,403.01 per month or more thereafter.

7      71.    This borrower's monthly payments on this 2/28 ARM will thus increase by
8  approximately 40% just during the 12 months between the end of the second year and beginning
9  of the fourth year of the loan.

10             **(2)    5/1, 7/1, and 10/1 ARMs**

11     72.    Countrywide also offered 5/1, 7/1, and 10/1 "interest-only" loans. Marketed as
12  having "fixed" or "fixed period" interest rates, these loans carried a fixed interest rate for the first
13  5, 7, or 10 years respectively.  These loans were underwritten based on the initial fixed, interest-
14  only payment until at least the end of 2005.  However, when the fixed rate period expires, the
15  interest rate adjusts once per year and is determined by adding a margin to an index.  The
16  monthly payments dramatically increase after the interest-only period, because payments over the
17  remaining 25, 23, or 20 years are fully amortized to cover both principal and interest –

18     73.    For example, if a borrower had a 5/1 loan for $500,000 that remained constant at
19  7.5% for the life of the loan, the monthly payments during the five year interest-only period
20  would be $3,125.00.  The monthly payment would increase to approximately $3,694.96 for the
21  remaining 25 years of the loan.  If the interest rate increased to 8% over the remaining 25 years,
22  the payment would jump to $3,859.08 per month.

23     74.    Collectively, 2/28, 3/27, 5/1, 7/1, and 10/1 ARMs will be referred to herein as
24  "Hybrid ARMs."

25

26             **(3)    Countrywide's Deceptive Marketing of its Hybrid ARMs**

27     75.    Countrywide marketed Hybrid ARMs by emphasizing the low monthly payment
28  and low "fixed" initial interest rate.  Countrywide and its business partner brokers misrepresented

17
COMPLAINT

1  or obfuscated the true terms of these loans, including but not limited to misrepresenting or
2  obfuscating the amount of time that the fixed rate would be in effect, misrepresenting or
3  obfuscating the fact that the interest rates on the loans are adjustable rather than fixed, and
4  obfuscating or misrepresenting the amount by which payments could increase once the initial
5  fixed rate expired.

6      76.    Countrywide and its business partner brokers also often misrepresented or
7  obfuscated the fact that Hybrid ARMs, particularly 2/28 and 3/27 ARMs, included prepayment
8  penalties, or represented that the prepayment penalties could be waived when the borrowers
9  refinanced with Countrywide. However, most loans originated by Countrywide are sold on the
10  secondary market and, as described in paragraph 64, above, Countrywide generally cannot waive
11  the terms of loans it does not own, even when it controls the servicing.

12     77.    Countrywide and its brokers also misrepresented or obfuscated how difficult it
13  might be for borrowers to refinance Hybrid ARMs. Although borrowers often were assured that
14  they would be able to refinance, those seeking to refinance Hybrid ARMs after the expiration of
15  the initial interest-only period likely would be able to do so unless the home serving as security
16  for the mortgage had maintained or increased its value. This was particularly true for borrowers
17  whose loans have very high loan-to-value ratios, as there would be no new equity in the
18  borrowers' homes to help them pay fees and costs associated with the refinances (as well as any
19  prepayment penalties that may still apply).

20     **C.    Home Equity Lines of Credit**

21     78.    Countrywide also aggressively marketed HELOCs, particularly to borrowers who
22  had previously obtained or were in the process of obtaining a first mortgage loan from
23  Countrywide. Defendants referred to such HELOCs as "piggies" or "piggyback loans," and
24  referred to simultaneously funded first loans and HELOCs as "combo loans." The first loan
25  typically covered 80% of the appraised value of the home securing the mortgage, while the
26  HELOC covered any of the home's remaining value up to (and sometimes exceeding) 20%.
27  Thus, the HELOC and the first loan together often encumbered 100% or more of a home's
28  appraised value.

79.     Under the terms of the piggyback HELOCs, borrowers received monthly bills for interest-only payments for the first five years of the loan term (which could be extended to ten years at Countrywide's option), during which time they could also tap any unused amount of the equity line. This was called the "draw period."

80.     Because Countrywide offered HELOCs as piggybacks to Pay Option and Hybrid ARMs, 100% or more of a property's appraised value could be encumbered with loans that required interest-only payments or allowed for negative amortization.

81.     Countrywide typically urged borrowers to draw down the full line of credit when HELOCs initially funded. This allowed Countrywide to earn as much interest as possible on the HELOCs it kept in its portfolio, and helped generate the promised payment streams for HELOCs sold on the secondary market. For the borrower, however, drawing down the full line of credit at funding meant that there effectively was no "equity line" available during the draw period, as the borrower would be making interest-only payments for five years.

82.     Upon the end of the draw period, the HELOC notes generally require borrowers to repay the principal and interest in fully amortizing payments over a fifteen year period. A fully drawn HELOC was therefore functionally a 20- or 25-year closed-end mortgage. However, Countrywide did not provide borrowers with any documents or other materials to help them calculate the principal and interest payments that would be due after the draw, or interest-only, period.

83.     Countrywide HELOCs were underwritten not to the fully amortizing payment, but to the interest-only payments due during the draw period. Countrywide typically charged an early termination fee for HELOCs closed before three years, and sometimes would charge a monthly fee for HELOCs where the balance fell below a specified amount.

84.     A borrower with an interest-only or a negatively amortizing loan faces even greater payment shock if he or she also has a fully drawn HELOC. For example, a borrower with a fully drawn $100,000 HELOC at a 7.00% interest rate will have monthly interest-only payments of approximately $583.33. At the end of the draw period, the payment will increase to $898.83. This payment increase is in addition to whatever payment increase the borrower is

1  experiencing on his or her first mortgage.  This potential dual payment shock is typically
2  obfuscated from or not explained to borrowers.  Moreover, a borrower with a piggyback HELOC,
3  particularly a borrower whose first mortgage negatively amortized or allowed interest-only
4  payments, is even less likely to be able to refinance at the time of his or her payment shock
5  unless his or her home has increased in value.

6  **V.    COUNTRYWIDE EASED AND DISREGARDED UNDERWRITING
        STANDARDS IN ORDER TO INCREASE ITS MARKET SHARE**

7

8         85.    Driven by its push for market share, Countrywide did whatever it took to sell
9  more loans, faster – including by easing its underwriting criteria and disregarding the minimal
10 underwriting criteria it claimed to require.  By easing and disregarding its underwriting criteria,
11 Countrywide increased the risk that borrowers would lose their homes.  Defendants Mozilo and
12 Sambol actively pushed for easing Countrywide's underwriting standards and documentation
13 requirements, allowed the liberal granting of exceptions to those already eased standards and
14 requirements, and received reports detailing the actual underwriting characteristics and
15 performance of the loans Countrywide funded.

16      **A.    Countrywide's Low- and No-Documentation Loans**

17        86.    Traditionally, lenders required borrowers seeking mortgage loans to document
18 their income, for example by providing W-2s or tax returns, as well as assets.  Countrywide,
19 however, disregarded such documentation requirements with respect to its riskiest loan products
20 and introduced a variety of reduced or no documentation loan programs that eased and
21 quickened the loan origination process.  The vast majority of the Hybrid ARMs and nearly all of
22 the Pay Option ARMs originated by Countrywide were reduced or no documentation loans.

23        87.    As an example of one of its widespread no documentation programs, Countrywide
24 made Pay Option ARMs, Hybrid ARMs, and piggyback HELOCs, among other loans, pursuant
25 to its "Stated Income Stated Assets," or "SISA," program.  The borrower's income and assets
26 were stated but not verified.  Employment was verbally confirmed and income was supposed to
27 be roughly consistent with incomes earned in the type of job in which the borrower was

28

1    employed. Reduced documentation loans, in turn, allowed borrowers to document their income
2    through the provision of W-2 tax forms, bank statements, or verbal verification of employment.

3        88.    These low- and no-documentation programs, such as SISA, enabled Countrywide
4    to process loans more quickly and therefore to make more loans. Stated income loans also
5    encouraged the overstating of income – loan brokers and officers either overstated the borrower's
6    income without his or her knowledge, or led the borrower into overstating his or her income
7    without explaining the risk of default that the borrower would face with a loan he or she could
8    not actually afford. According to a former Countrywide loan officer, for example, a loan officer
9    might say, "with your credit score of X, for this house, and to make X payment, X is the income
10   you need to make." Many borrowers responded by agreeing that they made X amount in income.

11       89.    For stated income loans, it became standard practice for loan processors and
12   underwriters to check www.salary.com to see if a stated income was within a reasonable range,
13   with more tolerance on the upside for California salaries. Because loan officers knew about this
14   practice, they too would look at salary.com to figure out the parameters ahead of time and know
15   by how much they could overstate (or fabricate) income.

16       **B.    Countrywide's Easing of Underwriting Standards**

17       90.    Countrywide also relaxed, and often disregarded, the traditional underwriting
18   standards used to separate acceptable from unacceptable risk in order to produce more loans for
19   the secondary market. Initially, for example, a borrower had to have a credit score of ▮ for a
20   stated income loan. As the secondary market's appetite for loans increased, Countrywide relaxed
21   its guidelines so that a borrower with a credit score of ▮ could get a stated income loan with
22   100% financing.

23       91.    Underwriting standards which Countrywide relaxed included qualifying interest
24   rates (the rate used to determine whether borrowers can afford loans), loan-to-value ratios (the
25   amount of the loan(s) compared to lower of the appraised value or sale price of the property), and
26   debt-to-income ratios (the amount of borrowers' monthly income compared to their monthly
27   indebtedness).

28

21
COMPLAINT

1       92.     With respect to qualifying rates, while Countrywide offered loans with initial low
2   payments that would increase, loans were underwritten without regard to borrowers' long-term
3   financial circumstances.  Until at least the end of 2005, Countrywide underwrote and approved
4   its Hybrid ARMs based on the fixed interest rate applicable during the initial period of the loan,
5   without taking into account whether the borrowers would be able to afford the dramatically
6   higher payments that would inevitably be required during the remaining term of the loan.

7       93.     In addition, Countrywide's approach to underwriting and marketing Pay Option
8   ARMs diverged.  Countrywide underwrote Pay Option ARMs based on the assumption that
9   borrowers would not make the minimum payment and therefore not experience negative
10  amortization.  In contrast, Countrywide marketed Pay Option ARMs by emphasizing the
11  minimum payments.  Countrywide continued this underwriting practice even though it knew that
12  many of its Pay Option ARM borrowers would choose to make only the minimum monthly
13  payment and that a high percentage of such borrowers had experienced negative amortization on
14  their homes, as described in paragraph 53, above.

15      94.     Countrywide also underwrote and approved HELOCs based on the borrower's
16  ability to afford the interest-only payments during the initial period of the loan, not based on the
17  borrower's ability to afford the subsequent, fully amortized principal and interest payments.

18      95.     Countrywide eased other basic underwriting standards.  Starting in 2003, as
19  Defendants pushed to expand market share, underwriting standards and verification requirements
20  became more flexible to enable underwriters to approve loans faster.  Countrywide, for example,
21  allowed higher and higher loan-to-value ("LTV") and combined loan-to-value ("CLTV") ratios –
22  the higher the ratio, the greater the risk that a borrower will default and will be unable to
23  refinance in order to avoid default.  Similarly, Countrywide approved loans with higher and
24  higher debt-to-income ("DTI") ratios – the higher ratio, the greater the risk the borrower will
25  have cash-flow problems and miss mortgage payments.

26      **C.**     **Countrywide's "Exception" Underwriting Compromised Standards**

27      96.     Countrywide approved loans that it knew to be high risk, and therefore highly
28  likely to end up in default, by ignoring its own minimal underwriting guidelines.  Based on the

1    proposed loan terms and the borrower's financial and credit information, Countrywide's

2    computerized underwriting system ("CLUES") issued a loan analysis report that rated the

3    consumer's credit and ability to repay the loan, and also indicated whether a proposed loan was

4    in compliance with Countrywide's underwriting guidelines. Based on this analysis, the CLUES

5    report would recommend that the loan be approved, the loan be declined, or that the loan be

6    "referred" to manual underwriting. CLUES, for example, might flag a "rule violation" if the

7    borrower's LTV, CLTV or credit score fell outside the guidelines for a given loan product. In

8    such instances, CLUES would make a recommendation to "refer" the loan for further analysis by

9    a Countrywide underwriter.

10       97.   The CLUES result was only a recommendation, not a final decision. The role of

11    the underwriter was basically to verify information and ultimately decide whether to approve a

12    loan based on Countrywide's underwriting criteria. Underwriters could overcome potential rule

13    violations or other underwriting issues flagged by CLUES by adding on "compensating factors,"

14    such as letters from the borrower that addressed a low FICO score or provided explanations

15    regarding a bankruptcy, judgment lien, or other issues affecting credit status.

16       98.   Underwriters were under intense pressure to process and fund as many loans as

17    possible. They were expected to process 60 to 70 loans per day, making careful consideration of

18    borrowers' financial circumstances and the suitability of the loan product for them nearly

19    impossible.

20       99.   As the pressure to produce loans increased, underwriters, their superiors, branch

21    managers, and regional vice presidents were given the authority to grant exceptions to

22    Countrywide's minimal underwriting standards and to change the terms of a loan suggested by

23    CLUES. Even if CLUES had recommended denying a loan, the underwriter could override that

24    denial if he or she obtained approval from his or her supervisor.

25       100.   Because of the intense pressure to produce loans, underwriters increasingly had to

26    justify why they were not approving a loan or granting an exception for unmet underwriting

27    criteria to their supervisors, as well as to dissatisfied loan officers and branch managers who

28    earned commissions based on loan volume. Any number of Countrywide managerial employees

1  could override an underwriter's decision to decline a loan and request an exception to an
2  underwriting standard. Countrywide employees also could submit a request for an exception to
3  Countrywide's Structured Loan Desk in Plano, Texas, a department specifically set up by
4  Countrywide, at the direction of defendants Mozilo and Sambol, to grant underwriting
5  exceptions. According to a former employee, in 2006, 15,000 to 20,000 loans a month were
6  processed through the Structured Loan Desk.

7       101.   Countrywide granted exceptions liberally, further diluting its already minimal
8  underwriting standards for making loans. Countrywide granted exception requests in a variety of
9  circumstances where one or more basic underwriting criteria of the borrower did not meet loan
10  product guidelines, including, for example, LTV or CLTV, loan amount and credit score.
11  Countrywide placed borrowers in risky loans such as Hybrid and Pay Option ARMs, based on
12  stated but not verified income and assets, and then overlooked its few remaining underwriting
13  indicia of risk.

14       102.   To attract more business Countrywide promoted its relaxed underwriting
15  standards and ready grant of exceptions to brokers. For example, Countrywide promoted
16  "Unsurpassed Product Choices and Flexible Guidelines," including (a) "100% financing for
17  purchase or refinancing" loans; (b) "80/20 combo loans for stated Self-Employed and Non Self-
18  Employed;" (c) "Stated Self-Employed and Non Self-Employed loan programs with as low as a
19  500 credit score." Countrywide stated that its "Specialty Lending Group's experienced and
20  knowledgeable loan experts are empowered to review all loan packages, make sound credit
21  decisions and provide quality lending solutions - yes, even for 'hard to close' loans."

22       **D.   Countrywide's Risk-Layering and Pressure to Sell "Piggyback" Loans
23            Further Loosened Underwriting Practices**

24       103.   Countrywide compromised its underwriting standards even further by risk
25  layering, i.e., combining high risk loans with one or more relaxed underwriting standards.
26  Countrywide was well aware that layered risk created a greater likelihood that borrowers would
27  lose their homes.

28       104.   As early as January 2005, Countrywide identified the following borrower/loan

1   characteristics as having a negative impact on the underwriting evaluation process: ███████

2   ██████████████████████████████████████████████████████

3   ██████████████████████████████████████████

4   ████████████████████████████. [Redacted description of risk factors

5   identified by Countrywide.]

6       105.    Nonetheless, Countrywide combined these very risk factors in the loans it

7   promoted to borrowers. Countrywide introduced, for example, loan programs that allowed for

8   higher LTVs/CLTVs, less documentation and lower credit scores. A high risk loan such as a Pay

9   Option ARM could be sold to borrowers with increasingly lower credit scores. In addition, by

10   accepting higher DTI ratios and combining Pay Option ARMs with second mortgages that

11   allowed borrowers to finance a down payment, Countrywide would qualify borrowers with fewer

12   financial resources, and hence a higher likelihood of default.

13       106.    With a second or "piggyback" mortgage, the borrower could get a first loan for

14   80% of the purchase price (i.e., an 80% LTV) and a second loan for 20% of the purchase price (a

15   20% LTV), for a combined loan-to-value ratio of 100%. This allowed the borrower to finance a

16   down payment and also avoid paying mortgage insurance (which typically is required if the LTV

17   on a first loan exceeds 80%). Such loans obviously were risky as the borrower had contributed

18   no funds whatsoever to the loan and, if the loan required no documentation, had only stated his or

19   her income and assets.

20       107.    The following examples describe risk layering and underwriting exceptions

21   granted to several California borrowers to whom Countrywide sold Hybrid or Pay Option ARMs.

22   These examples represent only a small percentage of the large number of California residents

23   who are likely facing foreclosure due to Countrywide's widespread practice of risk-layering.

24       a.     A Countrywide loan officer convinced a borrower to take a Pay Option

25      ARM with a 1-month teaser rate and a 3-year prepayment penalty, plus a full-draw

26      piggyback HELOC, based on the loan officer's representation that the value of the

27      borrower's home would continue to rise and he would have no problem refinancing. The

28      borrower's DTI was ██% and FICO was ██. An exception was granted for ████

<div align="center">25<br>COMPLAINT</div>

1

2

3

4

5

6                               . The loan closed in January 2006, and a Notice of Default issued in

7 June 2007.  [Redacted example of underwriting exception approved by Countrywide.]

8           b.      The CLUES report issued for a loan applicant in February 2005 stated that

9

10

11

12

13

14

15                           . [Redacted example of underwriting exception approved by

16 Countrywide.]

17          c.

18

19

20

21

22

23                          . [Redacted example of underwriting exception approved

24 by Countrywide.]

25 **VI.**  **COUNTRYWIDE ENGAGED IN DECEPTIVE MARKETING PRACTICES TO SELL INCREASING NUMBERS OF LOANS**

26

27

28

108.    Driven by its push for market share, Countrywide did whatever it took to sell more loans, faster – including by engaging in a number of deceptive marketing practices under the direction and with the ratification of defendants Mozilo and Sambol.

**A.    Countrywide Deceptively Lulled Borrowers Into Believing That it Was a "Trusted Advisor" Looking Out for the Borrowers' Best Interests**

109.    Countrywide sought to induce borrowers into believing that it was looking out for their best interest through various types of solicitations. Countrywide published television, radio, and print advertisements, for example, touting itself as "the company you can trust" and urging consumers to "join the millions of homeowners who have trusted Countrywide." Countrywide capitalized on its status as the "number one mortgage lender" and claimed that it was a mortgage loan expert capable of advising customers. For example, Countrywide claimed that it "had years to perfect [its] craft" and offered "industry leading expertise" and that "[w]ith over 35 years of service and one of the widest selections of loan programs, [it] is an expert at finding solutions for all kinds of situations." As another example, Countrywide offered "consultation[s] with our home loan experts" and claimed it "would go the distance with you to help secure a loan program to fit your financial needs and goals."

110.    Countrywide also engaged in extensive solicitation campaigns aimed at those borrowers it was easiest for it to find – existing Countrywide customers. Countrywide targeted existing customers with tailored letters and e-mail solicitations, creating the impression that it was a mortgage expert that advised its borrowers, at no cost, regarding the financial mortgage options that were in their best interest. For example, Countrywide took advantage of Pay Option ARM customers' worries regarding potential future "steep payment adjustments," by sending them a "special invitation" to talk with "specially-trained consultants" regarding "your current financial situation, at no charge, to see if refinancing may help put you in a better financial position."

111.    Countrywide also created an annual "anniversary" campaign, by sending letters and e-mails to existing customers offering a "free Anniversary Loan Review," which it touted as a "home loan analysis" with an "experienced Loan Consultant." Countrywide advertised itself in

1   these solicitations as, for example, an "expert at finding solutions" and "smart financial options"

2   that would best suit borrowers' financial needs.

3          112.    Countrywide operated an extensive telemarketing operation, aimed both at new

4   potential customers and existing Countrywide customers, in which it touted its expertise and

5   claimed to find the best financial options for its customers.  For example, Countrywide instructed

6   its Full Spectrum loan officers to memorize a script that instructed them to "build rapport" and

7   "gain trust" in conversations with potential customers, and to do so with existing customers by

8   "positioning" telephone calls, the true purpose of which was to sell refinance loans, as "Customer

9   Service loan check-up[s]." On these calls, loan officers were instructed to ███████████████

10  ████████████████████████████████████████████████████████████

11  ████████████████████████████████████████.  [Redacted description

12  of marketing training for loan officers.] Countrywide instructed FSLD loan officers to state, for

13  example, "I'm an experienced mortgage lending professional specializing in helping people

14  improve their financial situation." Countrywide even instructed loan officers to offer to provide

15  advice on other lender's mortgage loans and to tell potential customers, that "even if you're

16  working with someone else and just want a second opinion – mortgages can be very complicated.

17  I'm here for that."

18         113.    In addition, when handling initial calls from prospective customers, for example,

19  Countrywide instructed its FSLD loan officers to ████████████████████

20  ████████████████████████████████████████████████████████████

21  ████████████████████████████████████████████████

22  ████████████████████████████████.  [Redacted description of marketing

23  training for loan officers.]  Contrary to the kinds of representations described in this paragraph

24  and paragraphs 109 through 112, above, Countrywide often did not sell borrowers loans that

25  were in their best interest.

26

27

28         B.      Countrywide Encouraged Serial Refinancing

1    114.   In order to constantly produce more loans for sale to the secondary market,

2    Countrywide aggressively marketed refinance loans to those homeowners it had no trouble

3    finding -- Countrywide customers.  Countrywide misled these borrowers regarding the benefits of

4    refinancing, including by using the deceptive marketing practices described in paragraphs 119

5    through 128 below.  In addition, Countrywide created a perpetual market for its refinance loans

6    by selling Pay Option and Hybrid ARMs that borrowers would have to refinance in order to

7    avoid payment shock.  Countrywide knew that borrowers who could not afford the inevitable

8    payment increase on such loans and who were unable to refinance would be at great risk of losing

9    their homes.

10    115.   Countrywide provided lists of existing customers to its loan officers responsible

11    for outbound marketing.  Defendants' loan officers hounded Countrywide customers by phone,

12    mail, and electronic mail with refinance loan offers.  For example, ▆▆▆▆▆▆▆▆▆▆▆

13    ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

14    ▆▆▆▆  [Redacted description of Countrywide's marketing plans for soliciting existing

15    Countrywide customers to refinance.]  FSLD "leads" – telephone numbers for existing, eligible

16    customers – were uploaded into a telemarketing database on a weekly basis.

17    116.   Countrywide even solicited customers who were having trouble making payments

18    or facing foreclosure, without regard to the risk that the customer would default on Pay Option

19    and Hybrid ARM refinance loans.  FSLD solicited existing prime customers who had "recurring"

20    missed payments.  Countrywide required its customer service representatives to market refinance

21    loans to borrowers who called with questions, including borrowers who were behind on their

22    monthly payments or facing foreclosure.

23    117.   Countrywide  also solicited existing customers on other occasions, including on

24    their annual loan "anniversaries" (see paragraph 111, above) and shortly before a rate or payment

25    was to reset on Pay Option or Hybrid ARMs, without regard to whether the loan had a

26    prepayment penalty period that had not yet expired.  In doing so, the Countrywide Defendants

27    refinanced borrowers while the prepayment penalty on their prior Countrywide loan was still in

28    effect, often concealing the existence of the prepayment penalty.

1    118.   Countrywide claims that approximately 60% of FSLD's business has been

2    comprised of refinancing Countrywide loans.

3          C.    **Countrywide Misled Borrowers About the True Terms of Pay Option and**
              **Hybrid ARM Loans by Focusing the Borrowers' Attention on Low**
4             **Beginning Payments and Teaser Rates**

5    119.   Because Pay Option ARM and Hybrid ARMs start with lower monthly payments

6    and interest rates than most other types of loan products, and given their complex nature,

7    Countrywide was able to easily sell such loans to borrowers by focusing on the initial low

8    monthly payments and/or rates and by obscuring or misrepresenting the true risks of such loans.

9    120.   With respect to Pay Option ARMs, the crux of Countrywide's sales approach was

10   to "sell the payment." When presenting a borrower with various loan options, for example,

11   Countrywide would "sell the payment" by showing the borrower the minimum monthly

12   payments for the Pay Option ARM in comparison to other loan products with larger payments.

13   Then, Countrywide would ask which payment the borrower preferred without discussing other

14   differences between the loan products. Naturally, in this situation, most borrowers chose the

15   option with the lowest payment, the Pay Option ARM, without realizing that the payment would

16   last for only a short time before it would begin to increase.

17   121.   If, instead, Countrywide presented the Pay Option ARM as the only option, it

18   would "sell the payment" by emphasizing the low minimum payment and how much the

19   borrower would "save" every month by making such a low payment, without discussing the

20   payment shock and negative amortization that inevitably result when borrowers make minimum

21   payments. Given the complexity of Pay Option ARMs, such a presentation easily misled

22   borrowers regarding the long-term affordability of their loans.

23   122.   Countrywide also represented that the initial monthly payment would last for the

24   entire term of the loan, or for some period longer than that provided for by the loan's terms.

25   123.   Countrywide engaged in similar deceptive representations with respect to Hybrid

26   ARMs. For example, Countrywide focused its sales presentation on the interest-only payments

27   during the initial fixed-rate period, i.e. the 2-year period on a 2/28 ARM or the 3-year period on a

28   3/27 ARM, not on how the payment would adjust to include both principal and interest after the

1  initial fixed-rate period. It also represented that the payments would last for the entire term of the
2  loan, or for some period longer than that provided for by the loan's terms.

3      124.    When selling Pay Option and Hybrid ARMs, Countrywide engaged in another
4  deceptive practice -- rather than selling the payment, it would sell the rate. Countrywide either
5  focused exclusively on the initial one-month, two-year, or three-year "fixed" interest rate, for
6  example, without discussing that the rate would reset after the initial period to a potentially much
7  higher rate, or it represented that the initial interest rate would last for a much longer period than
8  it actually did or for the entire term of the loan.

9      125    Countrywide's letter and e-mail solicitations, as well as telemarketing calls, also
10  focused borrowers' attention on short-term low monthly payments. FSLD loan officers, for
11  example, were required to memorize scripts that marketed low monthly payments by focusing (a)
12  on the potential customer's dissatisfaction with his or her current monthly payments under his or
13  her current mortgage loan and/or (b) on so-called "savings" that result from minimum monthly
14  payments. As just one of many potential examples, to overcome a borrower's claim that he or
15  she already has a loan with a low interest rate, Countrywide required FSLD loan officers to
16  memorize the following response: "I certainly understand how important that is to you. But let
17  me ask you something . . . . Which would you rather have, a long-term fixed payment, or a short-
18  term one that may allow you to realize several hundred dollars a month in savings? I am able to
19  help many of my clients lower their monthly payments and it only takes a few minutes over the
20  phone to get started." What the FSLD loan officer did not state was that the borrowers would, in
21  fact, not save money because the payment on the new loan would ultimately exceed the payment
22  on the borrower's current loan.

23      126.    Borrowers subjected to any of the deceptive marketing practices described above
24  would not understand the true risks and likely unaffordability of their Pay Option or Hybrid
25  ARMs. Many borrowers did not read their loan documents and disclosures before signing.
26  Countrywide often made borrowers sign a large stack of documents without providing the
27  borrower with time to read them. Other borrowers were unable to read English. And, given the
28

1    complexity of Pay Option and Hybrid ARMs, many borrowers who managed to read their loan
2    documents did not understand the terms of the loans they were being sold.

3          127.   As a result, many borrowers who obtained Pay Option and Hybrid ARMs did not
4    understand that their initial monthly payment would at some point "explode," that their initial
5    interest rate would increase and become adjustable, or that the principal amount of their loans
6    could actually increase.   Countrywide received numerous complaints regarding these practices
7    from consumers, including over ▮▮▮▮ complaints per year handled by the ▮▮▮▮▮▮▮▮▮▮▮▮
8    alone between approximately January 2005 and August 2007.   Many borrowers complained that
9    they did not understand the terms of their Pay Option and Hybrid ARMs, including the potential
10   magnitude of changes to their monthly payments, interest rates, or loan balances.   Many
11   borrowers also complained that Countrywide's loan officers either did not tell them about the
12   payment or rate increases on such loans or promised that they would have fixed-rate, fixed
13   payment loans, rather than adjustable rate mortgage loans with increasing payments.

14         128.   Despite these complaints, Defendants did not alter their deceptive marketing
15   practices and did not address the hardship created by their practice of making Pay Option and
16   Hybrid ARMs with little or no regard to affordability.   Defendants cared only about doing
17   whatever it took to sell increasing numbers of loans.

18         **D.     Countrywide Misled Borrowers About their Ability to Refinance Before The
19                  Rates or Payments on Their Pay Option and Hybrid ARMs Increased**

20         129.   If a borrower was able to figure out that he or she had obtained a Pay Option or
21   Hybrid ARM *before* signing the loan documents, he or she may still have been misled by
22   Countrywide in another way -- Countrywide's loan officers often overcame borrower concerns
23   about exploding monthly payments or increasing interest rates by promising that they would be
24   able to refinance with Countrywide into a loan with more affordable terms before the payments
25   or rate reset.

26         130.   Countrywide often represented that the value of a borrower's home would
27   increase, thus creating enough equity to obtain a loan with better terms.   However, borrowers
28   with interest-only or negatively amortizing loans that encumbered as much as, if not more than,

1    100% of their home's appraised value, were highly unlikely to be able to refinance into another
2    loan if their home did not increase in value. Additionally, any consumers who sought to
3    refinance a Countrywide mortgage would likely incur a substantial prepayment penalty, thus
4    limiting their ability to obtain a more favorable loan.

5        131.    Countrywide loan officers often misrepresented or obfuscated the fact that a
6    borrower's loan had a prepayment penalty or misrepresented that a prepayment penalty could be
7    waived. Countrywide also promised borrowers that they would have no problem refinancing
8    their Pay Option or Hybrid ARMs, when in fact they might have difficulty refinancing due to the
9    existence of prepayment penalties. Prepayment penalties on Pay Option and Hybrid ARMs
10   essentially prevent many borrowers from refinancing such unaffordable loans before their
11   payments explode or rates reset.

12       132.    Countrywide received numerous complaints from borrowers who claimed that
13   they had not been told about the prepayment penalty or that the loan officer promised they would
14   not have one. Again, despite receiving such complaints, Defendants turned a blind eye to
15   deceptive marketing practices regarding prepayment penalties and the resulting adverse financial
16   consequences to borrowers.

17       **E.    Countrywide Misled Borrowers About the Cost of Reduced and No**
18               **Document Loans**

19       133.    Countrywide touted its low documentation requirements, urging borrowers to get
20   "fastrack" loans so that they could get cash more quickly. However, many borrowers who
21   obtained these loans possessed sufficient documentation to qualify for full document mortgages,
22   and some submitted that documentation to their loan officer or to one of Countrywide's business
23   partner brokers. In emphasizing the ease, speed and availability of reduced or no document
24   loans, Countrywide and its brokers concealed the fact that borrowers could qualify for a lower
25   rate or reduced fees if they elected to apply for a mortgage by fully documenting their income
26   and assets.

27       **F.    Countrywide Misled Borrowers Regarding the Terms of HELOCs**
28

134.    Countrywide misrepresented the terms of HELOCs, including without limitation by failing to inform the borrower that he or she would not have access to additional credit because he or she was receiving a full draw or that the monthly payment on the HELOC was interest-only and the borrower therefore would not be able to draw additional funds on the HELOC at a later date.

135.    Countrywide also misrepresented or obfuscated the payment shock that borrowers would experience after the interest-only payment period on the HELOCs ended. Countrywide's Call Center received large numbers of calls from borrowers complaining that they did not understand that the payments on their full-draw HELOCs would only cover interest, or that the interest rates on their HELOCs would adjust and increase.

## VII. IN ORDER TO INCREASE MARKET SHARE, DEFENDANTS CREATED A HIGH-PRESSURE SALES ENVIRONMENT WHERE EMPLOYEES WERE REWARDED FOR SELLING AS MANY LOANS AS THEY COULD, WITHOUT REGARD TO BORROWERS' ABILITY TO REPAY

136.    Despite touting itself as a lender that cared about its borrowers, Countrywide was, in essence, a mass production loan factory set up to produce an ever-increasing stream of loans without regard to borrowers' ability to repay their loans and sustain homeownership. In order to provide an endless supply of loans for sale to the secondary market, Defendants pressured Countywide employees involved in the sale and processing of loans to produce as many loans as possible, as quickly as possible, and at the highest prices.

137.    Defendants created this pressure through a compensation system, which predictably led employees to disregard Countrywide's minimal underwriting guidelines and to originate loans without regard to their sustainability. Countrywide's compensation system also motivated its loan officers to engage in the deceptive marketing practices described in the preceding sections.

138.    Defendants incentivized managers to place intense pressure on the employees they supervised to sell as many loans as possible, as quickly as possible, at the highest prices possible. Branch managers received commissions or bonuses based on the net profits and loan volume generated by their branches. In most circumstances, however, branch managers were eligible for

1    such commissions or bonuses only if █████████████████████████████████████

2    ██████████████████. [Redacted descriptions regarding minimum requirements for commission

3    or bonus eligibility.]  Branch managers were also rewarded for meeting production goals set by

4    corporate management, ████████████████████████████████████████████████

5    ███████████████████████████████████ – or penalized for failing to do so.

6    [Redacted description of the criteria Countrywide used to adjust branch managers' commissions

7    or bonuses.]

8.            139.    Countrywide provided branch managers with access to computer applications and

9    databases that allowed them to monitor loan sales on a daily basis and pressure employees to

10   "sell, sell, sell." A branch manager could input the type of loan (such as a Pay Option ARM), ██

11   ████████████████████████████████████████████████████████████████████

12   ████████████████████████████████████ and determine what price a

13   borrower would pay for that loan, as well as the amount of profit the loan would likely generate

14   for the branch.  Branch managers could also monitor their branches' loan sales performance by

15   tracking loans that were in the process of being underwritten and the prices and characteristics of

16   loans sold by the branch and by particular loan officers, during any specified time period.

17           140.    With such tools available, Countrywide's branch managers were able to

18   constantly pressure loan officers, loan processors, and underwriters to do their part in increasing

19   loan production – by hunting down more borrowers, selling more loans, and processing loans as

20   quickly as possible, thereby boosting loan production, branch profits, and branch manager

21   commissions and bonuses.  This high-pressure sales environment invited deceptive sales

22   practices and created incentives for retail branch managers, other managers, loan officers, loan

23   specialists, and underwriters to jam loans through underwriting without regard to borrower

24   ability to repay.

25           141.    Countrywide created additional pressure to engage in deceptive marketing

26   practices and sell loans without regard to their sustainability by paying its loan officers and

27   managers a modest base salary that could be supplemented by commissions or bonuses.  In most

28

1  circumstances, the employees were eligible to receive these commissions or bonuses only if they,

2  or the employees they supervised, sold a minimum number or dollar volume of loans.

3      142.    Not only did this compensation system create incentives for employees to sell as

4  many loans as possible, as quickly as possible, it also created incentives for retail employees to

5  steer borrowers into riskier loans.  For example, Countrywide paid greater commissions and

6  bonuses to CMD managers and loan officers for selling ▌▌▌▌▌▌▌▌

7  ▌▌▌▌▌▌▌▌▌▌▌▌.  [Redacted description of loan products.]

8  Countrywide also paid greater commissions and bonuses to FSLD managers and loan officers for

9  ▌▌▌▌▌▌▌▌▌.  [Redacted description of loan products.]

10      143.    Countrywide's compensation system also created incentives for wholesale loan

11  officers to steer brokers and their clients into riskier loans.  Countrywide's wholesale loan

12  officers worked one-on-one with "business partner" brokers approved by Countrywide.  The loan

13  officers cultivated relationships with brokers in order to persuade them to bring their business to

14  Countrywide and, in particular, to work with a particular loan officer so that he or she, and his or

15  her managers, could earn greater commissions.  ▌▌▌▌▌▌▌▌

16  ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌

17  ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌

18  ▌▌▌▌▌▌▌▌▌▌▌▌▌▌

19  ▌▌▌▌▌▌▌▌▌▌▌▌▌

20  ▌.  [Redacted description of compensation paid by Countrywide for the sale of particular loan

21  products.]

22      144.    Countrywide's compensation system also rewarded employees for selling ▌▌

23  ▌▌▌▌▌▌▌▌▌▌▌▌▌

24  ▌▌▌▌▌▌▌▌▌▌▌▌▌▌

25  ▌▌▌▌▌▌▌▌▌▌▌▌▌▌

26  ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌

27  ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌

28

1    ██████ . [Redacted description of compensation paid by Countrywide for the sale of

2    particular loan products.]

3          145.    Countrywide's high-pressure sales environment and compensation system

4    encouraged serial refinancing of Countrywide loans. The retail compensation systems created

5    incentives for loan officers to churn the loans of borrowers to whom they had previously sold

6    loans, without regard to a borrower's ability to repay, and with the consequence of draining

7    equity from borrowers' homes. Although Countrywide maintained a policy that discouraged loan

8    officers from refinancing Countrywide loans within a short time period after the original loan

9    funded (Countrywide often changed this time period, which was as low as ████ months for some

10   loan products), loan officers boosted their loan sales by targeting the easiest group of potential

11   borrowers to locate – Countrywide borrowers – as soon as that period expired.

12         146.    Countrywide management at all levels pressured the employees below them to sell

13   and approve more loans, at the highest prices, as quickly as possible, in order to maximize

14   Countrywide's profits on the secondary market. Defendant Sambol, for example, monitored

15   Countrywide's loan production numbers and pressured employees involved in selling loans or

16   supervising them to produce an ever-increasing numbers of loans, faster. Regional vice

17   presidents pressured branch managers to increase their branches' loan numbers. Branch

18   managers pressured loan officers to produce more loans, faster, and often set their own branch-

19   level production quotas.

20         147.    Underwriters were also pressured to approve greater numbers of loans quickly and

21   to overlook underwriting guidelines while doing so. Defendant Sambol pressured underwriters

22   to increase their loan production and to increase approval rates by relaxing underwriting criteria.

23   Regional operations vice presidents, branch operations managers, branch managers, and loan

24   officers all pressured underwriters to rush loan approvals. Countrywide required underwriters to

25   meet loan processing quotas and paid bonuses to underwriters who exceeded them.

26         148.    Customer service representatives at Countrywide's Call Center also were expected

27   to achieve quotas and received bonuses for exceeding them. Countrywide required service

28   representatives to complete calls in three minutes or less, and to complete as many as sixty-five

1  to eighty-five calls per day. Although three minutes is not sufficient time to assist the confused

2  or distressed borrowers who contacted them, Countrywide required service representatives to

3  market refinance loans or piggyback HELOCs to borrowers who called with questions --

4  including borrowers who were behind on their monthly payments or facing foreclosure. Using a

5  script, the service representatives were required to pitch the loan and transfer the caller to the

6  appropriate Countrywide division. Service representatives also received bonuses for loans that

7  were so referred and funded.

8       149.   Countrywide employees from senior management down to branch managers

9  pressured the employees below them to sell certain kinds of products. Regional vice presidents,

10  area managers, and branch managers pushed loan officers to sell Pay Option ARMs, piggyback

11  HELOCs, and loans with prepayment penalties, primarily because such loans boosted branch

12  profits, manager commissions, and Countrywide's profits on the secondary market.

13      150.   If any of these employees, including branch managers, loan officers, loan

14  processors, underwriters, and customer service representatives, failed to produce the numbers

15  expected, Countrywide terminated their employment.

16  **VIII. AS PART OF ITS DECEPTIVE SCHEME, COUNTRYWIDE COMPENSATED
        ITS BUSINESS PARTNER BROKERS AT A HIGHER RATE FOR MORE
17      PROFITABLE LOANS, WITHOUT CONSIDERATION OF SERVICES
        ACTUALLY PROVIDED BY THE BROKERS**

18
19      151.   In California, a mortgage broker owes his or her client a fiduciary duty. A
20  mortgage broker is customarily retained by a borrower to act as the borrower's agent in
21  negotiating an acceptable loan. All persons engaged in this business in California are required to
22  obtain real estate licenses and to comply with statutory requirements. Among other things, the
23  mortgage broker has an obligation to make a full and accurate disclosure of the terms of a loan to
24  borrowers, particularly those that might affect the borrower's decision, and to act always in the
25  utmost good faith toward the borrower and to refrain from obtaining any advantage over the
26  borrower.

27      152.   Countrywide paid brokers compensation in the form of yield spread premiums or

28  rebates to induce brokers to place borrowers in loans that would earn Countrywide the greatest

1 profit on the secondary market, regardless of whether the loans were in the best interest of, or

2 appropriate for, the borrowers. In fact, the mortgages that earned Countrywide the highest profit,

3 and therefore would pay the highest rebates or yield spread premiums to brokers, often were not

4 in the best interest of the borrower.

5       153.    For example, Countrywide paid a yield spread premium to brokers if a loan was

6 made at a higher interest rate than the rate for which the borrower qualified and without regard

7 for the services actually provided by the broker. Countrywide paid a rebate to a broker if he or

8 she originated or negotiated a loan that included a prepayment penalty. A three-year prepayment

9 penalty resulted in a higher rebate to the broker than a one-year prepayment penalty.

10 Countrywide would pay this higher rebate even in instances where the loan did not include a

11 provision, such as a more favorable origination fee or interest rate, to counterbalance the

12 prepayment penalty, and where brokers did not perform any additional services in connection

13 with the loan.

14       154.    Countrywide also would pay rebates in exchange for a broker providing an

15 adjustable rate loan with a high margin (the amount added to the index to determine the interest

16 rate). Countrywide would provide an additional rebate to brokers if they were able to induce a

17 borrower to obtain a line of credit.

18       155.    Countrywide accepted loans from brokers in which the broker earned up to █

19 points (i.e., █ percent of the amount of the loan), whether in origination fees, rebates, or yield

20 spread premiums. This high level of compensation was well in excess of the industry norm and

21 encouraged brokers to sell Countrywide loans without regard to whether the loans were in their

22 clients' best interest. In addition, the compensation paid by Countrywide to brokers was well in

23 excess of, and not reasonably related to, the value of the brokerage services performed by

24 Countrywide's business partner brokers.

25       156.    In order to maximize their compensation from Countrywide, brokers misled

26 borrowers about the true terms of Pay Option and Hybrid ARMs, misled borrowers about their

27 ability to refinance before the rates or payments on their loans increased, misled borrowers about

28 the cost of reduced and no document loans, and misled borrowers regarding the terms of

1  HELOCs by engaging in the same kinds of deceptive practices alleged at paragraphs 58 through

2  64, 75 through 77, 108 through 117, and 119 through 135 above.

3      157.    Borrowers often did not realize that their loans contained terms that were

4  unfavorable to them and provided greater compensation to their brokers specifically as payment

5  for those unfavorable terms.  An origination fee or other charges imposed by a broker are either

6  paid by the borrower or financed as part of the loan.  In contrast, rebates and yield spread

7  premiums are not part of the principal of the loan and instead are paid separately by Countrywide

8  to the broker.  Documentation provided to the borrower might indicate, at most, that a yield

9  spread premium or rebate was paid outside of closing (often delineated as "p.o.c." or "ysp poc"),

10  with no indication that the payment constituted compensation from Countrywide to the broker for

11  placing the borrower in a loan with terms that were not in the borrower's best interest, such as a

12  higher interest rate or lengthier prepayment penalty.

13      158.    Countrywide closely monitored and controlled the brokers with whom it worked.

14  Countrywide required brokers it accepted as "business partners" to cooperate and provide all

15  information, documents and reports it requested so that Countrywide could conduct a review of

16  the broker and its operations.  In addition, Countrywide required the broker to warrant and

17  represent that all loans were closed using documents either prepared or expressly approved by

18  Countrywide.

19  **IX.  AS A RESULT OF DEFENDANTS' DECEPTIVE SCHEME, THOUSANDS OF
20      CALIFORNIA HOMEOWNERS HAVE EITHER LOST THEIR HOMES OR
        FACE FORECLOSURE AS THE RATES ON THEIR ADJUSTABLE RATE
21      MORTGAGES RESET**

22      159.    Due to Countrywide's lack of meaningful underwriting guidelines and risk-

23  layering, Countrywide's deceptive sales tactics, Countrywide's high-pressure sales environment,

24  and the complex nature of its Pay Option and Hybrid ARMs, a large number of Countrywide

25  loans have ended in default and foreclosure, or are headed in that direction.  Many of its

26  borrowers have lost their homes, or are facing foreclosure, because they cannot afford the

27  payment shock and their properties are too heavily encumbered for them to be able to refinance

28  and pay prepayment penalties.

1       160.    The national pace of foreclosures is skyrocketing. In the month of May 2008,

2 approximately 20,000 Californians lost their homes to foreclosure, and approximately 72,000

3 California homes (roughly 1 out of 183 homes) were in default. This represented an 81%

4 increase from May 2007, at which point the rate was roughly 1 out of every 308 households,

5 while the May 2007 rate represented a 350% increase from May 2006.

6       161.    Countrywide mortgages account for a large percentage of these delinquencies and

7 foreclosures. Countrywide's 10-K filed in February, 2008, estimated that as of December 31,

8 2007, a staggering 27.29% of its non-prime mortgages were delinquent. As of that date,

9 approximately 26% of Countrywide's loans were secured by properties located in California.

10       162.    These numbers have only worsened. As of April, 2008, ▓▓▓% of the mortgages

11 owned by Countrywide Home Loans were in some stage of delinquency or foreclosure, including

12 ▓▓▓% of originated non-prime loans, and ▓▓▓% of Pay Option ARMs.

13       163.    In January and March, 2008, Countrywide recorded ▓▓▓ notices of default in

14 Alameda, Fresno, Riverside, and San Diego counties alone. Those ▓▓▓ notices of default

15 represented an aggregate total of delinquent principal and interest of more than ▓▓▓▓▓▓

16 dollars. An October 2007 report prepared by Credit Suisse estimated that Countrywide's

17 delinquency and foreclosure rates are likely to double over the next two years.

18       164.    This may well understate the extent of the crisis facing California homeowners

19 with Countrywide mortgages, as more and more Pay Option ARMs go into delinquency.

20 Approximately 60% of all Pay Option ARMs (made by any lender) were made in California, and

21 many of these were made by Countrywide. Once the thousands of Pay Option ARMs sold by

22 Countrywide to California borrowers reach their negative amortization cap or otherwise reset to

23 require fully indexed principal and interest payments, which will occur over the next two years

24 for many such loans made between 2003 and 2006, the number of such loans in default is likely

25 to skyrocket even above their current high delinquency rate.

26

27

28

**FIRST CAUSE OF ACTION AGAINST ALL DEFENDANTS**

**VIOLATIONS OF BUSINESS AND PROFESSIONS CODE SECTION 17500**

**(UNTRUE OR MISLEADING STATEMENTS)**

165.    The People reallege and incorporate by reference all paragraphs above, as though fully set forth in this cause of action.

166.    Defendants have violated and continue to violate Business and Professions Code section 17500 by making or disseminating untrue or misleading statements, or by causing untrue or misleading statements to be made or disseminated, in or from California, with the intent to induce members of the public to enter into mortgage loan or home equity line of credit transactions secured by their primary residences.  These untrue and misleading statements include but are not necessarily limited to:

        a.    Statements that Countrywide was a mortgage loan expert that could be trusted to help borrowers obtain mortgage loans that were appropriate to their financial circumstances, as described in paragraphs 109 through 113, above;

        b.    Statements regarding the terms and payment obligations of Pay Option ARMs offered by Countrywide, including statements that the initial payment rate was the interest rate, statements regarding the duration of the initial payment, statements regarding the duration of the initial interest rate, and statements obfuscating the risks associated with such mortgage loans, as described in paragraphs 58 through 64, 119 through 122, and 124 through 128, above;

        c.    Statements regarding the terms and payment obligations of Hybrid ARMs offered by Countrywide, including statements regarding the duration of the initial interest-only payment, statements regarding the duration of the initial interest rate, and statements obfuscating the risks associated with such mortgage loans, as described in paragraphs 75 through 77, 119, and 123 through 128, above;

        d.    Statements regarding the terms and payment obligations of HELOCs, as described in paragraphs 134 through 135, above; and

e.      Statements that borrowers with Pay Option and Hybrid ARMs offered by Countrywide would be able to refinance the mortgage loans before the interest rates reset, when in fact they most likely could not, as described in paragraphs 62, 76, 77, and 129 through 132, above;

f.      Statements regarding prepayment penalties on Pay Option and Hybrid ARMs offered by Countrywide, including statements that the mortgage loans did not have prepayment penalties, when in fact they did, and statements that prepayment penalties could be waived, when in fact they could not, as described in paragraphs 63, 64, 76, and 131 through 132, above;

g.      Statements regarding the costs of reduced or no documentation mortgage loans, as described in paragraph 133, above;

h.      Statements regarding the benefits or advisability of refinancing mortgage loans with Pay Option and Hybrid ARMs offered by Countrywide, as described in paragraphs 110 through 118, above; and

i.      Statements regarding the existence of prepayment penalties on mortgage loans being refinanced with Countrywide mortgage loans, as described in paragraph 117, above.

167.    Defendants knew, or by the exercise of reasonable care should have known, that these statements were untrue or misleading at the time they were made.

## SECOND CAUSE OF ACTION AGAINST ALL DEFENDANTS
## VIOLATIONS OF BUSINESS AND PROFESSIONS CODE SECTION 17200
## (UNFAIR COMPETITION)

168.    The People reallege and incorporate by reference all paragraphs above, as through fully set forth in this cause of action.

169.    Defendants have engaged in, and continue to engage in, acts or practices that constitute unfair competition, as that term is defined in Section 17200 of the Business and Professions Code. Such acts or practices include, but are not limited to, the following:

a.      Creating and maintaining a deceptive scheme to mass produce loans for

sale on the secondary market, as described in paragraphs 15 through 164, above;

b.      Making untrue or misleading representations that Countrywide could be trusted to sell borrowers mortgage loans that were appropriate to their financial circumstances, as described in paragraphs 109 through 113, above;

c.      Making untrue or misleading representations regarding the terms and payment obligations of Countrywide's Pay Option and Hybrid ARMs, including representations regarding the payment rate, the duration of initial interest rates, the duration of initial monthly payments, the inclusion of prepayment penalties, the waivability of prepayment penalties, the payment shock that borrowers were likely to experience, and the risks associated with such mortgage loans, as described in paragraphs 58 through 64, 75 through 77, and 119 through 132, above;

d.      Making untrue or misleading representations regarding the terms and payment obligations of Countrywide's HELOCs, as described in paragraphs 134 through 135, above;

e.      Making untrue or misleading representations regarding the costs of reduced or no documentation mortgage loans, as described in paragraph 133, above;

f.      Making untrue or misleading representations regarding the true likelihood or circumstances under which borrowers would be able to refinance Pay Option or Hybrid ARMs offered by Countrywide, as described in paragraphs 62, 76, 77, and 129 through 132, above;

g.      Soliciting borrowers to refinance mortgage loans by misrepresenting the benefits of doing so or by misrepresnting or obfuscating the fact that in doing so the borrowers will incur a prepayment penalty, as described in paragraphs 110 through 118, above;

h.      Making mortgage loans and extending HELOCs without regard to whether borrowers would be able to afford monthly payments on those loans or HELOCs after the expiration of the initial interest rates on the mortgage loans, or the draw periods on the HELOCs, as described in paragraphs 85 through 107, above;

i.      Aiding and abetting the breach of the fiduciary duty owed by mortgage brokers to California borrowers, as described in paragraphs 151 through 158, above;

j.      Failing to provide borrowers with documents sufficient to inform them of their payment obligations with respect to fully drawn HELOCs, as described in paragraphs 81 through 84, above;

k.      Paying compensation to mortgage brokers that was not reasonably related to the value of the brokerage services they performed, as described in paragraphs 152 through 155, above; and

l.      Violating Section 17500 of the Business and Professions Code, as described in the First Cause of Action, above.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

1.      Pursuant to Business and Professions Code section 17535, that all Defendants, their employees, agents, representatives, successors, assigns, and all persons who act in concert with them be permanently enjoined from making any untrue or misleading statements in violation of Business and Professions Codes section 17500, including the untrue or misleading statements alleged in the First Cause of Action.

2.      Pursuant to Business and Professions Code section 17203, that all Defendants, their employees, agents, representatives, successors, assigns, and all persons who act in concert with them be permanently enjoined from committing any acts of unfair competition, including the violations alleged in the Second Cause of Action.

3.      Pursuant to Business and Professions Code sections 17535, that the Court make such orders or judgments as may be necessary to prevent the use or employment by any Defendant of any practices which violate section 17500 of the Business and Professions Code, or which may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of any such practice.

4.      Pursuant to Business and Professions Code section 17203, that this court make such orders or judgments as may be necessary to prevent the use or employment by any

1  Defendant of any practice which constitutes unfair competition or as may be necessary to restore
2  to any person in interest any money or property, real or personal, which may have been acquired
3  by means of such unfair competition.

4      5.     Pursuant to Business and Professions Code section 17536, that Defendants, and
5  each of them, be ordered to pay a civil penalty in the amount of two thousand five hundred
6  dollars ($2,500) for each violation of Business and Professions Code section 17500 by
7  Defendants, in an amount according to proof.

8      6.     Pursuant to Business and Professions Code section 17206, that Defendants, and
9  each of them, be ordered to pay a civil penalty in the amount of two thousand five hundred
10 dollars ($2,500) for each violation of Business and Professions Code section 17200 by
11 Defendants, in an amount according to proof.

12     7.     That Plaintiff recover its costs of suit, including costs of investigation.

13     8.     For such other and further relief that the Court deems just, proper, and equitable.

14

15 DATED:   June  24, 2008              EDMUND G. BROWN JR.
                                          Attorney General
16                                        ALBERT NORMAN SHELDEN
                                          Senior Assistant Attorney General
17                                        RONALD REITER
                                          Supervising Deputy Attorney General
18                                        KATHRIN SEARS
                                          ROBYN SMITH
19                                        BENJAMIN G. DIEHL
                                          LINDA HOOS
20                                          Deputy Attorneys General

21

22                       By:     _____
                                          BENJAMIN G. DIEHL
23                                        Deputy Attorney General

24

25

26

27

28

46
COMPLAINT

# EXHIBIT E

EXHIBIT D

Atty. No. 99000

## IN THE CIRCUIT COURT OF COOK COUNTY, STATE OF ILLINOIS
## COUNTY DEPARTMENT 2 CHANCERY DIVISION

2008 JUN 25 AM 10: 18

CIRCUIT COURT OF COOK
COUNTY, ILLINOIS
CHANCERY DIV.

DOROTHY BROWN — CLERK

THE PEOPLE OF THE STATE OF
ILLINOIS,

        Plaintiff,

v.

COUNTRYWIDE FINANCIAL
CORPORATION, a Delaware
corporation; COUNTRYWIDE HOME
LOANS, INC., a New York
corporation also d/b/a Full Spectrum
Lending; FULL SPECTRUM
LENDING, a California corporation
formerly doing business in Illinois;
COUNTRYWIDE HOME LOANS
SERVICING, LP, a Texas partnership;
and ANGELO R. MOZILO,
individually and in his capacity as
Chief Executive Officer of Defendant
COUNTRYWIDE FINANCIAL
CORPORATION;

        Defendants.

**08CH22994**

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

NOW COMES the Plaintiff, THE PEOPLE OF THE STATE OF ILLINOIS, by LISA

MADIGAN, Attorney General of the State of Illinois, and complains of Defendants

COUNTRYWIDE FINANCIAL CORPORATION, a Delaware corporation, COUNTRYWIDE

HOME LOANS, INC., a New York corporation also doing business as Full Spectrum Lending,

FULL SPECTRUM LENDING, a California corporation formerly doing business in Illinois,

COUNTRYWIDE HOME LOANS SERVICING LP, a Texas partnership, and ANGELO R.

MOZILO, individually and in his capacity as Chief Executive Officer of Defendant

COUNTRYWIDE FINANCIAL CORPORATION.

Countrywide, in pursuit of market share, engaged in unfair and deceptive practices including the loosening of underwriting standards, structuring unfair loan products with risky features, engaging in misleading marketing and sales techniques, and incentivizing employees and brokers to sell more and more loans with risky features. Countrywide's business practices resulted in unaffordable mortgage loans and increased delinquencies and foreclosures for Illinois homeowners.

Countrywide's explosive growth was paralleled by the demand for loans with non-traditional risky features on the secondary market. Through the securitization process, Countrywide shifted the risk of the failure of these non-traditional loans to investors. Moreover, securitization allowed Countrywide to gain much needed capital to fuel the origination process and reach its goal of capturing more and more market share. As the risky Countrywide loans began to fail, it was forced to repurchase or replace the failing loans in the investor pools. This created further pressure to increase the volume of loan origination.

To facilitate the increase in loan origination volume, Countrywide relaxed its underwriting standards and sold unaffordable and unnecessarily expensive loans. Reduced documentation underwriting guidelines were heavily used to qualify many borrowers for unaffordable loans. Countrywide created so-called "affordability" loan products, such as adjustable rate mortgages and interest-only loan products, that only required qualifying borrowers at less than the full interest rate for the loan products. Countrywide pushed products that containing layers of unduly risky features, such as pay option ARMs and mortgage loans for 100% of the value of borrowers' homes. Unfair and deceptive advertising, marketing and sales

2

practices were utilized to push mortgages, while hiding the real costs and risks to borrowers.

These practices included enticing borrowers with low teaser rates, low monthly payments and

"no closing cost" loans that failed to make clear and conspicuous disclosures of the products'

risks. Finally, Countrywide engaged in unfair and deceptive acts and practices while servicing

borrowers' loans, such as requiring borrowers to make initial payments without regard to

whether a loan repayment plan or loan modification was even possible.

### JURISDICTION AND VENUE

1.      This action is brought for and on behalf of THE PEOPLE OF THE STATE OF

ILLINOIS, by LISA MADIGAN, Attorney General of the State of Illinois, pursuant to the

provisions of the Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et*

*seq.*, the Illinois Fairness in Lending Act, 815 ILCS 120/1 *et seq.*, and her common law authority

as Attorney General to represent the People of the State of Illinois.

2.      Venue for this action properly lies in Cook County, Illinois, pursuant to Section 2-101 of

the Illinois Code of Civil Procedure, 735 ILCS 5/2-101, in that the Defendants are doing

business in Cook County, Illinois.

### PARTIES

3.      Plaintiff, THE PEOPLE OF THE STATE OF ILLINOIS, by LISA MADIGAN, Attorney

General of the State of Illinois, is charged, *inter alia,* with the enforcement of the Consumer

Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.* and the Illinois Fairness in

Lending Act, 815 ILCS 120/1 *et seq.*

4.      Defendant ANGELO R. MOZILO is a co-founder of Defendant COUNTRYWIDE

FINANCIAL CORPORATION, which was formed as Countrywide Credit Industries in 1969.

3

5.      Defendant MOZILO participates in, manages, controls, and has knowledge of the day-to-day activities of Defendant COUNTRYWIDE FINANCIAL CORPORATION. He has been the Chairman of Defendant COUNTRYWIDE FINANCIAL CORPORATION'S Board since March 1999 and Chief Executive Officer of the company since February 1998. Defendant MOZILO was also President of the company from March 2000 through December 2003 and has served in other executive capacities since the company's formation.

6.      Defendant MOZILO has stated that he has "devoted [his] life to building from the ground up a mortgage banking company focused on providing homeownership opportunities to all Americans" for the last four decades.

7.      Although Defendant MOZILO resides in California, his companies conduct business in Illinois and, on at least two occasions, he has engaged in purposeful activity to further the interests of Defendant COUNTRYWIDE FINANCIAL CORPORATION (and its subsidiaries) while in the State of Illinois.

8.      Specifically, during an April 27, 2006 earnings conference call, Defendant MOZILO reported that he had just finished a tour of the offices of the subsidiary that handles the securitization of mortgage loans originated by Defendant COUNTRYWIDE FINANCIAL CORPORATION. As he reported, one of those offices was in Chicago.

9.      In addition, during October 1998, Defendant MOZILO appeared at the Mortgage Banker's Association of America's annual convention in Chicago. At this appearance, Defendant MOZILO discussed the turbulence in the mortgage business and stated that only big firms with adequate resources to maintain access to bank lenders and the capital markets would survive. He predicted that Defendant COUNTRYWIDE FINANCIAL CORPORATION would be a beneficiary of the market turbulence.

4

10.     Defendant COUNTRYWIDE FINANCIAL CORPORATION is a thrift holding company.  It has numerous subsidiaries that originate, purchase, securitize, sell and service residential and commercial loans; provide loan closing services such as credit reports, appraisals and flood determinations; conduct fixed income securities underwriting and trading activities; provide property, life and casualty insurance; and manage a captive mortgage reinsurance company.

11.     Since December 23, 1980, Defendant COUNTRYWIDE HOME LOANS, INC., a wholly-owned subsidiary of Defendant COUNTRYWIDE FINANCIAL CORPORATION, has been a registered foreign corporation in the State of Illinois.  Defendant COUNTRYWIDE HOME LOANS, INC. is a licensed Illinois mortgage bank, holding mortgage banker license MB.0000139, which is issued by the Illinois Department of Financial and Professional Regulations, Division of Banking.  Since 2004, Defendant COUNTRYWIDE HOME LOANS, INC. has also done business in Illinois as Full Spectrum Lending.

12.     Defendant FULL SPECTRUM LENDING, INC., was a registered foreign corporation in the State of Illinois from October 3, 1996 through April 25, 2005.  FULL SPECTRUM LENDING, INC. was a licensed Illinois mortgage bank, holding mortgage banker license MB.0004910, which was issued by the Illinois Department of Professional Regulations, Division of Banking.  Defendant FULL SPECTRUM LENDING, INC. became a division of Defendant COUNTRYWIDE HOME LOANS, INC. in 2004.  In April 2005, FULL SPECTRUM LENDING, INC. withdrew as a registered foreign corporation and began operating in Illinois as Full Spectrum Lending, a division of COUNTRYWIDE HOME LOANS, INC.

13.     In its annual reports from 1999 to 2006, Defendant COUNTRYWIDE FINANCIAL CORPORATION emphasized that mortgage banking, which has historically been conducted

5

through Defendant COUNTRYWIDE HOME LOANS, INC. for prime loan originations and Defendant FULL SPECTRUM LENDING, INC. for subprime loan originations, was its core business. Defendant COUNTRYWIDE FINANCIAL CORPORATION has stated that the company is engaged primarily in residential mortgage lending and that Defendant COUNTRYWIDE HOME LOANS, INC. is its primary subsidiary.

14.    During the entire time period from 1999 to 2006, there was a significant identity in the corporate governance and managing directors of Defendant COUNTRYWIDE FINANCIAL CORPORATION and Defendant COUNTRYWIDE HOME LOANS, INC. For example, between 1999 and 2005, Stanford Kurland was the Chief Executive Officer for Defendant COUNTRYWIDE HOME LOANS, INC. and he was also the Chief Operating Officer for Defendant COUNTRYWIDE FINANCIAL CORPORATION. In 2006, David Sambol became Chairman of the Board and Chief Executive Officer for Defendant COUNTRYWIDE HOME LOANS, INC. and President and Chief Operating Officer of Defendant COUNTRYWIDE FINANCIAL CORPORATION.

15.    There was also overlap between the management of Defendant FULL SPECTRUM LENDING, INC., when it was a separate company, and Defendant COUNTRYWIDE FINANCIAL CORPORATION. Specifically, Gregory Lumsden has been the President and Chief Executive Officer for Defendant FULL SPECTRUM LENDING, INC. from 2001, when it was a separate company, to the present day, when it is a division of Defendant COUNTRYWIDE HOME LOANS, INC. He has been and is currently a managing director for Defendant COUNTRYWIDE FINANCIAL CORPORATION.

16.    Defendant COUNTRYWIDE FINANCIAL CORPORATION issues consolidated annual reports and SEC filings with Defendant COUNTRYWIDE HOME LOANS, INC. Additionally,

6

Defendant COUNTRYWIDE FINANCIAL CORPORATION files a consolidated federal income tax return and a combined state income tax return in California with Defendant COUNTRYWIDE HOME LOANS, INC. and Defendant FULL SPECTRUM LENDING, INC. Defendant COUNTRYWIDE FINANCIAL CORPORATION also issued consolidated earnings statements and balance sheets for itself, Defendant COUNTRYWIDE HOME LOANS, INC. and Defendant FULL SPECTRUM LENDING, INC.

17.    Defendant COUNTRYWIDE FINANCIAL CORPORATION controls the policies and operations and profits from the activities of Defendant COUNTRYWIDE HOME LOANS, INC. and Defendant FULL SPECTRUM LENDING, INC. Defendant COUNTRYWIDE FINANCIAL CORPORATION arranged and profited from the securitization and/or sale of loans originated and serviced by Defendant COUNTRYWIDE HOME LOANS, INC. and Defendant FULL SPECTRUM LENDING, INC.

18.    Because they acted cooperatively in carrying out the conduct alleged in this Complaint, Defendants ANGELO R. MOZILO, COUNTRYWIDE FINANCIAL CORPORATION, COUNTRYWIDE HOME LOANS, INC. and FULL SPECTRUM LENDING, INC. are collectively referred to as "Countrywide," unless otherwise specified, and each is responsible for the unlawful conduct alleged herein.

19.    Defendant COUNTRYWIDE HOME LOANS SERVICING, LP is a licensed mortgage bank, holding mortgage banker license MB.0006041, which was issued by the Illinois Department of Financial and Professional Regulation, Div    n of Banking. Defendant COUNTRYWIDE HOME LOANS SERVICING, LP is a    xas limited partnership directly owned by two wholly-owned subsidiaries of Defendant COUNTRYWIDE HOME LOANS, INC. Defendant COUNTRYWIDE HOME LOANS SERVICING, LP services loans originated

7

by Defendant COUNTRYWIDE HOME LOANS, INC., the Federal National Mortgage

Association (Fannie Mae), the Federal Home Loan Mortgage Corporation (Freddie Mac), the

Government National Mortgage Association (Ginnie Mae), the United States Department of

Housing and Urban Development, and the United States Veterans Administration.

20.     Any allegation about any acts of Defendants COUNTRYWIDE HOME LOANS, INC.,

COUNTRYWIDE FINANCIAL CORPORATION, FULL SPECTRUM LENDING, INC. or

COUNTRYWIDE HOME LOANS SERVICING, LP, means that the entities did the acts alleged

through their officers, directors, employees, agents and/or representatives while they were acting

within the actual or ostensible scope of their authority.

## COMMERCE

21.     Section 1(f) of the Consumer Fraud and Deceptive Business Practices Act, 815 ILCS

505/1(f), defines "trade" and "commerce" as follows:

> The terms 'trade' and 'commerce' mean the advertising, offering for sale,
> sale, or distribution of any services and any property, tangible or
> intangible, real, personal, or mixed, and any other article, commodity, or
> thing of value wherever situated, and shall include any trade or commerce
> directly or indirectly affecting the people of this State.

22.     Defendants are and were, at all relevant times hereto, engaged in trade and commerce in

the State of Illinois, in that they offered mortgage lending services to the general public of the

State of Illinois.

23.     The Attorney General's Office has received over 200 complaints related to Countrywide

since 2005.

8

## COUNTRYWIDE'S BUSINESS PRACTICES RESULTED IN UNAFFORDABLE MORTGAGE LOANS AND INCREASED FORECLOSURES IN ILLINOIS

Countrywide's Domination of the Mortgage Industry

24.     Both Countrywide Financial Corporation ("CFC") and Countrywide Home Loans, Inc.
are based in Calabasas, California. CFC was formed by David Loeb and Angelo Mozilo as
Countrywide Credit Industries in 1969. The company went public shortly thereafter. Loeb
retired in 2000. The company restructured in 2001 and assumed its current name in 2002.

25.     Through its numerous subsidiaries, CFC is involved in virtually every segment of the
residential mortgage industry. The company sells, purchases, securitizes and services residential
and commercial loans; provides loan closing services such as credit reports, appraisals and flood
determinations; conducts fixed income securities underwriting and trading activities; provides
property, life and casualty insurance; and manages a captive mortgage reinsurance company.

26.     CFC's primary subsidiary, Countrywide Home Loans, Inc., offers loans to consumers
through three production channels. The first channel is comprised of Countrywide's prime
consumer-direct (retail) lending locations, referred to as the Consumer Markets Division, and
nonprime consumer-direct (retail) lending locations, referred to as Full Spectrum Lending. The
second channel is wholesale lending through a network of mortgage loan brokers and other
financial intermediaries. The third channel is correspondent lending through which Countrywide
provides lines of credit to financial institutions such as independent mortgage companies,
commercial banks, savings and loans and credit unions, purchases the mortgages made pursuant
to the lines of credit, and then arranges for the securitization of these loans.

27.     Today, Countrywide is America's largest mortgage lender. In the first quarter of 2008,
the company originated $73 billion dollars nationally in mortgage loans. Countrywide has also
been a significant originator of subprime mortgages. By the first quarter of 2007, Countrywide

9

had become the largest originator of subprime loans, with a total subprime loan volume of roughly $ 7,881,000,000.

28.    Countrywide is also the nation's largest loan servicer. The company administers $1.5 trillion in loans made by both it and other institutions. Countrywide's servicing operation generated $1.4 billion in revenue in the first quarter of 2008.

29.    Countrywide has a significant presence in Illinois. At the peak of its presence in Illinois, Countrywide operated approximately 100 retail branch offices and its mortgage loan products were offered by numerous mortgage brokers licensed to do business in Illinois. Countrywide also purchased loans through a network of some 2,100 correspondent lenders.

30.    Countrywide was the largest lender in Illinois in 2004, 2005, and 2006. During these years, Countrywide sold approximately 94,000 loans to Illinois consumers.

31.    In addition, Countrywide is the largest lender in the Chicago area. In 2006, for example, Countrywide made over 21,000 loans to consumers in the seven county Chicago area.

The Explosive Growth of a Market for Loans with Non-Traditional Risky Features

32.    Countrywide's growth paralleled and was fueled by the rise of private-label securitization in the mortgage industry.

33.    Securitization of mortgage loans is a relatively recent phenomenon. Historically, mortgages were long-term, fixed rate, amortizing products sold by depository institutions. From the post-World War II era to 1973, savings and loan institutions held the majority of all mortgages.

34.    The privatization of the Federal National Mortgage Association (Fannie Mae) in 1968 and the creation of the Federal Home Loan Mortgage Corporation (Freddie Mac) in 1970 laid the groundwork for securitization of mortgages and the secondary market's role in the mortgage

10

industry. Fannie Mae and Freddie Mac, also known as government-sponsored entities ("GSEs"),
began purchasing loans from financial institutions. These financial institutions were required to
make limited representations and warranties regarding the quality of the loans. Any remaining
risk passed on to the GSEs.

35.     After purchase, the GSEs bundled the mortgages into pools in order to sell the income
stream to investors. An asset-backed or mortgage-backed security is ultimately created from
such a pool of loans. The entire process is generally referred to as securitization. As used by the
GSEs, the primary purpose of securitization was to create liquidity for funding more residential
mortgage loans.

36.     There are limits on the types of loans that Fannie Mae and Freddie Mac purchase. The
loans they purchase are subject to certain standards regarding loan amount and credit risk, which
generally must be demonstrated through written documents showing the borrower's credit score,
income, assets and liabilities and the value of the home securing the loan. Loans that meet the
underwriting standards are referred to in the mortgage industry as "conforming loans." Like
other mortgage lenders, Countrywide marketed and sold conforming loans to borrowers and then
sold these loans to the GSEs.

37.     Until the early 1990s, "non-conforming loans," or loans that did not meet the GSEs'
underwriting standards, were rare and expensive. Borrowers who were considered subprime
(due to credit profiles riskier than the minimum required for conforming loans) or were unable to
document income and assets, or who wanted loan amounts in excess of the GSEs' underwriting
guidelines had few options. This situation would soon change.

38.     In the early 1990s, banking regulators adopted new rules at a time when banks were
under considerable financial stress from the 1991 recession. For the first time, the new rules

measured bank health through the use of a capital to asset ratio. Unable to raise new capital to increase the ratio, banks found it easier to reduce assets instead, and securitization proved particularly useful for that task. These assets included mortgage loans.

39.     Once banks had an incentive to divest assets, and with securitization enabling them to pass at least part of the risk of a loan's failure to investors, financial institutions became less wary of making riskier non-conforming loans. Securitization was no longer just a tool to create liquidity in the conforming mortgage industry. Instead, mortgage originators could employ it as a way of shedding much of the credit risk associated with non-conforming loans that they originated.

40.     Wall Street became aware of the potential cash flow from the securities backed by non-conforming mortgage loans. Investors were attracted to these securities because they assumed that non-conforming mortgage-backed securities would share the same stable performance of the conforming mortgage-backed securities issued by the GSEs. The favorable investment grade ratings given to the securities by the various ratings agencies – which allowed institutional investors such as state pension funds to buy the products – seemed to corroborate this assumption.

41.     In addition, the yields on the non-conforming loan securities were attractive. While subprime loans – a type of non-conforming loan – carry greater risks, they also produce higher returns. For a time, the large returns on subprime mortgage-backed securities outpaced (and concealed) high failure rates of loans in securitization pools.

42.     Investors paid a premium for certain types of loans and certain loan features, such as loans with high interest rates (i.e., subprime loans) or loans with prepayment penalties. Indeed, investors' growing appetite for mortgage-backed securities fueled a surge in the origination of

12

subprime mortgage lending. Between 1994 and 2005, subprime mortgage lending grew from
$35 billion to $625 billion. By the first quarter of 2007, subprime mortgage-backed securities
were being sold at a rate of $100 billion per quarter. The explosive growth in subprime
mortgage lending also marked a shifting away from traditional underwriting standards.

43.     Lenders, such as Countrywide, were aware of the types of loans and loan features for
which investors would pay a premium. Investor demand and secondary market valuation,
therefore, became the primary concern when determining what types of loans to market and sell
and at what price, rather than the consumers' ability to repay the loans. Countrywide sought to
place greater numbers of borrowers into loans laden with these premium-enhancing features.

44.     Countrywide had already established a small presence in the subprime lending field in the
late 1990s, when it formed its retail subprime lending unit, Full Spectrum Lending. Following
David Loeb's retirement in 2000, Countrywide became more aggressive in growing its business
in an effort to be the nation's largest mortgage lender. Countrywide expanded the range of non-
conforming loan products that it offered to consumers and began to concentrate more on
subprime lending and exotic mortgage products. For example, in 2002, Countrywide originated
roughly $9 billion in subprime loans. In 2005, that number shot up to over $44 billion.

45.     Countrywide also changed its corporate strategy to focus on increasing loan volume,
which would in turn generate more loan origination fees for the company. Instead of focusing on
fixed rate loans to creditworthy borrowers, the company began to emphasize reduced
documentation loans and adjustable rate products. For example, in 2003, only 18% of the loans
originated by Countrywide had adjustable interest rates. In 2004, however, that number had
grown to 49%.

13

46.     By 2005, Countrywide's growth in both revenue and number of loans originated was
fueled by the company's origination of a menu of risky loan products, such as reduced
documentation loans, option ARMs, and loans for 100% of a home's value.

Record Numbers of Foreclosures Nationally and in Illinois

47.     For many years, rising home prices concealed the consequences of Countrywide's
increased drive to sell loans regardless of the borrower's credit risk and ability to repay the loan.
Borrowers were often lured into expensive home loans with the promise that they could
refinance if the loan became unaffordable. As long as housing prices continued to rise and credit
remained available, many borrowers followed this strategy. Predictably, with the collapse of the
mortgage market and concomitant drop in housing prices, the days when borrowers could
refinance out of an unaffordable mortgage ended, and, as has been widely documented, defaults
and foreclosures nationwide·are rapidly rising.

48.     In the third quarter of 2007, 24% of all outstanding subprime loans and 30% of subprime
ARMs were either delinquent or in foreclosure. The Center for Responsible Lending has
projected that 2.2 million homeowners nationwide will lose their homes as a result of failed
subprime home loans originated from 1998 through 2006. This number could very well grow
larger, as the projection was made before subprime default rates skyrocketed in 2007.

49.     In the Chicago area, the foreclosure crisis resulting from subprime loan origination will
likely linger longer than in other parts of the country. In 2006, the Chicago metropolitan area
had more "high-cost" (i.e., subprime) mortgages than any other metropolitan area in the country,
according to a *Chicago Reporter* study. This marked the third year in a row that the Chicago
metro area claimed the nation's top spot for high-cost mortgages. Countrywide led the way with
high-cost loans in Chicago – in 2006 it was the leader in high-cost lending.

14

50.     Ultimately, although homeownership for subprime borrowers increased during recent years, it appears that there will be a net loss in homeownership nationwide. With the number of completed subprime foreclosures from 1998 to 2006 exceeding the number of homebuyers who used a subprime loan to enter the marketplace, the Center for Responsible Lending estimates that subprime mortgage lending has resulted in a net loss in homeownership of 900,000 homes nationwide. According to federal government figures, in 2007 homeownership suffered the biggest one-year drop on record.

51.     The failure of subprime loans explains only part of the homeownership crisis. Risky loan origination practices used in the prime mortgage market, such as volatile loan products like option ARMs and lax underwriting standards, also contributed to the current situation. Nationally, roughly 243,000 homes were in some stage of the foreclosure process in April 2008. This is up 65% from April 2007. The nationwide delinquency rate on mortgage payments grew to 6.35% in the first quarter of 2008, the highest since 1979.

52.     Illinois' home foreclosure rates have ranked among the highest in the nation for more than a year. Illinois experienced a 46% increase in the number of unique properties in foreclosure from 2006 to 2007 – 64,310 properties in 2007 as compared with 44,047 the year before. Lenders filed 9,670 foreclosures in May of this year alone, placing the state eighth in the number of new foreclosures filed. This represents a 41.71% increase from May 2007.

53.     The external costs of the mortgage collapse, in terms of declining property values and shrinking tax bases, are estimated to run over $200 billion nationally, with urban centers hit hardest. In Illinois, the loss is projected to be $15 billion, with $13 billion in Chicago.

15

### Countrywide's Role in the Foreclosure Crisis Nationally and in Illinois

54.     The delinquency rate on the mortgage loans of America's biggest mortgage lender and servicer, Countrywide, was 9.27% by the end of March 2008. The company originated $7 billion nationally in mortgage loans in *one quarter* of 2008. The March 2008 9.27% delinquency rate was an increase from 5.02% at the end of 2006 and 3.68% in March 2006.

55.     The incidence of "seriously delinquent" loans – loans that are 90 days or more past due or in foreclosure – is also increasing. Countrywide's latest financial filing says that 4.81% of the loans it services were seriously delinquent as of the end of March 2008. This serious delinquency rate was up almost four times from 1.70% at the same time in 2007.

56.     In terms of actual foreclosures, the percentage of Countrywide loans in foreclosure at the end of March 2008, 1.28%, had almost doubled from 0.69% at the end of March 2007.

57.     Countrywide's subprime loans have failed even more frequently. By the end of the first quarter of 2008, 35.88% of the subprime loans serviced by Countrywide were delinquent, up from 19.62% in the first quarter of 2007. Slightly over 21% of all Countrywide subprime loans serviced by the company were seriously delinquent by the end of March 2008, up from 7.82% in March 2007.

58.     The number of Countrywide foreclosure filings in Illinois is troubling. From 2006 to 2007, all foreclosure complaint filings in Cook Country increased by 46%. For this same period, however, Countrywide Home Loans, Inc.'s foreclosure complaint filings increased by 117%. From January 2004 through June 2008, Countrywide Home Loans, Inc. has foreclosed upon at least 2,534 Cook County homeowners. Note that this number does not include foreclosures filed by Full Spectrum Lending or any other Countrywide entity.

16

Securitization Sleight of Hand Masked Countrywide's Systemic Loan Origination Issues

59.   Countrywide's delinquency and foreclosure numbers show that there were systemic problems with the company's loan origination standards. These loosened loan origination standards came into place due to Countrywide's securitization practices.

60.   Countrywide's quest for domination in the mortgage lending industry is well-documented. During a May 24, 2005 investor conference, Defendant and Countrywide CEO Angelo Mozilo stated: "I am going to – little question – it's a question of dominance, you have heard this before we – we have [no] intention to structure the company to be at second place or third place." This sentiment was echoed by then-Countrywide President and Chief Operating Officer Stanley Kurland, who stated: "In the past, we talked about origination market share reaching 30% by 2008 and, as we've noted, this was intended to be a stretch goal as it is part of our culture, part of our nature to set aggressive targets." Ultimately, this quest for market domination created a self-perpetuating cycle in which Countrywide raced against time to originate loans of decreasing quality to cover up the failure of its prior loan originations.

61.   This cycle began with Countrywide's attempt to gain market share. The company had to acquire capital to fund loans and find borrowers to buy the loans. To find borrowers, Countrywide both expanded its menu of nonconforming mortgage products and loosened the standards for selling its products to reach untapped consumers. To gain capital, Countrywide relied on securitizing the loans that it made from its menu of nonconforming mortgage products and loosened loan origination standards.

62.   Securitization allowed Countrywide to generate capital using one of two methods. In one method, Countrywide sold the loans it made to third parties who then aggregated the loans into pools and sold the income streams from the pooled loans to investors. In this arrangement, a

17

party other than a Countrywide-controlled entity had an opportunity to evaluate the quality of the
loans being aggregated. This party was able to enforce any representations and warranties that
Countrywide made when selling the mortgage loans.

63.     In the other method, Countrywide eliminated the third-party intermediaries and
completed the securitization process by itself. Countrywide Financial Corporation created
numerous subsidiaries for this exact purpose. These subsidiaries purchased loans from
Countrywide entities, pooled them, and issued securities that were later sold through a brokerage
house. Securitization done through affiliated entities reduced any potential for delay in the
process.

64.     This second method allowed Countrywide to control the entire origination and
securitization process. In other words, Countrywide sold the loans itself, purchased and
aggregated the loans itself, and issued the securities itself.[1] The same corporate executive could
even sign off on securitization contracts as both the originator of the underlying mortgage loans
and the purchaser of the same loans.

65.     Countrywide had strong incentives to securitize its loans quickly. In order for an asset-
backed security to meet the Securities and Exchange Commission's requirements, it may not
have non-performing loans and delinquent loans may not constitute 50% or more of the pool on
the date the pool is readied for sale.[2]

66.     The securitization process was beneficial for Countrywide because it both generated
capital and allowed Countrywide to shed "credit risk" from the possible failure of the underlying

---

[1] In this self-dealing method, it is unclear how the required representations and warranties regarding the quality of
the underlying loans would be enforced. Moreover, the Bank for International Settlements issued a 1992 report
noting that "[t]here is at least a potential conflict of interest if a bank originates, sells, services and underwrites the
same issue of securities." BIS is an international organization established in 1930 which fosters international
monetary and financial cooperation and serves as a bank for central banks.
[2] Under this analysis, pay-option ARMs would have been among the most desirable products to satisfy this element
since, with their very low teaser rate and option to make less than full interest payments for a certain period, they are
unlikely to experience early payment defaults.

18

mortgage loans. Credit risk is the potential for financial loss resulting from the failure of a

borrower to pay on a mortgage loan. As CFC noted in its annual regulatory filing for 2003, it

managed "mortgage credit risk principally by securitizing substantially all mortgage loans that

we produce, and by only retaining high credit quality mortgages in our loan portfolio." In

comments to federal regulators, Countrywide advised that any guidance on nontraditional

mortgage products "contain explicit acknowledgement that the risk profile of a lender who

*effectively transfers the economic risks of a loan to the secondary market* is lower than that of a

portfolio lender" (emphasis added).

67.     By selling loans onto the secondary market, Countrywide created loan pooling

agreements through which it sought to limit its responsibility for the performance of the loans.

For instance, Countrywide is required to repurchase the loan from investors under these

agreements only in the event of documentation errors, underwriting errors, fraud, or early

payment defaults (i.e., the borrower defaults within one or two months after the loan sale).

68.     Although Countrywide attempted to shed the risk of originating loans of lower quality, it

retained some credit risk due to the representations and warranties that it is required to make

when selling mortgage loans to either third parties or itself for securitization. As a result,

investors still have some level of recourse against the company for defective loans.

69.     This recourse generally takes one of two forms. In some cases, these agreements

required Countrywide to indemnify the investors for the defective loans. In other cases,

however, Countrywide could simply swap in new loans for the defective loans through the

"removal of accounts provisions" included in some of its securitization agreements. Swapping

loans was preferable to lenders because it does not them to actually give investors cash.

19

70.     Under this approach, a lender, like Countrywide, needed to generate more loans if it both wanted to continue securitizing and needed to replace the defaulting loans removed from the securitized pools. In addition, the lender, who is not able to transfer the defaulted loans it takes back from the pools to anyone else, will want to hold more good loans on its balance sheet to offset the increasing numbers of bad loans it is holding. The lender must originate more loans to hold on its books – in the hope that a sufficient number of the new loans will not default – to offset the bad loans. Countrywide admitted that it did as much in its December 31, 2005 10-K filing, in which the company disclosed that "[t]he impact in the increase of the allowance for [delinquent option] loan losses will be partially mitigated by the addition of new loans to our portfolio."

71.     As Countrywide well knew or should have known, the loans that underpinned Countrywide's securitizations were unstable. In fact, the loans began to fail at a precipitous rate. As the company observed in 2007, the volume of claims for breaches of its representations and warranties grew due to the deterioration in credit performance of its loans. Thus, Countrywide had to accelerate origination to satisfy increased investor claims at precisely the time when it was already increasing origination to simply obtain capital to maintain its market position.

Defendants' Unfair and Deceptive Underwriting Standards, Loan Products, Sales Techniques and Servicing Practices

72.     Countrywide's need to accelerate loan originations compelled the company to develop a business model that, beginning in at least 2003 or 2004 and lasting into 2007, reflected the company's indifference to whether homeowners could afford its loans. As part of this model, Countrywide: (a) originated mortgage loans to borrowers who did not have the ability to repay the loan; (b) originated mortgage loans with multiple layers of risk that exposed borrowers to an unnecessarily high risk of foreclosure or loss of home equity; (c) originated unnecessarily more

20

expensive mortgage loans to unknowing borrowers; and (d) engaged in unfair and/or deceptive marketing and advertising acts or practices.

73.     Also, Countrywide implemented a compensation structure that incentivized broker and employee misconduct without exercising sufficient oversight to ensure that misconduct did not occur due to:

        a.  Implementing a compensation structure that incentivized employees to maximize loan sales without proper oversight, resulting in the sale of unaffordable and/or unnecessarily expensive loans;

        b.  Failing to adequately supervise and/or implement proper underwriting guidelines to see whether brokers used and sold reduced documentation loans to avoid revealing borrowers' true income and assets;

        c.  Rewarding brokers for selling loans with certain risky loan features such as prepayment penalties without ensuring that borrowers received a benefit from the risky features; and

        d.  Structuring the compensation for option ARMs in such a way that brokers were incentivized to sell this riskier loan product – to the exclusion of other products – in order to obtain the maximum yield spread premium possible.

74.     Countrywide's servicing division, Countrywide Home Loans Servicing, LP, unfairly and deceptively required borrowers to make additional payments just to consider whether they would qualify for a loan repayment or modification plan – regardless of the potential feasibility or affordability of such a plan.

75.     Former employees commented on Countrywide's increasing disregard for a borrower's ability to repay a mortgage loan. For example, a former Full Spectrum Lending Division

21

employee stated that the division (which was Countrywide's subprime lending arm) had underwriting guidelines that would approve virtually any loan. Likewise, an underwriter in Countrywide's Wholesale Lending Division said that her supervisor would approve most of the loans that she herself did not feel comfortable approving.

76.     Even though former employees noted that Countrywide had loose underwriting standards, the company also had a system to grant exceptions to those standards. A Countrywide wholesale account executive said that in the beginning of 2006, Countrywide became very aggressive in granting exceptions to their underwriting criteria – further diluting borrower protections.

77.     This employee also explained that she was pushed to sell more "Expanded Criteria" loans. Another wholesale account executive remarked that Countrywide paid its employees more to sell "Expanded Criteria" loans. Expanded Criteria loans included loans with reduced documentation underwriting, higher loan-to-value ratios and other risky loan features.

78.     Countrywide itself observed in its first quarter 2008 10-Q the consequences of this expansion into risky products and practices. It disclosed that, since 2007, it had "observed a marked decline in credit performance (as adjusted for age) for recent vintages, especially those loans with higher risk characteristics, including reduced documentation, high loan to value ratios or low credit scores."

79.     As described, Countrywide's expansion into riskier products and practices became apparent in a number of ways.

### Countrywide Sold Unaffordable and More Expensive Loans to Borrowers Due to its Lax Underwriting Standards

80.     For the reasons described above, Countrywide relaxed its underwriting standards in recent years. These relaxed underwriting standards allowed the mass selling of reduced

22

documentation loans and the failure to ensure borrowers had sufficient capacity to repay the mortgages Countrywide sold them.

A.    Countrywide Inappropriately Sold Reduced Documentation Loans

81.    Countrywide's relaxation of traditional underwriting standards is evident in its increased reliance on reduced documentation loans. From 2005 through the first half of 2007, a majority of the Countrywide mortgages sold in Illinois were reduced documentation loans, often called "stated-income" or "liar's loans." Countrywide underwrote these loans with less documentation and, consequently, less verification, of borrowers' income and assets than traditional mortgages.

82.    The four types of reduced documentation loans sold by Countrywide from at least 2004 through the first half of 2007 are described as follows:

    a.    The "Stated Income Verified Assets" loan, often referred to as a "SIVA," required the disclosure of employment, income and assets on the loan application. Employment and assets were verified, but income was not verified by Countrywide. A debt-to-income ratio was calculated based on the stated income and it typically had to meet certain requirements. This product was the most commonly sold reduced documentation loan. In addition to the SIVA product, Countrywide sold a product known as the "Fast 'n' Easy" that had similar underwriting criteria. Borrowers whose credit score exceeded a certain threshold could qualify for the Fast 'n' Easy as opposed to the SIVA product.

    b.    The "No Ratio" loan, often called a "NIVA," required the disclosure of employment and assets on the loan application, both of which were verified. However, income could not be disclosed on the loan application, and

23

Countrywide did not calculate debt-to-income ratios in qualifying borrowers for these loans.·

c. A "Stated Income Stated Assets" loan, or "SISA," required that employment be disclosed and verified, but neither income nor assets were verified by Countrywide.

d. A "No Income No Assets No Employment" loan, also called a "No Doc" or "NINA" loan, prohibited disclosure of employment, income and assets on the loan application. No debt-to-income ratio was calculated to qualify the borrower.

83.    The various types of reduced documentation loans sold by Countrywide are collectively referred to in this Complaint as "reduced documentation" or "stated income" loans.

84.    Countrywide sold reduced documentation loans to prime borrowers and some types of reduced documentation loans to subprime borrowers. Over time, Countrywide actually lowered the minimum credit score for which it would approve a reduced documentation loan to include a broader set of borrowers. Countrywide also lessened underwriting standards for reduced documentation loans sold to subprime borrowers, increasing the numbers of subprime borrowers who were eligible to receive these loans. In fact, during recent years, a significant percentage of  . the subprime loans Countrywide sold to Illinois borrowers were reduced documentation loans.

85.    Because a majority of the loans sold in Illinois in recent years were reduced documentation loans, Countrywide employees and brokers clearly sold reduced documentation loans to borrowers regardless of the borrowers' ability of the borrower to document income and assets. In fact, Countrywide sold some of its reduced documentation loans to salaried borrowers who received W-2's from their employment.  Countrywide had no rules restricting the sale of reduced documentation loans to borrowers who had difficulty documenting their income.

24

Rather, they could be sold to borrowers regardless of the ease or difficulty of documenting their income, employment or assets.

86.    Countrywide had very few safeguards on the use and underwriting of reduced documentation loans. The only check on fraudulent income was a reasonableness standard allegedly used by Countrywide. Early on, Countrywide employees merely used their judgment in deciding whether or not a stated income loan seemed reasonable. In or around 2005 or 2006, Countrywide required its employees to use salary.com – a website that provides a salary range for a given job title or profession in a certain zip code – to determine whether the income stated on the loan application appeared reasonable. However, if the stated income fell outside of the range provided by salary.com, Countrywide underwriters could still approve the loan.

87.    In addition to a lack of controls on these risky underwriting guidelines, Countrywide pushed their sales employees, both retail and wholesale, and their underwriters to sell and close large volumes of loans without due regard for the risk to borrowers as quickly as possible. Countrywide fired employees for low production when they failed to originate and close sufficient numbers of loans.

88.    To encourage the fast origination of loans, Countrywide compensated its sales employees, at least in part, on the volume of loans sold. The more loans its employees sold, the more money Countrywide paid them. Countrywide sales employees were paid on a tiered bonus system that compensated them more for each tier of sales volume they reached during the month. Once an employee sold enough loans to put him in the next tier for that month, he would earn more on *each* loan he had sold during that month. A substantial portion of the salary of Countrywide sales employees, both retail and wholesale, was based on sales volume. In fact, wholesale account executives—Countrywide employees who dealt with brokers—were paid only

25

on commission, they had no base salary. Countrywide employees, therefore, had incentives to sell as many loans as possible – regardless of credit risk.

89.     Countrywide's underwriters were also compensated based on the number of loans they underwrote. They were paid a base salary, but a large percentage of their total salary was a bonus payment based on the number of loans underwritten. In addition, the goal for underwriters who reviewed broker files was to approve and process purchase files in 24 hours and refinance files in 48-72 hours. One underwriter stated that, for a period of time, she was required to underwrite 25 loan files a day during the week and 25-35 loan application files over the weekend. Thus, Countrywide underwriters also had a large incentive to underwrite as many loans as possible as quickly as possible, and Countrywide pushed them to do so.

90.     In addition to these compensation incentives for its own employees, Countrywide enticed its mortgage brokers to sell reduced documentation loans with advertisements proclaiming

> Expanded Criteria: More ways to say yes! Qualify more of your borrowers with Expanded Criteria programs from Countrywide®, America's Wholesale Lender®. Countrywide offers some of the most flexible documentation guidelines in the industry. Our extensive Expanded Criteria programs provide you with solutions that help you close more loans. You'll see that when it comes to lower documentation loans; no one delivers like Countrywide.

91.     Countrywide also enticed brokers with advertisements that said "Designed to deliver Low Doc and No Doc solutions to meet the needs of virtually every type of borrower," "NO INCOME NO ASSETS DOC OPTIONS," "Reduced Doc – Simplified and Enhanced!," and "Low down payment, low documentation solutions."

92.     The lack of rules and oversight on stated income loans, and the push for employees to sell more loans and to close loans quickly, facilitated rampant fraud in the sales of reduced documentation loans. Countrywide sales employees and brokers used reduced documentation loans as a way to qualify borrowers for loans they could not afford. One former Countrywide

employee has estimated that approximately 90% of all reduced documentation loans sold out of the branch where he worked in Chicago had inflated incomes.

93.     As noted in a Chicago Tribune article, the Mortgage Asset Research Institute reviewed 100 stated income loans, comparing the income on the loan documents with the borrowers' tax documents. The review found that almost 60% of the income amounts were inflated by more than 50%, and that 90% of the loans had inflated income of at least 5%.

94.     Countrywide sales employees sometimes received income documentation (e.g. W-2's or tax returns) and determined that the borrower could not qualify for the loan based on their real income. The employee would then submit the loan as a stated income loan, inflating the borrower's income to qualify him for the loan. Countrywide "stretch[ed] the income" on reduced documentation loans as far as possible.

95.     In the review of one Illinois mortgage broker's sales of Countrywide loans, the vast majority of the loans had inflated income, almost all without the borrowers' knowledge.

96.     Many Countrywide borrowers were not aware they were receiving a reduced documentation loan, and did not realize they were being sold a loan they could not afford and were not qualified to receive.

97.     In addition to a lack of rules concerning what borrowers were appropriate for reduced documentation loans, Countrywide failed to have sufficient controls concerning what loan programs could be sold as reduced documentation loans. Many of the riskier exotic and "affordability" products offered by Countrywide were sold with reduced documentation. For example, Countrywide's option ARM and interest-only products could be sold with reduced documentation underwriting. Countrywide also sold loans with very high loan-to-value ratios with reduced documentation underwriting.

27

98.     Countrywide pushed these products in advertisements to its mortgage brokers like:

"Check Out Countrywide's Expanded Criteria 80/20 Loans with Reduced Documentation!";

"Low down payment, low documentation solutions. Qualify more borrowers with high LTVs and

low doc options from Countrywide®, America's Wholesale Lender®;" "Stated Income Program

Enhancements. Up to 100% LTV;" and "The PayOption ARM from Countrywide®, America's

Wholesale Lender® offers your qualified borrowers reduced paperwork with the Stated

Income/Stated Assets (SISA) documentation option."

99.     Not surprisingly, reduced documentation loans have higher delinquency rates than full

documentation loans, further suggesting the prevalence of fraud in these loans.

100.    Countrywide acknowledged the existence of higher default rates for reduced

documentation loans in its 10-Q filing for the first quarter of 2008:

> We attribute the overall increase in delinquencies in our servicing portfolio from
> March, 31, 2007 to March 31, 2008, to increased production of loans in recent
> years with higher loan-to-value ratios and reduced documentation requirements,
> combined with a weakening housing market and significant tightening of
> available credit and to portfolio seasoning.

101.    Even if income was not inflated, Countrywide charged many borrowers more for reduced

documentation loans. Countrywide employees used reduced documentation loans because they

were faster, easier to sell, and to underwrite. It took as little as 30 minutes to underwrite some

reduced documentation loans, and some loans closed the same day the application was taken

from the borrower. This scheme enabled Countrywide employees to sell more loans and make

more money. So, some borrowers who could easily have documented their income were sold

more expensive reduced documentation loans by Countrywide employees and brokers.

102.    In short, Countrywide's sale of reduced documentation loans put many Illinois borrowers into unnecessarily riskier and more costly loans and, for many borrowers, loans that they could not afford.

**B.    Countrywide Inappropriately Qualified Borrowers For Adjustable Rate and Interest-Only Mortgages Based on Less than a Fully-Indexed Rate or Less Than Fully-Amortizing Payments**

103.    In addition to increased sales of reduced documentation loans, in recent years Countrywide also increased its sale of "affordability" products. These loans allowed borrowers to obtain a loan with low initial payments that would not continue for the life of the loan. Countrywide qualified borrowers at this initial low payment knowing that they would not be able to repay the loan in its entirety.

104.    One affordability product Countrywide sold was an interest-only loan. An interest-only loan allows borrowers to make payments covering only the interest on their loan during the first years of the loan, usually the first 3, 5, 7 or 10 years. After this initial period, borrowers must make fully-amortizing payments to pay off their principal balance plus interest over the remaining life of the loan. The interest-only payments at the beginning of the loan are much lower than the later fully-amortizing payments.

105.    According to an article by the New York Times published on November 11, 2007, Countrywide was the second leading originator of interest-only loans from 2006 through the second quarter of 2007.

106.    Countrywide sold interest-only loans to prime and subprime borrowers as stated income loans. In 2005 and 2006, Countrywide's interest-only loan was sold to a borrower with a credit score as low as 560, and as a stated income loan to a borrower with a credit score as low as 620.

29

107.    In 2007, Countrywide qualified non-prime borrowers to receive interest-only loans for up to $1 million with a minimum credit score of 600 and up to $850,000 with a minimum credit score of 580. Interest-only loans in lesser amounts were also available to non-prime borrowers as stated income loans. One Countrywide ad to brokers touts "Interest-Only loans from Countrywide®, America's Wholesale Lender® offer low monthly payments for the initial loan period, possibly helping your non-prime customers qualify for a bigger loan amount."

108.    During at least part of the time from 2003 through 2007, Countrywide qualified its borrowers at less than fully-amortized payments on its interest-only products. According to comments Countrywide provided to federal regulators concerning the proposed Interagency Guidance on Nontraditional Mortgage Products, Countrywide stated that "[i]nterest-only loans are designed to be an affordability product, allowing borrowers to qualify at the 'minimum' or lower non-amortizing interest only payment for a fixed and extended term. We [Countrywide] believe that it is appropriate to qualify borrowers based on the interest only payment."

109.    Countrywide advertised these loose underwriting standards to its brokers in ads like "Maximize your borrower's cash flow with Interest-Only loans. Qualify based on the Interest-Only payment."

110.    The practice of qualifying borrowers at low interest-only payments, which, under the terms of the mortgage, can only be paid during a certain period of the loan and then a higher, fully amortizing payment will be required, places borrowers into loans that they ultimately may not be able to afford. Such a practice implicitly relies on borrowers either changing their financial circumstances or being able to sell their home or refinance their loan.

111.    Moreover, these interest-only loans could be given using the loose standards of a Stated Income; No Ratio; Stated Income, Stated Asset; and a No Income, No Assets or Employment (No Doc) loan, creating even more risk that the borrower would not be able to afford the loan.

112.    Countrywide advertised its "flexible qualifying criteria" even to brokers selling this product to subprime borrowers. In one ad to brokers titled "Interest Only Now Available for Non-Prime Stated Wage Earners," Countrywide told its brokers that their "Interest Only loan options give Stated Wage Earners more flexible qualifying criteria." Countrywide went on to entice brokers to "learn more about how our Non-Prime Interest Only loan programs can help you increase your business and qualify more borrowers for their dream home . . .". This interest-only product could be sold as a stated income loan to a borrower with a credit score as low as 620.

113.    The interest-only loan advertised above could also be a hybrid ARM. Borrowers who took out this loan as a hybrid adjustable rate mortgage ("ARM") received a loan that (1) allowed them to pay only the interest portion of their full payment for the first years of the loan, and (2) came with a discounted interest rate that would likely increase after the first few years. Such borrowers were set up for a payment shock once the discounted fixed rate term and interest-only portion of their loan was over.

114.    Countrywide used these products to entice unsuspecting borrowers with low monthly payments and to qualify more borrowers for loans – often loans that they might not be able to afford long-term.

115.    Another affordability product sold by Countrywide was the hybrid ARM. These loans typically have a two-or three- year fixed rate followed by 28 or 27 years of a variable rate, and are often referred to as a 2/28 and 3/27. These loans usually came with low, discounted interest

31

rates during the short fixed-rate period. After the fixed-rate period ended, the rate would adjust—but could only adjust up, not down—every six months to a year, based on an index plus a margin. Countrywide sold these loans to prime and subprime borrowers.

116.    Countrywide also qualified its borrowers at less than fully-indexed rates on its 2/28's and 3/27's, meaning that Countrywide qualified the borrowers based on low rates that would adjust upward in two or three years without regard to whether the borrowers could afford the higher rates. This scheme forced borrowers into unaffordable payments once the fixed rate period of their loans terminated because they were not qualified at these higher payments.

117.    One Illinois consumer's experience provides an example of Countrywide's business practice of placing borrowers in unaffordable hybrid ARM loans. Countrywide was the servicer for a 64 year-old widow's mortgage loan. This widow lived on a fixed income. At the time Countrywide purchased the servicing rights for her loan, the widow had a 30-year fixed-rate mortgage with a monthly payment of approximately $300. In January 2005, Countrywide refinanced this 64 year-old borrower into a 3/27 interest-only loan with a fixed rate for only the first three years of the loan. The consumer's monthly payment more than doubled to approximately $800 a month. Even before this consumer's loan reset, however, she was unable to afford her mortgage payment – showing that Countrywide refinanced her into an unaffordable adjustable rate mortgage.

118.    Countrywide acknowledged in a May 7, 2007 letter to the Office of Thrift Supervision commenting on a proposed federal Statement on Subprime Mortgage Lending that: "Specifically looking at originations in the fourth quarter of 2006, we know that almost 60% of the borrowers who obtained subprime hybrid ARMs [from Countrywide] would not have qualified at the fully indexed rate." Countrywide also acknowledged that "almost 25% of the borrowers would not

32

have qualified for any other [Countrywide] product." Even removing the added risk layers of

reduced documentation and high loan-to-value ratios, Countrywide knew that a majority of the

borrowers who received their hybrid ARMs, at least during this period, were likely unable to

afford the loans unless they refinanced by the time the introductory fixed period expired.

119.    Countrywide did not inform its borrowers who were qualified at less than a fully-indexed

rate or less than a fully-amortizing payment, that they were not qualified at the higher payments

after the loans reset.

120.    Countrywide made loans to borrowers that they ultimately would not be able to afford,

relying on the premise that borrowers would be able to continue to refinance out of their

unaffordable loans into new loans – and without making clear to borrowers the costs and risks of

such loans.

### Countrywide Pursued Market Share With Products That Layered Borrowers' Loans with Unnecessary Additional Risk

121.    Even as it was relaxing its underwriting standards to increase loan origination,

Countrywide also sought to increase its market share by offering new products packed with

features that compounded risk to the borrower. These included option ARM mortgage products

and loans for all or close to all of a homeowner's equity in a home.

122.    The New York Times aptly described Countrywide's increasing origination of exotic

products during the period from 2005 into 2007 with a quote from a former Countrywide

executive that: "To the extent that more than 5 percent of the market was originating a particular

product, any new alternative mortgage product, then Countrywide would originate it."

33

A.    Countrywide's Combined its PayOption ARM with Unnecessary Layers of Risk,
      Improper Marketing, Confusing Disclosures, Inappropriate Sales Incentives and
      Inadequate Oversight

123.    Countrywide's marketing and selling of option ARM mortgage loans exemplifies the

company's increasing reliance on unfair and deceptive loan products and sales techniques to

increase its market share.

124.    From their inception, option ARMs were intended to be "a niche product aimed at

sophisticated and well-heeled borrowers who wanted flexibility." Starting in 2003, however,

option ARM origination grew beyond this narrow market, particularly at Countrywide.

125.    Option ARMs, frequently referred to as "exotic" mortgage products, have three core

features that sharply contrast with traditional mortgage loan products.

126.    First, for a certain period of time, borrowers have four options as to which payment to

make each month. These payment options are (1) a minimum payment that covers none of the

principal and only part of the interest normally due each month; (2) an interest-only payment; (3)

a payment that is amortized to pay off the loan in 30 years; and (4) a payment that is amortized to

pay off the loan in 15 years.

127.    Second, an option ARM may result in negative amortization – meaning that the amount

owed increases over time. The amount of accrued interest that is not paid each month is added

onto the borrower's loan balance. Therefore, the balance of the borrower's loan will actually

increase by the amount of the unpaid interest if the borrower makes only minimum payments.

128.    Traditionally, failure to pay the amount of accrued interest on a loan each month results

in default and, ultimately, foreclosure. This outcome is a negative event for both the borrower

and the lender. With option ARMs, however, Countrywide was able to neutralize this negative

34

event – at least for itself. Countrywide simply added this uncollected interest to the borrower's loan as additional principal and calculated the interest on this new, higher amount of principal.

129.    There was, however, a cap to the amount of unpaid interest growing from negative amortization that could be added to the principal of the loan. Once the loan balance hit a certain ceiling – typically 115% of the loan's value – the minimum and interest-only payment options were removed and the borrower had to make fully-amortizing principal and interest payments. This "recasting" of the loan is the third core feature of a option ARM.

130.    The fully-amortizing payments that borrowers must make after recast are far more than the minimum payment that the borrowers had been previously making. Taking one consumer's loan as an example, the monthly minimum payment was $751, but the fully amortizing payment was $1834. The payment shock experienced by option ARM borrowers when the interest rate on their adjustable rate mortgage fluctuated was small compared to the payment shock from a loan recasting to require the fully-amortizing payment. Assuming steady interest rates, recasting for consumers who consistently make the minimum required payment will occur approximately three to four years after origination of the loan.

131.    Countrywide quickly became a leader in this profitable and growing part of the mortgage market. Option ARMs increased from approximately 3% of the company's loan production during the quarter ended June 30, 2004, to approximately 21% of its production during the quarter ended June 30, 2005.

132.    The reason for Countrywide's increasing origination of option ARMs is clear: profit. An investigation by the New York Times revealed that option ARMs "were especially lucrative. Internal company documents from March [2007] show that Countrywide made gross profit

35

margins of more than 4 percent on such loans, compared with 2 percent margins earned on loans backed by the Federal Housing Administration."

133.    At the same time that Countrywide touted the profitability of these loans, it also acknowledged that they were riskier for borrowers. The company said in its June 30, 2005 10-Q filing, "[w]hen the monthly payments for pay-option loans eventually increase, borrowers may be less likely to pay the increased amounts and, therefore, more likely to default on the loan, than a borrower using a normal amortizing loan." Angelo Mozilo even acknowledged that "it isn't clear how successful borrowers ultimately will be in paying off their option ARMs."

134.    As discussed below, it is now clear that many borrowers will not only fail to pay off their option ARMs, but will lose equity in their homes and perhaps the ownership of their homes altogether.  The full breadth of the problem has yet to emerge, but the numbers show that borrowers are losing ground.  During the nine months ended September 30, 2007, 76% of borrowers elected to make less than full interest payments – much less than a payment that would cover any amount of the outstanding loan principal.  This represents a 10% increase over the number of borrowers making less than full interest payments during the same period in 2006.

135.    While attention is now focused on the meltdown in the subprime mortgage industry, option ARMs – which are classified as "prime" loan products – are ticking time bombs contained in lenders' prime loan portfolios and in securitized loan pools.  According to Moody's Economy.com, monthly payments on roughly $229 billion of option ARMs will recast to include market-rate interest and principal from 2009 to 2011.

1.      <u>Countrywide Inappropriately Coupled its Volatile PayOption ARM Loan Product with Teaser Interest Rates, Prepayment Penalties, High LTVs and Reduced Documentation Underwriting</u>

136.     The core features of an option ARM – multiple payment options, negative amortization and automatic recasting of loan terms – make the product much riskier than traditional mortgages. But Countrywide typically did not sell its option ARM (typically called a PayOption ARM) with just these three features. Instead, it proceeded to layer the product with features that made it exceptionally risky, placing borrowers at risk of losing equity in their homes or even their homes. These features include: illusory teaser interest rates, prepayment penalties, high loan-to-value ratios and/or reduced documentation underwriting guidelines. As one former Countrywide loan originator explained, Countrywide's "options ARMs were built to fail."

137.     Countrywide frequently combined its PayOption ARMs with illusory "teaser" interest rates. These "teaser" interest rates could be as low as 1%, but were illusory in that they were generally only valid for the first month or first three months of the loan.

138.     After the illusory teaser interest rate expired, the interest rate on the loan would adjust to a true interest rate that typically had a cap of 9.95%. After the initial interest rate adjustment, the interest rate on the loan would continue to adjust each month. Therefore, the borrower would only have the benefit of the interest rate for one to three months of the 30 to 40 years of the life of the loan.

139.     An interest rate that was only in effect for one month conferred no real benefit to a borrower. Thus, the marketing emphasis on the teaser interest rate of Countrywide's PayOption ARM was inherently misleading.

140.     Interviews with former Countrywide employees and brokers and an examination of Countrywide's advertisements confirmed that the teaser interest rate was used to mislead

37

borrowers and obfuscate the true interest rate of the loan. A former Countrywide Account
Executive, who was assigned to work with brokers in selling Countrywide products, was
encouraged to tell her brokers to sell the loan based on the low monthly payment. A former
employee who worked at Countrywide's prime retail locations confirmed that loan originators
sold the product by highlighting the low payment on the option ARM, although it was based on
an illusory teaser interest rate.

141.    Countrywide's advertisements highlighted the teaser interest rate. For example, a
television advertisement promoting the product emphasized "[a]nd 1 percent, you can't beat that.
So pick up the phone, call Countrywide, or just visit your local branch today." Despite legal
disclaimers, this emphasis on the teaser interest rate shows the company's intent to use the teaser
to market the product.

142.    Countrywide also generally coupled its option ARM loans with a three year prepayment
penalty. In order for a consumer to refinance an option ARM during the first three years of the
loan, the consumer would be required to pay the equivalent of six months' interest on the loan.
Consequently, even if borrowers became aware of the risky features of their mortgage, they were
effectively trapped in a loan with a payment that could adjust upward and become unaffordable.

143.    Although prepayment penalties are touted by lenders as a bargaining tool for consumers,
analysis has revealed that subprime borrowers generally received no appreciable benefit in
exchange for accepting a loan with a prepayment penalty. At least one broker indicated that,
although he was paid more for a loan with a prepayment penalty, there was no appreciable
benefit to a prime consumer for taking a loan with a prepayment penalty. Therefore, the only
point of this risky feature was to generate additional profit for Countrywide because investors
would pay more for loans with prepayment penalties.

38

144.    Another risky feature that Countrywide layered onto its PayOption ARM allowed a

borrower to mortgage 90-95% of a home's value with a PayOption ARM first mortgage for the

bulk of the amount and a second mortgage for the remainder.

145.    According to a UBS survey conducted on behalf of The Wall Street Journal:

> Countrywide also allowed borrowers to put down as little as 5% of a home's price and
> offered "piggyback mortgages," which allow borrowers to finance more than 80% of a
> home's value without paying for private mortgage insurance. By 2006, nearly 29% of the
> option ARMs originated by Countrywide and packaged into mortgage securities had a
> combined loan-to-value of 90% or more, up from just 15% in 2004, according to UBS.

146.    Although higher loan-to-value ratios are inherently riskier than lower loan-to-value

ratios, that risk is compounded when the underlying mortgage product is an option ARM.  If a

borrower has an option ARM mortgage with a high loan-to-value ratio or during a time when the

housing market depreciates (or both), the borrower could easily end up owing more on a home

than it was worth because of the possibility of negative amortization on this product.

147.    Finally, the vast majority of the PayOption ARMs sold by Countrywide were

underwritten with reduced documentation requirements.  Prudent underwriting is how borrowers

are protected from the risk that they will be given a mortgage that they will not be able to repay.

In the case of a PayOption ARM, Countrywide purportedly mitigated the risk that borrowers

would not be able to repay their risky loans by requiring that its underwriters qualify borrowers

at the full principal and interest payment for the option ARM. This process became a

meaningless protection, however, when Countrywide failed to require full documentation for its

underwriting.

148.    When Countrywide designed its mortgage products, it also determined what underwriting

documentation requirements it would attach to the product.  As discussed above, these

39

requirements could vary from full documentation to no documentation at all. Countrywide

apparently decided that its underwriting for an option ARM did not require full documentation.

149.    This decision led to underwriting guidelines that allowed a borrower to mortgage 95% or

more of the value of a home with a PayOption ARM underwritten with stated income and stated

assets.

150.    Countrywide's decision to allow reduced documentation underwriting resulted in the vast

majority of its PayOption ARMs being sold with less than full documentation. Of the option

ARMs Countrywide sold in 2007, 82% were reduced documentation mortgages in which the

borrower did not fully document income or assets.

151.    One former Countrywide manager noted that the loans were an easy sell because they

could use stated income – presumably to ensure that the borrower's income (at least what was

stated as the borrower's income) was sufficient to qualify for the mortgage.

152.    As discussed above, low or no documentation loans are likely to contain material

misrepresentations and/or fraud that will result in increased default rates. Risk of default is

compounded when a lessened underwriting standard is coupled with "nontraditional" mortgages

such as option ARMs. Regulators and analysts have counseled against this type of risk layering.

> Banking regulators say that lenders are increasingly relying on unverified income to
> qualify borrowers for so-called nontraditional mortgage loans. Those products – such as
> pay-option adjustable-rate mortgages and interest-only loans – allow borrowers to defer
> payment of principal and sometimes interest. Many analysts see such a combination of
> nontraditional products and nontraditional underwriting processes as presenting another
> layer of risk to those who could be hurt by defaults, including consumers, shareholders in
> mortgage lenders and investors in securities backed by mortgage loans.

153.    Combining a PayOption ARM with any of the risk-layering features described above

results in a product that is significantly increases a borrower's risk of loosing home equity or

ending up in foreclosure.

40

154.    Delinquency reports support this conclusion. Statistics show that consumers are becoming increasingly delinquent on option ARMs. Countrywide securitized roughly three quarters of its option ARMs, but held the loans most likely to be high performing in its portfolio. Of the option ARMs that Countrywide held in its bank portfolio, 9.4% of the option ARMs were at least 90 days past due in April 2008, up from 5.7% at the end of December 2007 and 1% a year earlier. As this input likely includes many option ARMs that have not recast, these delinquencies are particularly alarming as they show consumers are not even able to make the minimum payment on these loans. In other words, borrowers somehow received option ARMs when they were unable to make even the minimum payments, much less the fully-amortizing payment.

155.    These numbers show that option ARMs are failing at a troubling rate, but that has not led Countrywide to stop layering the product with risky features. In fact, an analysis of only those option ARMs that Countrywide held in its own portfolios (i.e., the least risky option ARMs) shows a steady decrease in loan quality. For example, the loan-to-value ratio for the product increased from 73% in 2004 to 76% in 2007. The average credit score, a general indicator of creditworthiness, dropped from 730 in December 2004 to 716 in September 2007. Even though external indicators should have provided Countrywide with ample notice that it needed to tighten option ARM underwriting criteria, the company continued to relax its standards in selling increasingly risky loans.

156.    Former Countrywide employees and brokers who sold Countrywide products have stated that option ARMs are risky products.

157.    Some of Countrywide's own former employees found the product unsound for anyone. Brokers who sold the product opined that it should never be paired with either a prepayment

41

penalty or reduced documentation underwriting due to the dramatic increase in risk to the borrowers. Another broker referred to the product as a "ticking timebomb" and another former Countrywide employee referred to it as "dangerous."

    2.    Countrywide Improperly Mass Marketed its PayOption ARMs and Failed to Provide Borrowers with Adequate Disclosures About the Product's Risks

158.    Despite the structural unfairness of the PayOption ARM described above, Countrywide marketed the product indiscriminately to all borrowers, pushed its employees and brokers who sold Countrywide loans to sell the product inappropriately and failed to provide disclosures to ameliorate borrowers' confusion about the mortgage they were obtaining.

159.    With all of its risky features, the PayOption ARM should have been marketed cautiously – if at all. That was not, however, Countrywide's approach. For example, Countrywide sent direct mailers to consumers whose loans it serviced to market the product. In one such mailer, Countrywide advised the consumer that he had an "excellent payment record" and might now qualify for "our best 'A' level mortgage interest rates – such as our PayOption ARM."

160.    Likewise, Countrywide sent direct mailers to consumers advising them to call Countrywide for a one year anniversary loan check-up. The direct mailer also touted Countrywide's option ARM product.

161.    Countrywide provided its brokers with sample advertisements that they could use to entice borrowers to get option ARMs. One of these advertisement exemplars asks borrowers "[w]ho doesn't need more options?" The implication of the ad is that an option ARM is appropriate for anyone who would simply like "more options."

162.    The disclosures that Countrywide gave borrowers provided little help in explaining their actual mortgages because they were the epitome of "information overload." For example, in 2007, one disclosure entitled the "Home Loan Application Disclosure Handbook" (Handbook)

42

was 123 pages long and had 63 pages concerning all of the available Countrywide loan products, not just the products in which borrowers were interested.

163.    Regardless of whether borrowers applied for loans through a broker or a retail division, Countrywide sent borrowers various disclosures, such as this handbook, prior to closing loans. Often acknowledgment forms accompanied the disclosures. For some borrowers, Countrywide required consumers to sign acknowledgement forms prior to processing the loan application. At this point, what types of loans they could even afford. Without this information, it was difficult for borrowers to assess the various mortgage products and their options. For other borrowers, Countrywide required borrowers to sign acknowledgment forms at closings, along with many other closing documents.

164.    For borrowers wanting to learn about PayOption ARMs, in the Handbook, there were eight pages about different PayOption ARMs buried in the middle of other disclosures. Each of these had confusing titles such as "PayOption Adjustable Rate Mortgage Loan Program Disclosure Monthly Treasury Average ("MTA") Index-Payment Caps All States Except New York."

165.    Not only did this Handbook bury explanations of Countrywide PayOption ARMs and use confusing titles to describe them, it also failed to adequately warn borrowers about the possible pitfalls of negative amortization with option ARMs, like depreciation of home values. The Handbook defined negative amortization as ... "the interest shortage in a [consumer's] payment is automatically added to the loan balance and then interest may be charged on that amount). [The consumer] might therefore owe the lender more later in the loan..." It then stated, "However, an increase in the value of your home may make up for the increase in what you

43

owe." Yet, it never stated that if the market failed or the value of the homes depreciated, consumers would owe more than the value of their homes.

166.    By overloading borrowers with irrelevant information and using confusing language, Countrywide's disclosures hid the very information that they were supposed to disclose to consumers—the relevant details about their actual mortgages.

167.    Notably, a number of former Countrywide employees remarked that they did not feel comfortable selling the products because they either did not understand the product themselves or did not feel comfortable explaining it to someone else.

168.    Although Countrywide may have created training materials for the product, at least one former employee did not recall receiving any training on it at all -- although she was authorized to sell option ARMs. Brokers authorized to sell Countrywide products similarly recalled that the company failed to provide any training materials on option ARMs.

169.    With their risk and complexity, option ARMs should have been sold with discretion and only with proper disclosures of risks. Countrywide knew from its own empirical evidence that its mass-marketing of this product would place many homeowners into unsustainable loans.

170.    When consumers made only the minimum payment, Countrywide carried the negative amortization that resulted on its books as uncollected "income." In 2004, the accumulated negative amortization "income" was only $29 thousand. For the year ending 2007, however, accumulated negative amortization from pay option ARMs that Countrywide was holding on its books had grown to $1.215 billion. The negative amortization had steadily – and markedly – increased from $29 thousand to slightly over a billion dollars by rising to $74.7 million in 2005 and $654 million at year end 2006,.

44

171.    Despite all of these warning signs and the widespread acknowledgement among analysts

and even its own former employees that this product is unsuitable for most borrowers,

Countrywide is still promoting its option ARM products on its website to this day.

     3.    Countrywide Incentivized and Facilitated Improper Sales Techniques without
         Providing Adequate Guidelines for Selling its PayOption ARMs

172.    Countrywide further increased the risks associated with this product by incentivizing

mortgage brokers to sell PayOption ARMs over more traditional mortgage products.    The

company then failed to provide the brokers with sufficient parameters for selling the product,

facilitated deceptive sales tactics and did not exercise sufficient oversight over brokers' conduct.

173.    As Angelo Mozilo stated during an April 26, 2005 investor conference call, the product

was "a good product for both us, the lender, and for the mortgage broker." Countrywide left

consumers out of this analysis.

174.    As an initial matter, Countrywide provided financial incentives for brokers and its

employees to inappropriately sell its PayOption ARMs.

175.    Brokers are compensated in two ways. First, borrowers may compensate brokers directly

through loan origination, underwriting, processing and other fees. The second way that brokers

are compensated, however, is through "yield spread premiums" ("YSPs").

176.    A yield spread premium is the cash rebate paid to a mortgage broker by a lender.

Typically, the YSP is based on a broker selling a borrower a loan with an interest rate above the

wholesale par rate.    The par rate is the actual interest rate a borrower qualifies for with a given

lender.  For example, a mortgage broker could earn a YSP for selling a borrower a loan with an

interest rate of 6.25% when the borrower's par rate is 6%. This fee is paid by the lender directly

to the broker as a "rebate." Although the consumer is not charged the fee directly, the consumer

45

pays the fee indirectly by paying a higher interest rate. The YSP is typically a percentage of the loan amount, therefore, the larger the loan, the larger the fee that the broker earns.

177.    Countrywide structured the YSP for option ARMs in a manner that virtually guaranteed that brokers who were more concerned with getting the highest YSP possible than getting their borrowers the best loan possible would steer borrowers into these risky loans. Plainly put, it was easier to obtain higher commissions for option ARMs as opposed to other traditional Countrywide mortgage products.

178.    Ordinarily a broker would need to increase the interest rate over a borrower's par rate on a loan in order to receive a higher YSP. A borrower would notice, of course, that a broker was offering a loan with a higher interest rate.

179.    With option ARMs, the YSP was based on three factors which helped obscure the true cost of the loan: the amount of the teaser interest rate, the amount of the margin that was used to calculate the product's interest rate, and the existence of a prepayment penalty.

180.    First, the teaser rate was so low, borrowers would not notice a material difference between 1%, for example, and 1.25%.

181.    Second, as far as the margin, borrowers were unlikely to notice what the margin was and realize that they were able to negotiate this term. Once the one-month teaser rate has expired, the PayOption ARM's interest rate is calculated each month by adding a margin—e.g. 4%—on top of on an index (such as the monthly United States Treasury average yield). The margin remains the same throughout the life of the loan, while the index changes monthly. The higher the margin, the higher the borrower's interest rate would be from month to month after the one-month teaser rate expired. Both the standard used for the index and the margin amount could be negotiated by the borrower. But because brokers sold the low monthly payment and the teaser

46

interest rate, the fact that there were other features that could be adjusted – to the borrower's detriment – often went unnoticed and was buried in the midst of the voluminous disclosures that borrowers received. Thus, borrowers would not typically notice if their broker increased their loan's margin to the maximum sold by Countrywide (around 4%) in order to increase his YSP.

182. Finally, brokers often added a three-year prepayment penalty to the loan. As discussed above, borrowers frequently did not receive any benefit for accepting a loan with a prepayment penalty – if they were even aware the loan had a prepayment penalty.

183. By slightly increasing an already low "teaser" rate, increasing the margin, and adding a three-year prepayment penalty, brokers could maximize the YSP Countrywide paid them.

184. Notably, because PayOption ARMs were considered "prime" loan products, borrowers who qualified for the loan would also have qualified for fixed rate and adjustable rate mortgages with favorably low interest rates. The true interest rate on a PayOption ARM was typically higher than the rates on either of these products. In other words, borrowers paid a premium for a product that most of them did not understand and that did not provide them with any benefits in return for this premium.

185. Therefore, Countrywide provided brokers with a financial incentive to sell option ARMs with a high margin and the worst prepayment penalty possible. Although the possible fraud that this financial incentive would motivate should have been clear, Countrywide then failed to institute appropriate checks on its sale or to adequately oversee its brokers.

186. A mortgage broker's primary contact within Countrywide was its assigned Account Executive, a Countrywide employee. Account Executives gave brokers selling tips on option ARMs to emphasize the meaningless one-month teaser rate. One former Countrywide Account

47

Executive was encouraged to tell her brokers to sell the loan based on the low monthly payment, since rising property values would offset negative amortization.

187.    Countrywide also gave its Account Executives materials, like flyers, which they could use to promote certain loan products to brokers or that they could give brokers to use to promote Countrywide products to borrowers.  Almost all of the flyers that Account Executives gave to brokers highlighted that reduced documentation could be used to qualify borrowers for the product and also emphasized the illusory teaser interest rate for the product.

188.    Not surprisingly, after receiving materials emphasizing the illusory teaser interest rate, brokers used the rate to obfuscate the true cost and interest rates of an option ARM.

189.    One broker, for example, placed a full-page advertisement in the Chicago-Sun Times for a closed-end line of credit of $235,000.00 for a monthly payment amount of $656.05. The advertisement does not disclose that the interest rate upon which the payment is based is only applicable for the first month of the mortgage loan.

190.    Another example is a direct mailing that a broker used to advertise an option ARM product. The broker solicited consumers through a direct mailing for a closed-end line of credit of $681,182.00 for a monthly payment amount of $1,898.54. Again, the direct mailing does not disclose, in readily understandable terms, that the interest rate upon which the payment is based is only applicable for the first month of the mortgage loan.

191.    Countrywide also failed to create any checks on who received a Countrywide option ARM. Due to the complexity of the product and the likelihood of severe negative consequences to the borrower -- such as loss of home equity, this product was not appropriate for most borrowers. As described above, the option ARM was initially designed for sophisticated borrowers – people who were investing in or building homes or properties for resale.

48

Countrywide took this niche product and mass marketed it to the general public, often through mortgage brokers, without instituting any parameters for its sale.

192.    Based on the materials that Account Executives gave brokers regarding the product, it would seem that the product was appropriate for any borrower who wanted "options," regardless of their actual financial circumstances. This lack of rules enabled Countrywide's brokers to misuse the product and to sell this Countrywide product to unsuspecting borrowers looking for a good, long-term, sustainable loan.

193.    Given Countrywide's critical reliance upon mortgage brokers to sell option ARMs, the complexity of the product, and huge potential for borrower harm, Countrywide should have developed, employed and facilitated proper – not deceptive – sales techniques. Countrywide also should have instituted parameters on what borrowers could receive this product. Countrywide did not.

     4.    Countrywide's Relationship with One Source Mortgage, Inc.

194.    Countrywide's use and abuse of the option ARM product is clearly illustrated by the relationship between the company and an Illinois broker who specialized in selling Countrywide PayOption ARM loans, One Source Mortgage, Inc. ("One Source").

195.    Countrywide should have been aware of potential issues with One Source Mortgage, Inc. when it first approved the broker to work as its business partner in Spring 2004. At the time Charles Mangold, the owner of One Source, submitted the company's broker application to Countrywide, he had no fewer than five felony convictions in the State of Illinois. Specifically, between 1989 and 2000, Mangold was convicted and sentenced to jail time for improperly communicating with a juror, multiple occurrences of felony possession and use of a weapon or firearm, and driving with a suspended or revoked license.

49

196.    In terms of actual conduct, One Source used the illusory one month teaser rate that Countrywide coupled with its option ARM exactly as one would expect – to commit fraud. For example, when describing the PayOption ARM to consumers, One Source told consumers the amount of only one payment – the minimum payment. One Source also did not adequately describe to consumers the distinctive characteristics of PayOption ARMS: the fact that the initial low interest rate was merely a one month teaser rate or that negative amortization would occur if the consumers pay only the minimum payment.

197.    One Source frequently did not disclose to consumers any interest rate for the mortgage loan at all or described only the illusory teaser rate.

198.    One Source told a consumer that his minimum payment of $700 covered all the interest on his loan. In reality, the consumer would have had to pay $1816 a month to make even an interest-only payment on his loan.

199.    To the extent that Countrywide or One Source provided disclosures to consumers, they were ineffectual. Consumers reported that they did not learn that One Source's representations about their mortgage loans were false until they began to receive statements from Countrywide.

200.    Countrywide handsomely compensated One Source for its fraudulent conduct. One Source received YSPs from Countrywide ranging from $4185 to $11,310 per loan in the month of March 2006. During that one month, One Source received a total of at least $100,000 from Countrywide in the form of yield spread premiums.

201.    One Source engaged in rampant fraud on borrowers' loan applications without the consumers' knowledge, and which Countrywide then completely failed to detect. Consumers typically told One Source their monthly income and even provided pay stubs and tax returns to verify their income. On some consumers' loan applications, however, their monthly income was

increased to sometimes even double the correct amount. Because Countrywide coupled PayOption ARMs with reduced documentation underwriting, the company failed to discover this fraud.

202.    For example, One Source listed one consumer's monthly income as $8000 on his mortgage loan application. In fact, this consumer earned only approximately $3400 to $4000 a month and provided pay stubs and tax returns to One Source to verify his income. This consumer was unaware that One Source listed his income as $8000.

203.    Countrywide's purported fraud detection programs failed to catch any of these issues. Along with this failure, Countrywide repeatedly bent the rules for One Source Mortgage. Although it was supposedly against company policy, Charles Mangold treated three Countrywide employees (his primary underwriter, the manager of the branch he dealt with, and the closer on his loans) to flowers and expensive gifts, such as Coach handbags.

204.    In addition, Countrywide's stated general policy is that broker files are assigned to underwriters randomly. This policy was not followed in the case of One Source Mortgage. One underwriter who worked in Countrywide's Lisle office was often assigned to underwrite One Source files and, in 2006, this underwriter was designated as One Source's primary underwriter.

205.    This underwriter was disciplined time and again for errors in her underwriting. Prior to being assigned to One Source, the underwriter had been counseled several times for, among other things, quality of work. Eventually, Countrywide terminated the underwriter. Despite the documented problems with One Source's primary underwriter, Countrywide failed to detect the systemic fraud in the One Source loan files.

206.    Countrywide did nothing to curb the rampant abuses inflicted by this broker. In fact, Countrywide did not even terminate its relationship with the broker until December 2007 – after

51

the Attorney General's Office sued the broker for fraud and served Countrywide with a subpoena seeking documents related to the broker's conduct.

207. As the One Source example illustrates, Countrywide's inducements to brokers combined with its lack of loan parameters or any real oversight resulted in brokers steering borrowers to loans that were exceptionally risky and routinely qualifying borrowers for loans they could not actually afford.

208. As a result of Countrywide's inappropriate marketing, selling and risk layering of its option ARM product, Illinois borrowers who thought they were refinancing into beneficial loan product are now facing the possibility of losing all the equity they had built up in their homes or losing their homes entirely.

**B.** **Countrywide Indiscriminately Sold Mortgages With High Loan-to-Value Ratios Regardless of the Loans' Risky Features**

209. In addition to risky products like option ARMs, Countrywide aggressively sold loans with very high loan-to-value ratios. In recent years, the loan-to-value ratio on many Countrywide loans – that is, the ratio of the home's appraised value to the amount of the loan – reached as high as 100%. Loans with 100% loan-to-value ("LTV") ratios were sold as a single loan, or separated into two concurrent loans: a first-lien loan paired with a simultaneously originated second-lien loan that, together, had a combined loan-to-value ratio of 100%.

210. These simultaneous second-lien loans were often referred to as "piggyback" loans, and the combination of a first- and second-lien loan with a 100% loan-to-value ratio was commonly referred to as an "80/20" or "combo" loan.

211. Countrywide regularly paired the first-lien loan in the 80/20 loans with a second-lien loan in the form of a product type known as a Home Equity Line of Credit, or "HELOC."

52

212.    The HELOC second-lien loans were sold as open-end revolving lines of credit. But, in order to avoid exorbitant add-on charges, borrowers were generally required to draw down the principal amount of the HELOCs fully at the time both the first and second-lien loans were originated, and Countrywide required HELOC borrowers to maintain a "minimum" average daily balance for several years thereafter to keep the "minimum" balance intact.

213.    This loan structure could be comprised of a first-lien loan for 80% LTV piggybacked with a simultaneous second-lien HELOC for 20% LTV.

214.    Countrywide could also achieve this 100% LTV structure with a simultaneously written second-lien fixed-rate loan. Countrywide boasted to its brokers that it has a "Greater variety of high LTV, low doc options for more borrowers: Enhanced 80/20 Options."

215.    This conduct was profitable. Countrywide applied a higher rate of interest to loans in the second lien position than the rate of interest applied to senior first-lien loans. This rate structure produced a correspondingly higher monthly payment (and income stream for investors) due to the higher interest rate applied to the outstanding principal balance on the junior second-lien loans.

216.    Countrywide's simultaneous second-lien HELOCs often came with some variation of an interest-only period. Many of Countrywide's HELOCs had a five-year interest-only period that could be extended for another five years – this was called the "draw" period – even if the loan was already fully drawn.

217.    For the interest-only period, the required payment would only cover interest. As a result, a borrower would neither pay down any of the loan principal nor increase the amount of equity in the home during this time. Even if the borrower stayed current on monthly payments in these loans, they could find themselves owing the entire original loan balance at the end of the interest-

only period of the loan term. In fact, Countrywide even had HELOCs that were interest only for the entire term of the loan.

218.    The length of loan term of the second-lien HELOC loans was generally shorter than the length of the loan term on the first-lien loans. Countrywide often paired junior second-lien HELOCs that contained abbreviated 15-25 year terms with senior first-lien loans containing 30-year terms.

219.    In these shorter-term HELOCs that had interest-only features, the loan "reset" after the interest-only period expired, five or ten years into the loan term. The loan then began to amortize. Because these loans also often had a balloon feature at the end of the loan term, however, they did not amortize fully. This meant that a borrower was set up to experience payment shock twice. First, the borrower would experience payment shock due to the reset to a partially amortizing payment amount. Next, the borrower would experience payment shock at the end of the loan term, when the balloon came due. Consequently, at the end of the term, the borrower was faced with paying the total outstanding unpaid principal amount of the junior loan, which came due before the end of the term of the underlying first-lien senior loan.

220.    To the uninitiated borrower, this balloon payment would arrive deep into the term of the first-lien loan and could undermine the borrower's ability to maintain payments on the underlying first-lien loan. This set-up was typical of Countrywide's 30/15 Balloon mortgage loan. A "30/15 Balloon" was available on second loans with 100% financing. Countrywide prompted its brokers to "Qualify more borrowers for 100% financing with our new 30/15 Balloon options on Seconds."

54

221.    All of these features of Countrywide HELOCs and piggyback loans, especially when paired with a loan with a combined LTV of 100%, had the potential to force borrowers into foreclosure or otherwise harm them.

222.    Loans with loan-to-value ratios of 100% combined with low introductory interest-only payments, or with a balloon feature, are very risky. These features increase the risk that borrowers cannot afford the loan payments at all or will be unlikely to build any equity in their homes when faced with stagnant or a slight reduction in home value. Such borrowers are at risk of losing their homes if they cannot make the increased payments or cannot refinance. In either case, borrowers will have little or no equity with which to work in order to refinance, and may have to pay out-of-pocket just to sell their homes.

223.    Not surprisingly, loans with piggyback second-lien loans are more likely to fail. Defaults on the riskier, higher-rate second lien loans expose the entire mortgage structure, both first and second lien loans, to failure. Standard & Poor's, the largest securities rating agency, analyzed over a half million first-lien mortgages sold with HELOCs or fixed rate seconds between 2002 and 2004 and found that borrowers were 43% more likely to default on those liens than comparable first mortgages without piggybacks.

224.    Lending at 100% LTV is particularly dangerous with subprime borrowers who, as demonstrated by their shaky credit history, are more likely to be without financial breathing room, with no budgetary margin of error or an adequate safety net to help them weather and get past even minor life events, like the need to replace a water heater or an unusually high energy bill. If they begin to miss payments and, as a consequence, have servicing penalties and late fees added to their mortgage payments, they get turned "upside down" on the equity in their property and quickly owe more on the Countrywide mortgage than their home is worth.

225.    This risk is magnified when paired with reduced documentation underwriting or other features that further increase the likelihood that the borrower will be unable to afford the loan.

226.    In 2005, Countrywide qualified borrowers with credit scores as low as 580 for single loans with loan-to-value ratios of 100% and for 80/20 piggyback loans. On the first-lien loan in an 80/20 piggyback loan combination, borrowers could be sold an interest-only option, whereby the borrower would make payments only on the interest for a certain period of time. During the period in which the borrower was paying only the interest, the principal balance on first-lien loan would remain the same – at 80% of fair market value. In 2007, a non-prime stated self-employed or salaried borrower could qualify for an 80/20 loan for as much as $850,000 with a minimum credit score of 640 and could qualify for a loan up to $1 million with a minimum credit score of 680. As Countrywide told its brokers in an ad, "Countrywide®, America's Wholesale Lender®, Specialty Lending Group delivers more options to your Non-Prime Stated Income borrowers!"

227.    A self-employed borrower with a minimum credit score of 640 could get a "100% 'One Loan' Stated" for up to $700,000. A stated wage earner with a minimum credit score of 640 could also mortgage 100% of a home's value with an 80/20 loan.

228.    Countrywide told borrowers that there was "GOOD NEWS! Now you can qualify for up to 100% financing without a recent bankruptcy affecting your FICO score." Countrywide proclaimed "Low credit scores allowed" and "Hard to prove income acceptable."

229.    Countrywide also had 80/20 loan programs that could be paired with a hybrid ARM— even a hybrid ARM with an interest-only feature.

230.    Countrywide loans made at 100% loan-to-value were imprudently made and were unsound as written because they were unsustainable and unaffordable for borrowers, even borrowers in a stable housing market.

56

Countrywide Utilized Unfair and Deceptive Advertising and Sales Pitches to Push
Mortgages, While Hiding Costs and Risks to Consumers

231.    To further its aggressive loan origination practices, Countrywide engaged in unfair and

deceptive sales practices through telemarketing, direct mailings, newspaper advertisements, and

television and radio commercials in Illinois. Countrywide generally lead consumers to believe

that they could offer consumers the best loan at the lowest price. Countrywide's advertisements

to consumers often hid or obscured the risks associated with different mortgage products and

refinancing.

A.      Personalized Direct Mailings Pushed Consumers to Refinance into Risky Products

232.    Countrywide sent direct mailings to consumers in an effort to push certain mortgage

products and to induce current Countrywide borrowers to refinance within a short period of time

after finalizing their loan. Often, the direct mailing appeared to be a personalized letter or email,

including information about consumers' present loans, which deceptively compared present

loans with new offers, and instructed consumers to contact Countrywide quickly.

233.    For example, on or about April 15, 2005, Countrywide sent borrowers a direct mailing to

refinance into a PayOption ARM and directed borrowers to contact Countrywide on Saturday,

April 23, 2005. Next to the consumer's name and address was a highlighted box which stated

the "estimated initial payment savings" as $15,132 assuming the consumer refinanced into a

PayOption ARM.

234.    This "estimated initial payment savings" was misleading because it was based on the

consumer paying the initial rate of 1% for an entire year. But with a PayOption ARM, after the

first month, merely paying the initial rate of 1% would not have covered the principal and

interest of the mortgage, resulting in negative amortization. Thus, if a consumer opted to

refinance into the advertised program, the consumer would not actually save any money on their

57

payments. To emphasize the "savings," Countrywide hid the method for calculating the estimated savings and the negative amortization that would result in a tiny font text after the signature of Countrywide's personal loan consultant at the bottom of the page.

235.    The text of the mailing touted to consumers the benefits of a PayOption ARMs, such as "free up cash…, paying off high interest credit card debt, invest in income property, saving cash for the purpose of a new home and afford a larger home." However the mailing failed to disclose clearly and conspicuously the many risks and negative ramifications of a PayOption ARM product.

236.    The promise of "afford a larger home" was deceptive because PayOption ARMs were not necessarily cheaper than fixed rate mortgages. While a consumer may have been able to obtain a larger mortgage with a PayOption ARM, it did not mean that she could afford to pay it off. An option ARM merely allowed a consumer to choose the amount of a monthly payment. Thus, some payments could be smaller than those with a fixed rate mortgage, but to prevent negative amortization, the consumer had to make much larger payments.

237.    Another direct mailing about refinancing into PayOption ARMs emphasized the amount the consumer could cash-out if he refinanced from a 30-year fixed rate loan to a PayOption ARM. Again, next to the consumer's name and address was a highlighted box with "Up to $65,380" and then under it, "Please Call Now, 1-800-598-1129."

238.    In the text; it promised that the consumer could access as much as $65,380 in home equity through refinancing into an option ARM with a 4.250% fully indexed interest rate. Further the mailer stated that this interest rate is lower than the rate of the borrower's current fixed-rate mortgage.

239.    This statement failed to clearly and conspicuously disclose the interest rate and how Countrywide calculated the consumer's home equity, whether it was based on a computer program or an actual appraisal. Further, since the rate on this option ARM product would fluctuate monthly after the one-month teaser interest rate expired, the interest rate and payment could increase to more than the consumer's current mortgage rate and payment. To sweeten the offering, Countrywide offered, "Fasttrack Cash-out Refinancing" which promised to "cut down on the amount of qualifying and application paperwork."

240.    Yet, this mailing did not clearly and conspicuously disclose the risks of refinancing into a PayOption ARM. At the bottom of the mailing, after the signature of the personal loan consultant and in tiny font, the mailing made a reference to the introductory period. It instructed the consumer to see another footnote on the second page for an explanation of that footnote. By burying this information after the signature, using tiny font and referring the consumer to another footnote for an explanation, Countrywide obscured the significant risks of refinancing into a PayOption ARM.

B.    Emails Touting Complimentary Loan Reviews Deceptively Induced Consumers to Refinance

241.    Besides paper mailings, Countrywide also emailed personalized mailings to current customers on their loan anniversaries, which offered "free" or "complimentary" loan reviews.

242.    For example, in 2006, Countrywide sent emails to current Full Spectrum Lending Division consumers with the subject line "It's Your Anniversary!" In the heading with large bold font, it stated "Happy Anniversary! Enjoy your complimentary loan review" and then to the immediate right it had printed Countrywide's telephone number and "Click Here to Get Started," which linked the consumer to an on-line loan application.

243. By placing the telephone number and the link immediately after the complimentary loan review, the email led the consumer to believe that contacting Countrywide would result in an informational review, not a sales pitch for refinancing.

244. After the heading, the email congratulated the consumer for being a current customer. Then it proclaimed that "many home values skyrocketed over the past year. That means that you may have thousands of dollars of home equity to borrow from—at rates much lower than most credit cards." This statement led the customer to believe that the value in her home skyrocketed to allow her "thousands of dollars of home equity." Yet, the email failed to clearly and conspicuously disclose how Countrywide calculated the consumer's equity in her home.

245. Then the email offered an "exclusive interest rate discount of 1/2 %" because the consumer was a current customer. At the end of the email, it emphasized that Countrywide wanted to provide the "right" home financing situations to meet the consumer's needs and stated "Call us now at 1-866-253-2352 or Click Here."

246. If the consumer did not respond to this email, Countrywide sent a follow up "Your Anniversary Review Reminder" which stated "If you haven't called for your free Anniversary Loan Review yet, there is still time." The follow up email created a false sense of urgency, in which the consumer had to act fast to avoid losing a supposedly great deal.

C. <u>Television and Radio Commercials: Deceptively Advertise No Closing Cost Refinancing</u>

247. Besides direct mailings and newspaper ads, Countrywide also used deceptive television and radio commercials to induce consumers to purchase loans and refinance their mortgages or obtain home equity lines of credit.

248. For example, in November 2005, Countrywide ran a television commercial called "Guess What A" which offered a "no closing cost debt consolidation loan." During the commercial, a

man informed consumers to "act fast" to consolidate their high interest credit cards while mortgage interest rates were low. Although a legal disclaimer disclosed that refinancing or taking a HELOC may increase the total number of payments and total amount paid, it did not disclose that consumers paid for the "no closing costs" through a higher interest rate. Rather, it just referred consumers to Countrywide's website for information on closing costs.

249.    Similarly, in July 2007, Countrywide ran a television commercial which again offered a "refinance with no closing costs." The man in the commercial stated "That's right. At closing you'll pay absolutely no closing costs. This means more cash for you."

250.    Again, the legal disclaimer obfuscated the truth that consumers paid for "no closing costs" through a higher interest rate. Rather, it stated that "borrowers who choose to pay lender fees and closing costs upfront may qualify for a lower rate."

251.    Countrywide engaged in similar confusing and deceptive advertising in its "Dueling Announcers" radio commercial. In that commercial, Countrywide offered a "no closing cost" refinance loan and again the legal disclaimer obfuscated the truth that consumers paid for no closing costs through a higher interest rate. At the end of the commercial, it said that borrowers who choose to pay lender fees upfront may qualify for a lower rate. Then it stated "recent trends show home values flattening or even declining in some areas." The commercial urged consumers "[s]o tap into your home's available equity now."

252.    In addition, this commercial emphasized the benefits of refinancing such as: cash from the equity, a lower fixed rate, and paying credit card bills. Yet, this commercial failed to disclose clearly and conspicuously the danger that by removing equity at a time when home values are stagnant or declining, consumers could owe more than the value of their homes.

D.    Countrywide Used Deceptive Sales Pitches to Push Risky Mortgages

253.    After receiving advertisements, many consumers contacted Countrywide account executives, who were trained to use deceptive sales scripts to originate mortgages for purchases and refinancing.

254.    According to an interview with a former account executive in Countrywide's retail division, Countrywide instructed employees to sell the "low" monthly payments of each product and to down play the total cost of the mortgage, the interest rate, adjustable rate, prepayment penalty or any other risks associated with the products.

255.    If consumers questioned the terms of the offered mortgage, account executives would offer to refinance consumers into better mortgages at later date, such as in loans with ARMs often before the rates adjusted. It was a deceptive promise because the account executives could not predict consumers' ability to refinance, which often depended on whether housing values continued to appreciate.

256.    According to an interview with a former account executive in the Full Spectrum Lending Division (Countrywide's subprime retail division), Countrywide used scripted telemarketing to solicit both new borrowers and current Countrywide borrowers for subprime mortgages.

257.    These potential consumers, or sales "leads," included prime borrowers who mistakenly called Full Spectrum, consumers with prime mortgages serviced by Countrywide but who were late in their payments at least 30 days, consumers who called Countrywide's prime retail lending division and whose credit scores were below a certain level, and current Countrywide subprime borrowers whose loans had adjustable rate mortgages, balloons or other variable terms.

258.    Countrywide required employees to memorize sales scripts, prior to attending intensive sales training in Illinois or California. Countrywide instructed account executives to use the

62

sales scripts for every conversation with consumers. In fact, the scripts covered the entire loan origination process, from intake to closing, for refinance, purchase and home equity mortgages.

259.    By using the sales scripts, Countrywide employees deceived and confused consumers so that consumers would not understand the true costs associated with the new loans.

260.    As described in the New York Times' article, *Inside the Countrywide Lending Spree*, Countrywide used a "seductive sales pitch" to convince consumers that Countrywide aspired to provide consumers with "the best loan possible." Rather than actually providing the best loan possible, Countrywide led consumers into "high-cost and sometimes unfavorable loans that resulted in richer commissions for Countrywide's smooth talking sales force."

261.    For example, according to one former Full Spectrum account executive, Countrywide's subprime divisions did not offer FHA loans to consumers who could have qualified for them and instead frequently offered costlier or riskier subprime loans.

262.    As compared to subprime loans, FHA loans have historically allowed lower income consumers to borrow money for the purchase of homes. FHA loans are insured by the Federal Housing Authority for consumers with "less than perfect credit" histories and allow for down payments as low as 3%. The majority of FHA loans are 30-year fixed rate loans, rather than ARMs.

263.    A former account executive provided the following comparison for a consumer with a down payment of 5% (or 95% LTV) seeking a $100,000 loan. With an FHA loan, the consumer could have received a fixed interest rate of 6% for 30 years (with an additional insurance fee of 1½ %). Yet, through Full Spectrum, the account executive sold the same consumer a subprime loan with 8-10% interest rate and layered with additional risks, such as a prepayment penalty.

63

264.    The deception of providing the best loan for the consumer started right from the beginning of the sales script with the first telephone call. In fact, according to an interview with a former Full Spectrum employee, the 2005 script prohibited employees who spoke with prime borrowers who were merely 30 days late from mentioning the purpose of their phone call, e.g., to refinance into more costly subprime mortgages.

265.    By misrepresenting the purpose of the call and obscuring consumers' possible weakened credit, Countrywide led consumers to believe that the call was to discuss servicing issues or even refinancing into a prime loan, rather than refinancing into a more expensive subprime mortgage.

266.    Even if consumers were uninterested in obtaining new mortgages, the sales script provided ways for sales representatives to persuade reluctant consumers. For example, if a consumer stated that she had paid off a first mortgage, the script advised the account executive to ask about a home equity loan. "Don't you want the equity in your home to work for you? You can use your equity for your advantage and pay bills or cash out. How does that sound?"

267.    Another method utilized in the scripts led consumers into believing that the account executives were their friends, interested in providing the best loans to consumers. This method is exemplified by the Full Spectrum sales script that instructed account executives to build an emotional connection known as the "Oasis of Rapport" with consumers before discussing rates, points and fees. The immediate objective was to get to know the consumer, "look for points of common interests, and to use first names to facilitate a friendly helpful tone."

268.    Countrywide also coached employees to ask questions about the consumer's financial situation, then lie that the account executive had another customer with the same problems and say that it was difficult for this other, similar, customer to get a loan from other lenders.

269.    By scripting an emotional connection with consumers, Countrywide led consumers to believe that account executives understood their financial situations and Countrywide would provide consumers with the best possible mortgages. As a result, consumers were more likely to accept refinancing, fees, points, higher interest rates, adjustable rate mortgages, and very risky products, such as option ARMs.

Countrywide Home Loans Servicing LP Utilizes Unfair and Deceptive Practices in the Servicing of Borrowers' Residential Mortgage Loans

270.    When consumers fall behind on their mortgage loan payments, they call Countrywide Home Loans Servicing LP ("Countrywide Servicing"), the Countrywide entity that services consumers' mortgages. Consumers who ask what can be done to avoid foreclosure proceedings are often shuffled from person to person and even department to department before reaching someone who can actually address their concerns.

271.    Countrywide Servicing generally demands an initial payment from the consumers prior to even discussing whether anything can be done to keep the consumers in their homes. Because Countrywide Servicing demands this payment prior to doing any analysis of the consumers' situations, this scheme often results in consumers paying money to Countrywide Servicing when there is no chance of negotiating a workable plan. The money used for "initial payments" could have been used by consumers to pay for moving expenses or finding new housing in the event that foreclosure was inevitable.

272.    Countrywide Servicing also requires consumers to send their initial payments via certified checks. If a consumer's check is not certified, Countrywide Servicing will refuse it without even attempting to verify whether there are sufficient funds to cover the check. This needless bureaucracy has led to Countrywide Servicing rejecting initial payments made on consumers' behalf by non-profits and state agencies.

273.    For example, one consumer fell behind on her mortgage payments when she was being treated for breast cancer. Trying to help the consumer, her church raised funds to make her delinquent payment. A check, drawn on the church's account, was sent to Countrywide Servicing. It was rejected.

274.    After receiving the initial payment, instead of doing an analysis on what would be necessary to allow consumers to stay in their homes, Countrywide Servicing's first offer to consumers is typically to put them on repayment plans. These repayment plans require consumers both to remain current on their existing mortgage loan payments and also pay an additional amount to cover any past due payments and fees the consumers have incurred.

275.    A repayment plan is often an unworkable and unaffordable solution to most consumers' mortgage payment problems. Plainly put, if consumers are having problems making their current payments, there is absolutely no reason to think that the consumers will be able to make even larger payments in the future.

276.    One consumer's experience illustrates the problem. The consumer's monthly mortgage payment was $1600. She fell behind and, in an attempt to salvage the situation, repeatedly called Countrywide Servicing to try to find a solution. Although the consumer was already having difficulty making her $1600 monthly payment, Countrywide Servicing's solution was to increase the consumer's payment to $2500 to cover both the existing payment and the past due payments and fees.

277.    Predictably, the consumer was unable to keep up with the repayment plan and fell even further behind on her mortgage. After trying to work with Countrywide Servicing for almost six months, the company demanded (and received) a payment of over $5000 from the consumer before it would complete an analysis and consider the file for loan modification.

66

278.    Even when Countrywide Servicing comes up with a loan modification plan, the company often fails to discuss the plan with the consumer to confirm it is affordable or to send timely documentation to the consumer regarding the specific details of the plan.

279.    For example, a consumer called Countrywide Servicing on five separate occasions seeking assistance with mortgage payments that she was having difficulty making. The consumer had a loan with an initial teaser interest rate of 9.375% that had jumped to 12.625%. During the fifth call, the consumer learned that Countrywide Servicing had decided to reduce the interest rate on her loan back to the teaser interest rate for an additional five years. Although Countrywide Servicing attempted to provide relief to the consumer, it failed to actually discuss with the consumer whether this plan would be affordable. The consumer had sent Countrywide Servicing financial documents, so it should have known that the plan was unaffordable. Moreover, it took Countrywide Servicing an additional month to send the consumer documentation of her loan modification, resulting in the consumer making an incorrect mortgage payment based on what she had been told on the phone.

280.    Countrywide Servicing representatives have also been difficult to reach when consumers are trying to catch up on their mortgages. For example, a consumer who fell behind in her mortgage sent Countrywide Servicing additional checks for 10 months with the designation that they were to be applied to her past due payments and fees. When her statements did not appear to reflect the additional payments, the consumer repeatedly called Countrywide Servicing to deal with the problem. She was put on hold and transferred from person to person when she called and was never able to talk to a Countrywide Servicing representative who could help her figure out the problems with her account.

67

281.    Consumers will sometimes try to refinance their Countrywide mortgages in an attempt to save their homes. Consumers have complained that Countrywide Servicing fails to send them the payoff statements necessary to complete the refinance in a timely manner. Because the refinance is delayed, the consumers end up falling even further behind on their Countrywide mortgages.

282.    On occasion, consumers who fall behind in their mortgages and other debt payments are forced to declare bankruptcy. Countrywide Servicing has been sued by United States Bankruptcy Trustees in four states over its practices with consumers in bankruptcy. These trustees allege, among other things, that Countrywide Servicing may have filed inaccurate proofs of claims, filed unwarranted motions for relief from the bankruptcy stay, inaccurately accounted for funds and made unfounded payment demands to consumers after the discharge of their bankruptcy.

283.    Countrywide Servicing has also acted illegally towards borrowers in foreclosure actions. In a particularly egregious case, a consumer whose Countrywide mortgage was in foreclosure returned home to find that Countrywide Servicing had changed her locks and boarded her home. At the time it boarded the owner-occupied property, Countrywide Servicing had filed a foreclosure complaint against the consumer, however, no judgment for foreclosure had been entered and no sale conducted. The consumer's attorney made numerous attempts to contact Countrywide Servicing to rectify the situation. It took a week and the intervention of the Attorney General's Office for the consumer to regain access to her home and possessions.

284.    There are also occasions when Countrywide Servicing acts inappropriately towards consumers who are not in foreclosure, but have a problem with the application of funds from an escrow account.

68

285.   In one situation, a consumer whose Countrywide mortgage included an escrow for real

estate taxes mistakenly paid her tax bill herself, even though Countrywide Service also paid the

bill. Once this error was discovered, the consumer's overpayment should have been refunded

directly to her. Instead, Countrywide Servicing decided to keep a portion of the overpayment in

the consumer's escrow account, purportedly as a "cushion." Countrywide Servicing had no

authority to arbitrarily keep a portion of the consumer's overpayment and only returned the funds

after mediation through the Attorney General's Office.

## STATUTORY PROVISIONS

286.   Section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act (815

ILCS 505/2) provides that:

> Unfair methods of competition and unfair or deceptive acts or
> practices, including but not limited to the use or employment of
> any deception, fraud, false pretense, false promise,
> misrepresentation or the concealment, suppression or omission of
> any material fact, with intent that others rely upon concealment,
> suppression or omission of such material fact, or the use of
> employment of any practice described in Section 2 of the "Uniform
> Deceptive Trade Practices Act," approved August 5, 1965, in the
> conduct of any trade or commerce are hereby declared unlawful
> whether any person has in fact been misled, deceived or damaged
> thereby. In construing this section consideration shall be given to
> the interpretations of the Federal Trade Commission and the
> federal courts relating to Section 5(a) of the Federal Trade
> Commission Act.

287.   Section 7 of the Consumer Fraud Act, 815 ILCS 505/7, provides in relevant part:

> a.      Whenever the Attorney General has reason to believe that
> any person is using, has used, or is about to use any method, act or
> practice declared by the Act to be unlawful, and that proceedings
> would be in the public interest, he may bring an action in the name
> of the State against such person to restrain by preliminary or
> permanent injunction the use of such method, act or practice. The
> Court, in its discretion, may exercise all powers necessary,
> including but not limited to: injunction, revocation, forfeiture or
> suspension of any license, charter, franchise, certificate or other

69

evidence of authority of any person to do business in this State; appointment of a receiver; dissolution of domestic corporations or association suspension or termination of the right of foreign corporations or associations to do business in this State; and restitution.

b.      In addition to the remedies provided herein, the Attorney General may request and this Court may impose a civil penalty in a sum not to exceed $50,000 against any person found by the Court to have engaged in any method, act or practice declared unlawful under this Act. In the event the court finds the method, act or practice to have been entered into with intent to defraud, the court has the authority to impose a civil penalty in a sum not to exceed $50,000 per violation.

c.      In addition to any other civil penalty provided in this Section, if a person is found by the court to have engaged in any method, act, or practice declared unlawful under this Act, and the violation was committed against a person 65 years of age or older, the court may impose an additional civil penalty not to exceed $10,000 for each violation.

288.    Section 10 of the Consumer Fraud Act, 815 ILCS 505/10, provides that "[i]n any action brought under the provisions of this Act, the Attorney General is entitled to recover costs for the use of this State."

289.    Section 2 of the Illinois Fairness in Lending Act, 815 ILCS 120/2, provides that

(a)     "Financial institution" means any bank, credit union, insurance company, mortgage banking company, savings bank, savings and loan association, or other residential mortgage lender which operates or has a place of business in this State.

         . . .

(d)     "Equity stripping" means to assist a person in obtaining a loan secured by the persons' principal residence for the primary purpose of receiving fees related to the financing when (i) the loan decreased the persons' equity in the principal residence and (ii) at the time the loan is made, the financial institution does not reasonably believe that the person will be able to make the scheduled payments to repay the loan. "Equity stripping" does not include reverse mortgages as defined in Section 5a of the Illinois Banking Act, Section 1-6a of the Illinois Savings and Loan Act of 1985, or subsection (3) of Section 46 of the Illinois Credit Union Act.

70

290. Section 3 of the Illinois Fairness in Lending Act, 815 ILCS 120/3 provides in

relevant part that:

> No financial institution, in connection with or in contemplation of any loan to any
> person, may:
> ...
> (e) Engage in equity stripping or loan flipping.

291. Section 5 of the Illinois Fairness in Lending Act, 815 ILCS 120/5(c), provides in

relevant part that:

> An action to enjoin any person subject to this Act from engaging in activity in
> violation of this Act may be maintained in the name of the people of the State of
> Illinois by the Attorney General or by the State's Attorney of the county in which
> the action is brought. This remedy shall be in addition to other remedies provided
> for any violation of this Act.

### Count I

### Violations of Section 2 of the
### Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2

292. The allegations contained in Paragraphs 1 through 291 of the Complaint are re-alleged

and incorporated herein by reference.

293. As described above, Countrywide's conduct has contributed to the high number of

foreclosures in Illinois and caused significant harm to the public, the market, and scores of

Illinois borrowers and homeowners.

294. Countrywide engaged in unfair and/or deceptive acts or practices by originating mortgage

loans to borrowers who did not have the ability to repay their loans through practices such as, but

not limited to:

> a. Using reduced documentation underwriting guidelines to qualify borrowers who
>    did not have sufficient income or assets to afford the Countrywide loans they
>    were sold;

71

    b.  Promoting the use of reduced documentation underwriting guidelines to qualify borrowers who did not have sufficient income and assets for the Countrywide loans they were sold;

    c.  Inflating borrowers' income on loan applications to qualify the borrowers for Countrywide loans;

    d.  During a certain period of time, qualifying subprime borrowers for hybrid ARM mortgage loans using less than the full- indexed rate;

    e.  During a certain period of time, qualifying borrowers for mortgage loans that had an interest-only payment option using less than the fully-amortizing payment;

    f.  Originating loans that were not designed for long term viability, but for short term refinancing, as employees and brokers frequently represented that borrowers could refinance the loan;

    g.  Promoting serial refinancing without regard to the increased cost to the borrower or the affordability of the loan, and without disclosing that the ability to refinance relied on a perpetual increase in home valuation;

    h.  Loosening certain underwriting guidelines over time, resulting in the sale of unaffordable loans;

    i.  Originating loans with multiple layers of risk, resulting in the sale of unaffordable loans; and

    j.  Allowing exceptions to underwriting guidelines, resulting in the sale of unaffordable loans.

72

295.    Countrywide engaged in unfair and/or deceptive acts or practices by originating mortgage loans that exposed borrowers to an unnecessarily high risk of foreclosure or loss of home equity through practices such as, but not limit to:

      a.  Originating option ARM mortgage loans with one or more of the following characteristics: illusory introductory teaser interest rates, prepayment penalties, high loan-to-value ratios, and reduced documentation underwriting;

      b.  Mass marketing and selling option ARM mortgage loans to the general public that were only beneficial to specific sophisticated segments of the borrower population;

      c.  Marketing and selling option ARM mortgage loans as a beneficial refinance loan product to current customers in good standing, when that was not the case; and

      d.  Originating mortgage loans with 100% loan-to-value or combined loan-to-value ratios that included other risky features.

296.    Countrywide engaged in unfair and/or deceptive acts or practices by originating unnecessarily more expensive mortgage loans to unknowing borrowers through practices such as, but not limited to:

      a.  Originating more expensive reduced documentation loans to borrowers who could have documented their income and assets, without informing borrowers of the increased cost; and

      b.  Attaching prepayment penalties to borrowers' loans, without ensuring that the borrowers actually received any benefit from the added risk of the penalty.

297.    Countrywide engaged in unfair and/or deceptive acts or practices by deceptively marketing and/or advertising its mortgage loans through practices such as, but not limited to:

73

a.  Leading consumers to believe that Countrywide would obtain for them the best possible loan terms, when, in fact, they did not;

b.  Avoiding discussing the interest rate or APR of a loan by shifting the focus to the monthly payment in an effort to confuse consumers about the true cost of the loan;

c.  Representing that refinancing into an option ARM could save the borrower money when, in fact, the claim of savings was false;

d.  Advertising the one-month teaser interest rates for an option ARM without clearly and conspicuously disclosing that the rate would increase dramatically the following month;

e.  Representing to consumers that option ARMs were beneficial for consumers in good standing on their current Countrywide loans when, in fact, refinancing into the product was not beneficial for most consumers;

f.  Failing to properly inform a borrower of the potential of owing more on his home than what it is worth due to negative amortization if the borrower's house did not continue appreciating or depreciated in value;

g.  Inflating borrowers' income information on their loan applications in order to qualify borrowers for Countrywide mortgages when their income would not have qualified them for the loan they received;

h.  Representing to borrowers that they should not worry about the interest rate of their Countrywide mortgage because the loans could be refinanced before they became unaffordable;

74

i.   During a certain period of time, failing to disclose to subprime borrowers that they were qualified at less than the fully-indexed rate for hybrid ARM mortgage loans and not at a rate sufficient to repay the loan in its entirety;

j.   During a certain period of time, failing to disclose to borrowers that they were qualified at less than a fully-amortizing payment for mortgage loans with an interest-only payment option and not at a rate sufficient to repay the loan in its entirety;

k.   Advertising that a Countrywide mortgage had "no closing costs" when the closing costs were incorporated in the features of the loan;

l.   Representing to current Countrywide borrowers that Countrywide offered "Complimentary" or "Free Loan" reviews when in fact, it was a sales pitch to refinance current subprime borrowers into other subprime mortgages;

m.   Hiding the purpose of subprime sales calls to prime borrowers with late payments, which was, in actuality, to refinance borrowers into subprime loans; and

n.   Advertising that because the housing market is stagnant or declining, borrowers should refinance their homes and take cash out or pay debts, without informing borrowers of the risk of owing more than the value of their homes.

298.   Countrywide engaged in unfair and/or deceptive acts or practices by implementing a compensation structure that incentivized broker and employee misconduct and failed to exercise sufficient oversight to ensure that such misconduct did not occur through practices such as, but not limited to:

75

a. Implementing a compensation structure that incentivized employees to maximize sales of loans without proper oversight, resulting in the sale of unaffordable and/or unnecessarily expensive loans;

b. Failing to provide adequate parameters for the sale of option ARMs, resulting in the product being sold to inappropriate groups of borrowers;

c. Failing to adequately supervise and/or underwrite brokers' use and sale of reduced documentation loans resulting in the sale of unaffordable or unnecessarily more expensive loans;

d. Facilitating and/or instructing brokers' emphasis of the low teaser rate when selling option ARMs;

e. Rewarding brokers for selling loans with certain risky loan features such as prepayment penalties without ensuring that borrowers received a benefit from the risky features; and

f. Structuring the compensation for option ARMs in such a way that brokers were incentivized to sell a product that was riskier than necessary – to the exclusion of other products – in order to obtain the maximum yield spread premium possible.

299.   Countrywide Home Loans Servicing, LP engaged in unfair and/or deceptive acts or practices during the servicing of residential mortgage loans through practices such as, but not limited to:

a. Inducing borrowers to pay Countrywide Servicing monies under the premise that Countrywide Servicing would be able to assist distressed borrowers, even though Countrywide Servicing has not done any analysis to determine whether assistance was feasible in light of the borrowers' particular factual circumstances;

76

     b.  Misleading borrowers into paying Countrywide Servicing additional monies

         under a repayment plan or loan modification plan that Countrywide Servicing

         knew or should have know was unaffordable; and

     c.  Recklessly facilitating the foreclosure of borrowers' homes by misleading

         borrowers or failing to respond to borrowers' requests for assistance.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays for the following relief:

    A.     A finding that Defendants have engaged in and are engaging in trade or

commerce within the meaning of Section 2 of the Illinois Consumer Fraud and Deceptive

Business Practices Act, 815 ILCS 505/2;

    B.     A finding that Defendants have engaged in and are engaging in acts or practices

that constitute violations of Section 2 of the Illinois Consumer Fraud and Deceptive Business

Practices Act, 815 ILCS 505/2;

    C.     An order preliminarily and permanently enjoining Defendants from the use of acts

or practices that violate the Consumer Fraud and Deceptive Business Practices Act including, but

not limited to, the unlawful acts and practices specified above;

    D.     An order rescinding, reforming or modifying all mortgage loans between

Defendants and all Illinois consumers who were affected by the use of the above-mentioned

unlawful acts and practices;

    E.     An order requiring Defendants to make restitution to all consumers who were

affected by the use of the above-mentioned unlawful acts and practices in the origination of

Countrywide residential mortgage loans whose homes were lost due to foreclosure on their

Countrywide mortgage loans;

77

F.      An order requiring Defendants to make restitution to all consumers who were affected by the use of the above-mentioned unlawful acts and practices in the origination of Countrywide residential mortgage loans who refinanced their mortgage loans with Defendants or another residential mortgage lender;

G.      An order requiring Defendants to make restitution to all consumers who were affected by the use of the above-mentioned unlawful acts and practices in the origination of Countrywide residential mortgage loans who are unable to modify their Countrywide mortgages to a sustainable level and are forced to relinquish ownership of their homes;

H.      An order requiring Defendants to repurchase owner-occupied residential mortgage loans for all Illinois consumers who were affected by the use of the above-mentioned unlawful acts and practices that have been sold, transferred or assigned to investors and then to rescind, reform or modify any such mortgage loans;

I.      An order enjoining Defendants from:

      1)      further selling, transferring or assigning mortgage loans originated by Countrywide by the use of the above-mentioned unlawful acts and practices that are secured by owner-occupied residential properties in Illinois;

      2)      further selling, transferring or assigning any legal obligations to service Illinois owner-occupied residential mortgage loans originated by the use of the above-mentioned unlawful acts and practices; and

      3)      initiating or advancing a foreclosure, as an owner or servicer, on any owner-occupied residential mortgage loan originated by the use of the above-mentioned unlawful acts and practices and secured by an Illinois

property, without first providing the Attorney General a 90-day period to
review each such loan so that, upon the expiration of the 90 days, the
Attorney General may object to a foreclosure based upon unfair or
deceptive origination or servicing conduct by Countrywide and
Countrywide Home Loans Servicing, LP in order to provide the borrower
with a meaningful opportunity to avoid foreclosure. In the event of the
Attorney General's objection, no foreclosure sale shall go forward absent
court approval.

J.      An order requiring Defendants to establish a "Distressed Property Reserve" to
cover costs incurred by municipalities due to vacant foreclosed properties that secured owner-
occupied residential mortgage loans originated by Countrywide;

K.      An order imposing a civil penalty in a sum not to exceed $50,000 against any
Defendant found by the Court to have engaged in any method, act or practice declared unlawful
under this the Illinois Consumer Fraud and Deceptive Business Practices Act;

L.      An order imposing a civil penalty in a sum not to exceed $50,000 against any
Defendant found by the Court to have engaged in any method, act or practice declared unlawful
under the Illinois Consumer Fraud and Deceptive Business Practices Act committed with the
intent to defraud;

M.      An order imposing an additional civil penalty not to exceed $10,000 for each
violation of the Illinois Consumer Fraud and Deceptive Business Practices Act committed
against a person 65 years of age or older, as provided in Section 7(c) of the Consumer Fraud and
Deceptive Business Practices Act, 815 ILCS 505/7(c);

N.      An order requiring Defendants to pay the costs of this action and any costs related to the 90-day Attorney General review period described above; and

O.      An order granting such further relief as this Court deems just, necessary, and equitable in the premises.

## Count II

### Violation of the Illinois Fairness in Lending Act, 815 ILCS 120/4

300.    The allegations contained in Paragraphs 1 through 299 of the Complaint are re-alleged and incorporated herein by reference.

301.    Countrywide violated Section 3 of the Illinois Fairness in Lending Act, 815 ILCS 120/3 by engaging in equity stripping when refinancing consumers into mortgage loan products that Countrywide knew or should have known were unaffordable and that decreased the borrowers' equity in their homes, with the primary purpose of receiving fees for the refinancing.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays for the following relief:

A.      A finding that Defendants have violated the Illinois Fairness in Lending Act;

B.      An order preliminarily and permanently enjoining Defendants from the use of acts or practices that violate the Illinois Fairness in Lending Act including, but not limited to, the unlawful acts and practices specified above;

C.      An order requiring Defendants to make restitution to all consumers affected by the use of the above-mentioned unlawful acts and practices;

D.      An order rescinding or reforming all contracts, loan agreements, notes or other evidences of indebtedness between Defendants and all Illinois consumers who were affected by the use of the above-mentioned unlawful acts and practices;

80

E.    An order requiring Defendants to pay the costs of this action; and

F.    An order granting such further relief as this Court deems just, necessary, and

equitable in the premises.

Respectfully submitted,

LISA MADIGAN, IN HER OFFICIAL
CAPACITY AS ATTORNEY GENERAL OF
ILLINOIS,

JAMES D. KOLE
Bureau Chief, Consumer Fraud

LISA MADIGAN
Attorney General of Illinois

DEBORAH HAGAN, Chief
Consumer Protection Division

JAMES D. KOLE, Chief
Consumer Fraud Bureau

THOMAS JAMES
SUSAN N. ELLIS
VERONICA L. SPICER
SHANTANU SINGH
JENNIFER FRANKLIN
MICHELLE GARCIA
CECILIA ABUNDIS
Assistant Attorneys General
Telephone: 312-814-3000

100 W. Randolph St., 12th Floor
Chicago, IL 60601

# EXHIBIT F

EXHIBIT E

## MULTISTATE SETTLEMENT TERM SHEET

(10/6/08 Final Multistate Version)

Countrywide Financial Corporation ("CFC") offers the following settlement proposal in an effort to resolve the States' interests in the mortgage origination and servicing activities of CFC and its subsidiaries, including all outstanding investigations related to those lending activities.

I.   **FORMALIZATION OF PUBLIC COMMITMENTS MADE IN CONNECTION WITH BAC'S PURCHASE OF COUNTRYWIDE FINANCIAL CORPORATION IN JULY 2008.**

   A.   *Change of Product Lines and Business Practices.*

   1.   CFC no longer offers "subprime" or "high cost" mortgage products, and for a mutually agreed period shall not offer such products. At the request of a State, CFC will exclude all or part of this commitment.

   2.   CFC no longer offers nontraditional forward mortgages that may result in negative amortization, such as payment option ARMs, and for a mutually agreed period shall refrain from offering such mortgages.

   3.   CFC has significantly curtailed the offering of "low documentation" or "no documentation" loans and, for a mutually agreed period, will only underwrite "low documentation" or "no documentation" loans that are:

   (a)   eligible for sale to or guaranty by a federal agency, GSE or comparable federally-sponsored entity similar to a GSE; or

   (b)   underwritten subject to verification of the salaried portion of a borrower's income (if any) and with respect to residential mortgage loans secured by owner-occupied properties, after the extension of credit, there would be either (i) a maximum CLTV of 75% and minimum 700 FICO or (ii) a maximum 80% CLTV and minimum 720 FICO; or

   (c)   streamlined documentation loans involving waivers of some documentation on the basis of risk assessments made by automated underwriting systems.

   4.   For a mutually agreed period, CFC shall limit broker compensation to four percent (4%) of the amount borrowed.

   B.   *Enhanced Home Retention Practices.*

   1.   CFC shall be responsible for maintaining, for the duration of this agreement, robust processes for early identification and contact with borrowers who are having, or may have, trouble making their mortgage payments. Under these processes, when contact is made with delinquent borrowers, conducting an

*CONFIDENTIAL*
*FOR SETTLEMENT PURPOSES ONLY*

individualized evaluation of the borrowers' economic circumstances to determine if alternatives to foreclosure are available, and consistent with the directions of the investors, if applicable. CFC shall be responsible for maintaining, for the duration of this agreement, the current practice of offering delinquent borrowers who desire to remain in their homes and who can afford to make reasonable mortgage payments loan modifications or other workout solutions, subject to applicable investor guidance and approvals. CFC's reports to the State under this agreement shall include information on the numbers and types of workouts concluded on loans secured by owner-occupied property in the State.

2.      CFC shall be responsible for continuing, for the duration of this agreement, the current practice of regularly monitoring the delinquency characteristics of the entire portfolio of CFC loans serviced by CFC's affiliates, inclusive of "Alt-A" loans, loans with interest-only features, and other loans to prime borrowers, to identify high-delinquency segments that may be appropriate for streamlined or non-streamlined loan modification campaigns. CFC shall be responsible for providing reports to participating States on the delinquency characteristics of such loans, as provided herein. With respect to "Alt-A" loans in particular, CFC acknowledges that the States have expressed concerns about future delinquency, and agrees to provide the States a notification whenever the rate at which owner-occupied "Alt-A" borrowers originated, nationwide, are 30 days or more delinquent in their payments exceeds 150% of the delinquency rate for comparably-aged FHA-insured loans serviced by CFC or its affiliates. If such notice is required, CFC agrees to confer with the States concerning "Alt-A" delinquency trends, including whether delinquencies are isolated in certain segments of the "Alt-A" portfolio (e.g., loans with interest-only features, loans originated at high CLTV), and concerning the possible deployment of streamlined foreclosure avoidance solutions for such borrowers.   For purposes of this provision, "Alt-A" loans shall be defined as first-mortgage loans not in GSE securitizations (other than subprime loans or pay option ARMs) that were originated on or before December 31, 2007 in an amount of $400,000 or less with documentation or other characteristics making them ineligible for sale to GSEs.

3.      A minimum of 3900 personnel are employed in home retention operations to assist borrowers with loan modifications and other foreclosure avoidance measures. CFC shall cause this this staffing level to be maintained through July 1, 2009.

*C.     Compliance.* Understanding the circumstances and behaviors of lenders and brokers that may have contributed, in part, to the current mortgage crises, CFC recognizes its responsibility to ensure the very highest degree of ethical conduct on the part of CFC's agents and employees. CFC shall ensure that (i) to the extent it resumes subprime lending, it will design and implement an effective compliance management

<div align="center">2</div>

<div align="right">*CONFIDENTIAL*<br>*FOR SETTLEMENT PURPOSES ONLY*</div>

program to provide reasonable assurance as to the identification and control of consumer protection hazards associated with such subprime lending activities, and (ii) to the extent of its own lending activities (if any), it will create appropriate consumer safeguards to avoid unfair or deceptive activities or practices arising in connection with its interaction with brokers and other third parties.

## II. LOAN MODIFICATIONS FOR SERIOUSLY DELINQUENT BORROWERS IN CERTAIN MORTGAGE PRODUCTS.

CFC shall be responsible for attempting to qualify borrowers in certain mortgage products who meet the eligibility criteria set forth below for affordable loan modifications.

*A.* *Eligible Borrowers.* Potentially eligible borrowers are those who have a Qualifying Mortgage on an owner-occupied 1-4 unit residential property that was originated before December 31, 2007, was within CFC's servicing portfolio on June 30, 2008, and is within CFC or an affiliate's servicing portfolio at the time a loan modification is effected.

*B.* *Qualifying Mortgages.* The following mortgages shall be Qualifying Mortgages, and borrowers with such mortgages shall be eligible to be considered for loan modification offers when they meet the indicated delinquency profiles. Borrowers who received loan modifications or other workouts from CFC, whether or not pursuant to this agreement, shall be eligible to be considered for new loan modification offers under this agreement if they otherwise meet eligibility criteria. LTV computations under this provision shall be based on recent valuation information, as follows: a full appraisal that is no more than 180 days old; a broker price opinion that is no more than 120 days old; or an electronic appraisal (automated valuation model ("AVM")) that is no more than 90 days old. CFC shall ensure that the values in any AVM system used to generate electronic appraisals are regularly updated and periodically audited to ensure maximum accuracy.

    1. *Subprime 2, 3, 5, 7 and 10 Hybrid ARMs.* A subprime 2, 3, 5, 7 and 10 hybrid ARM shall be a Qualifying Mortgage when the borrower meets any one of the following delinquency profiles:

        (a) The borrower is seriously delinquent[1] and the borrower's current LTV is 75% or above;

---

[1]    "Seriously delinquent" means 60 or more days delinquent.

<div align="center">3</div>

*CONFIDENTIAL* *FOR SETTLEMENT PURPOSES ONLY*

(b) The borrower is current[2] on his or her mortgage payments, but is reasonably likely to become seriously delinquent as a consequence of a rate reset, and the borrower's LTV at the time he or she is considered for a modification is 75% or above; or

(c) The borrower becomes seriously delinquent at any time before June 30, 2012, and the borrower's LTV at the time he or she is considered for a loan modification is 75% or above.

2.      *Pay Option ARMs.*  A pay option ARM shall be a Qualifying Mortgage when the borrower meets any one of the following delinquency profiles:

(a) The borrower is seriously delinquent and the borrower's current LTV is 75% or above;

(b) The borrower is current on his or her mortgage payments, but is reasonably likely to become seriously delinquent as a result of a rate increase or contractual payment recast based on negative amortization triggers, and the borrower's LTV at the time he or she is considered for a loan modification is 75% or above; or

(c) The borrower becomes seriously delinquent at any time before June 30, 2012, and the borrower's LTV at the time he or she is considered for a loan modification is 75% or above.

3.      *Subprime First Mortgage Loans (Other than Hybrid 2, 3, 5, 7 and 10 ARMs).*  A subprime first mortgage loan shall be a Qualifying Mortgage if the borrower meets any one of the following delinquency profiles:

(a) The borrower is seriously delinquent and the borrower's current LTV is 75% or above; or

(b) The borrower becomes seriously delinquent at any time before June 30, 2012, and the borrower's LTV at the time he or she is considered for a loan modification is 75% or above.

C.      *Loan Modifications to Be Considered.*  Each Eligible Borrower in a Qualifying Mortgage shall be considered for a range of affordable loan modification options, subject, as applicable, to approval of the investor who owns the borrower's loan.[3]   Loan modification options for each category of Qualified Mortgages are as follows:

---

[2]      For this purpose, "current" includes 30 days delinquent but fewer than 60 days delinquent.

[3]      CFC represents that it currently has, or reasonably expects to obtain, discretion to pursue the foreclosure avoidance measures outlined in this agreement for the substantial majority of Qualifying Mortgages. Where CFC

4                                *CONFIDENTIAL*
*FOR SETTLEMENT PURPOSES ONLY*

1. *Subprime Hybrid 2, 3, 5, 7, and 10 ARMs.* Eligible Borrowers shall be considered for the following loan modifications:

(a) To the extent the HOPE for Homeowners Program is operational, an FHA refinance under the HOPE for Homeowners Program under the underwriting criteria applicable to that program; or

(b) For Eligible Borrowers that were current on their payment of interest and principal before the first rate reset and became seriously delinquent as a result of the reset, an unsolicited restoration of the introductory rate on the borrower's mortgage for five years, without the need for execution of new loan documentation or for an evaluation of the borrower's current income (communications to borrowers informing them of this modification shall invite borrowers to contact servicing personnel if they do not believe they will be able to afford the restored payment in order to be considered for more extensive relief under (c) or (d) below); or

(c) A streamlined, fully-amortizing loan modification within the limits of the Affordability Equation through implementation of the following: (i) a reduction of the interest rate on the mortgage to the introductory rate or lower (subject to an interest-rate floor of 3.5%); and (ii) an automatic conversion, after five years, to a fixed rate mortgage for the remainder of the loan term at the higher of the Fannie Mae 30-year fixed rate 60-day delivery required net yield or the rate the borrower enjoyed immediately prior to the fifth anniversary of the loan modification. If the prime rate option applies and would not be affordable for the borrower at the end of the five-year period, based on his or her income at that time, the borrower will be considered for a one-time temporary (two-year) extension of reduced-rate financing, and the conversion to a fixed rate will occur at the end of that two-year extension period; or

(d) A streamlined loan modification within the limits of the Affordability Equation through implementation of the following: (i) introduction of a ten-year interest only period; and (ii) a reduction of the interest rate on the mortgage (subject to an interest-rate floor of 3.5%), with fixed step-rate interest adjustments such that the borrower's interest payment increases by no more than 7.5% each year, and subject to a lifetime interest-rate cap of the introductory rate.

2. *Pay Option ARMs.* Eligible Borrowers shall be considered for the following loan modifications:

---

does not enjoy discretion to pursue these foreclosure avoidance measures, CFC will use its best effort to seek appropriate authorization from investors.

*CONFIDENTIAL
FOR SETTLEMENT PURPOSES ONLY*

(a) An FHA refinance under the HOPE for Homeowners Program, under the underwriting criteria applicable to that program; or

(b) A streamlined, fully-amortizing loan modification within the limits of the Affordability Equation through implementation of the following: (i) elimination of the negative amortization feature of the loan; (ii) a writedown of the principal balance for borrowers who are single property owners and currently have no equity in their homes to as low as 95% of the current value of their properties; and (iii) a reduction of the interest rate on the mortgage (subject to an interest-rate floor of 2.5%), with fixed step-rate interest adjustments such that the borrower's principal and interest payment increases by no more than 7.5% each year, and subject to a lifetime interest-rate cap of 7%.

(c) A streamlined loan modification within the limits of the Affordability Equation through implementation of the following: (i) elimination of the negative amortization feature of the loan; (ii) a writedown of the principal balance for borrowers who are single property owners and currently have no equity in their homes to as low as 95% of the current value of their properties; (iii) introduction of an ten-year interest only period; and (iv) a reduction of the interest rate on the mortgage (subject to an interest-rate floor of 3.5%), with fixed step-rate interest adjustments such that the borrower's interest payment increases by no more than 7.5% each year, and subject to a lifetime interest-rate cap of 7%.

3.   *Subprime Loans (Other than Hybrid 2, 3, 5, 7, and 10 ARMs).*  Eligible Borrowers shall be considered for the following loan modifications:

(a) An FHA refinance under the HOPE for Homeowners Program, under the underwriting criteria applicable to that program; or

(b) A streamlined, fully-amortizing loan modification within the limits of the Affordability Equation through implementation of a reduction of the interest rate on the mortgage (subject to an interest-rate floor of 2.5%), with fixed step-rate interest adjustments such that the borrower's principal and interest payment increases by no more than 7.5% each year, and subject to a lifetime interest-rate cap of (A) 2% below the fixed interest rate, in the case of fixed-rate loans, and (B) 2% below the highest contractual rate that would have been payable based on the applicable interest rate index as of the date immediately before the loan modification, in the case of an ARM.

(c) A streamlined loan modification within the limits of the Affordability Equation through implementation of the following: (i) introduction of an ten-year interest only period; and (ii) a reduction of the interest rate on the

6                          *CONFIDENTIAL*
                           *FOR SETTLEMENT PURPOSES ONLY*

mortgage (subject to an interest-rate floor of 3.5%), with fixed step-rate interest adjustments such that the borrower's interest payment increases by no more than 7.5% each year, and subject to a lifetime interest-rate cap of (A) 2% below the fixed interest rate, in the case of fixed-rate loans, and (B) 2% below the highest contractual rate that would have been payable based on the applicable interest rate index as of the date immediately before the loan modification, in the case of an ARM.

D.   *Affordability Equation.*  Eligible Borrowers in Qualifying Mortgages shall be considered for loan modifications according to the following Affordability Equation:

1.   *Foreclosure Avoidance Budget.*  Except for Eligible Borrowers that receive a streamlined reduction of their interest rates pursuant to Section III.C.1.b, for each Eligible Borrower in a Qualifying Mortgage, a Foreclosure Avoidance Budget shall be determined based on the difference between (a) the likelihood and severity of the investor's projected loss in a foreclosure sale and (b) the likelihood and severity of the investor's projected loss in the event the borrower were to receive a loan modification and later experience a foreclosure sale.

2.   *Affordability Criteria.*  To the extent the borrower's Foreclosure Avoidance Budget permits, Eligible Borrowers for whom taxes and insurance are escrowed shall be offered a loan modification that produces a first-year payment of principal (if applicable), interest, taxes and insurance equating to 34% of the borrower's income, or as close to 34% of the borrower's income as the Foreclosure Avoidance Budget permits without exceeding 42% of the borrower's income.  To the extent the borrower's Foreclosure Avoidance Budget permits, Eligible Borrowers for whom taxes and insurance are not escrowed shall be offered a loan modification that produces a first-year payment of principal (if applicable) and interest equating to 25% of the borrower's income, or as close to 25% of the borrower's income as the Foreclosure Avoidance Budget permits without exceeding 34% of the borrower's income.

3.   *Borrowers Who Cannot Afford a Loan Modification.*  There shall be no obligation to secure loan modification offers under this Agreement for Eligible Borrowers who cannot be qualified under the Affordability Equation.  Such borrowers may be eligible for a Relocation Assistance payment and/or a payment under the Foreclosure Relief Payment program.

E.   *Outreach to Borrowers at Risk of Delinquency.*  Subprime or pay option ARM borrowers whose loans were originated on or before December 31, 2007, and whose payments are scheduled to change as a result of an interest-rate reset, recast, or expiration of an interest-only term shall be advised prior to the payment change to contact servicing personnel if they believe they will not be able to afford their new payments.  In the event that borrowers respond to this solicitation, they shall be considered for loan modifications under the eligibility criteria in this agreement.

7                          *CONFIDENTIAL*
                    *FOR SETTLEMENT PURPOSES ONLY*

*F.*     *Second or Junior Liens.*  CFC shall implement the loan modification program contemplated by this agreement without regard to the presence of second or junior liens on mortgaged properties. CFC does not expect that the presence of second or junior liens will impede Eligible Borrowers from receiving a loan modification offer under this agreement or from remaining in their homes. Nevertheless, while the scope of the loan modification program in this agreement is limited to certain first mortgages, CFC recognizes that many borrowers have second mortgages and that the existence of such junior liens may reduce the incentive of the borrower to remain in the home and may impair the borrower's ability to refinance. CFC states that efforts are underway to develop best practices with respect to addressing such second mortgages and will periodically report to the States on its progress.

*G.*     *Restrictions on Initiation or Advancement of Foreclosure Process for Eligible Borrowers.*  The foreclosure process for all Eligible Borrowers in Qualified Mortgages shall not be initiated or advanced for the period necessary to determine the borrowers' interest in retaining ownership and ability to afford the revised economic terms, as well as the investor's willingness to accept a loan modification.

*H.*     *Concessions Related to Loan Modification.*

   1.     *Commitment to Waive Late/Delinquency Fees.*  Any late/delinquency fees associated with the delinquency that led to the Eligible Borrower's default shall be waived.

   2.     *Commitment Not to Charge Loan Modification Fees.*  Eligible Borrowers shall not be charged loan modification fees in connection with loan modifications under this Agreement, except to the extent required in connection with FHA HOPE for Homeowners refinances.

   3.     *Prepayment Penalty Waivers:*  For any subprime mortgages and pay option ARMs with first payment due dates between January 1, 2004 and December 31, 2007, which are held for investment by CFC or its affiliates and which remain subject to prepayment penalties, such penalties in connection with any workout or refinance of the mortgage, whether or not the new loan is originated by CFC or any of its affiliates, shall be waived. CFC will encourage investor owners of subprime mortgages and pay option ARMs in its servicing portfolio to waive prepayment penalties in such circumstances as well.

*I.*     *Government Acquisition of Qualifying Mortgages.*  To the extent the federal government acquires any Qualifying Mortgages and, as the owner of these mortgages, authorizes loan modifications that offer borrower benefits greater than those associated with the modifications outlined in this agreement, such relief measures shall be pursued in modifying such Qualifying Mortgages to the full extent of the federal government's authorization.

<div align="right">

8          *CONFIDENTIAL*
*FOR SETTLEMENT PURPOSES ONLY*

</div>

*J.*    *Timeframe for Loan Modification Process.*  CFC shall manage the loan modification process to ensure that offers of loan modifications under this agreement (other than unsolicited interest rate reductions) are made to Eligible Borrowers, on average, no more than 60 days after such Eligible Borrowers make contact with CFC and provide the required information concerning a possible modification.

*K.*    *Response to Intentional Nonperformance by Borrowers.*  If CFC detects material levels of intentional nonperformance by borrowers that appears to be attributable to the introduction of the loan modification program, it reserves the right to require objective prequalification of borrowers for loan modifications under the program and to take other reasonable steps.  Such prequalification could significantly slow implementation of the loan modification program.

*L.*    *No Releases with respect to Loan Modifications.*  CFC shall not solicit or require releases of claims from Eligible Borrowers in connection with loan modifications offered under this agreement.

*M.*    *Number of Loan Modification Offers before March 31, 2009.*  On or before March 31, 2009, CFC will offer loan modifications in accordance with this agreement to not fewer than 50,000 seriously delinquent borrowers.  Participating States may terminate the agreement and void their releases if CFC fails materially short of that commitment.  Any terminating State must return to CFC any portion of its Early Payment Default allocation that was not paid to borrowers.

## III.    RELOCATION ASSISTANCE PROGRAM.

*A.*    *Eligibility.*  With respect to any loans[4] in CFC's servicing portfolio on June 30, 2008, and which continue to be serviced by CFC or its affiliates who face foreclosure on or after the date of this agreement, CFC shall ensure that borrowers who agree to voluntarily and appropriately depart from the mortgaged premises at the time of the foreclosure sale, shall, upon fulfillment of their agreement, be provided a cash payment to assist with their transition to a new residence ("Relocation Assistance" payment).  Borrowers who are eligible for, and/or receive, payments under CFC's Foreclosure Relief Payment program may also receive a payment under this program.

*B.*    *Amount.*  CFC projects that, from the date of this agreement through December 31, 2010, Relocation Assistance payments will be made to 35,000 borrowers in a total amount of more than $70,000,000.  Discretion is retained to negotiate the payment amounts with the borrowers according to their individual circumstances (*e.g.*, number of dependents, amount of moving expenses).

*C.*    *Timing of Payments.*  Relocation Assistance payments shall be made to no later than fourteen days following the borrowers' departure from the mortgaged premises.

---

[4]    The Relocation Assistance program is not limited to borrowers who received Qualifying Mortgages.

*CONFIDENTIAL*
                *FOR SETTLEMENT PURPOSES ONLY*

## IV.   FORECLOSURE RELIEF PAYMENTS.

A.   *CFC Payment.* CFC shall pay a total of $150 million on a nationwide basis (or a proportionally reduced amount based on the States participating in this agreement and the number of affected borrowers in those States) under a Foreclosure Relief Payment program to borrowers who have either experienced a foreclosure sale or are 120 days or more delinquent as of the date of this agreement, or for other foreclosure-related relief.

B.   *State Allocation.* The $150 million will be allocated to each State through a pro rata formula based on the number of borrowers with a CFC-originated first lien residential mortgage loan secured by owner occupied property, who have lost their homes through foreclosure, or who are 120 days or more delinquent as of the date of this agreement, whose first payment on the loan was due between January 1, 2004 and December 31, 2007, and who made six or fewer payments over the life of the loan.

C.   *Individual Allocation.* Each State's allocation shall be based on its share of borrowers meeting the following criteria:

1.   The borrower has a CFC-originated first lien residential mortgage loan secured by owner-occupied property;

2.   The first payment on the borrower's loan was due between January 1, 2004 and December 31, 2007;

3.   The borrower made six or fewer payments over the life of the loan; and

4.   The borrower lost his or her home through foreclosure or is 120 days or more delinquent as of the date of this Agreement.

Each participating State shall have the ability to expand the Foreclosure Relief Payment program to cover additional borrowers or to contract the Foreclosure Relief Payment program to limit payments to easily ascertained borrowers. However, in each State the program must cover at least those borrowers who made three or fewer payments over the life of the loan. If the State elects to expand or contract the program, the amount allocated to the State will remain the same. States may reserve as much as 50% of their allocable shares for foreclosure relief/mitigation or related programs other than payments to defaulted borrowers, including purchasing/rehabilitating foreclosed properties.

D.   *Unallocated Funds.* Funds allocated to borrowers within a given State who choose not to participate in the Foreclosure Relief Payment program or who cannot be located after commercially reasonable efforts shall be available to such State for re-allocation to borrowers under this program at the State's direction.

<div align="center">10</div>

<div align="right">*CONFIDENTIAL*<br>*FOR SETTLEMENT PURPOSES ONLY*</div>

E.     *Release.* In order to receive payments under this Foreclosure Relief Payment program, borrowers will be required to execute a release of all claims relating in any way to the subject loan. Borrowers offered payments under this Foreclosure Relief Payment program whose loans have not yet been foreclosed shall be afforded at least a three-month period to decide whether to execute the release to permit them to determine whether they wish to raise claims covered by the release in connection with any foreclosure-related proceedings.

## V.     BANK OF AMERICA FOUNDATION COMMUNITY INVESTMENT ACTIVITIES.

The parties understand that while the Bank of America Foundation is not a party to this agreement, it intends to work actively with non-profits, CDC's, and others in addressing the adverse effects of the current housing crisis, particularly by promoting community redevelopment and facilitating the application of HERA funds to beneficial usage of REO properties. CFC commits to collaborate in good faith with the States to identify ways in which it can support or complement the Foundation's efforts.

## VI.    REPORTING REQUIREMENTS.

A.     *Eligible Borrowers in Qualified Mortgages.*

1.    For all Eligible Borrowers in Qualified Mortgages who receive loan modifications under this Agreement, the State shall receive a report with:

a.    A summary of the modifications, broken out by type, including the redefault rate by modification type.

b.    If a state requests, a summary report detailing the loan terms before and after the loan modification broken out by borrower

2.    For all Eligible Borrowers in Qualified Mortgages who do not receive modifications under this agreement, a summary of the terms of the borrower's loan and the reason for modification denial (*i.e.*, inability to contact borrower, borrower refuses modification offer or cannot be qualified for an affordable modification). Such reporting may be made on a mutually agreeable sample of loans.

B.     *Other Loan Modifications.* The State shall receive a mutually agreeable report concerning modifications made to all other CFC-originated first lien residential mortgage loans secured by owner occupied property summarizing the terms of the loans and the loan modifications and/or other workouts.

<div align="center">

11                          *CONFIDENTIAL*
*FOR SETTLEMENT PURPOSES ONLY*

</div>

DC1.758521.6

C.    *Reports on Delinquency and Default Rates.*   At a State's request, it shall be provided with a report summarizing the delinquency and default rates for mortgages other than Qualifying Mortgages.

D.    *Format/Frequency of Reports.*   Reports under this provision shall be provided in the same, uniform format to each participating State. Reports shall be provided initially on a quarterly basis, and shall be adjusted in terms of frequency and shall terminate on a mutually agreeable basis.

E.    *Compliance Monitor.*   CFC will appoint an employee as the Compliance Monitor for this agreement. The Compliance Monitor will be responsible for (i) making reports to the States under this agreement and (ii) receiving and responding to complaints from States or from individual borrowers concerning the operation of the loan modification program.

## VII.   RELEASE/NO ADMISSION.

*A.*    *Release.*   Each participating State shall release CFC/releasees from all claims and liability relating to the CFC's origination and servicing activities that are within the authority of its Attorney General to release, except for (i) any claims the State might have as an investor in CFC securities and (ii) any active claims or investigations specifically identified to CFC by the State.

*B.*    *No Admission.*   This agreement shall not constitute an admission of liability or responsibility by CFC, BAC, or anyone else, with respect to CFC's residential mortgage origination and servicing activities, and shall not be cited as such by participating States.

*CONFIDENTIAL*
*FOR SETTLEMENT PURPOSES ONLY*

# EXHIBIT G

EXHIBIT· F

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

ORIGINAL FILED
Los Angeles Superior Court

OCT 14 2008

John A. Clarke, Clerk
By Sahak Guladzhyan, Deputy

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

NORTHWEST DISTRICT

THE PEOPLE OF THE STATE OF
CALIFORNIA,

               Plaintiff,

    v.

COUNTRYWIDE FINANCIAL
CORPORATION, a Delaware corporation;
COUNTRYWIDE HOME LOANS, INC., a
New York corporation; and FULL
SPECTRUM LENDING, INC., a California
corporation,

               Defendants.

LC083076

Case No.

STIPULATED JUDGMENT AND
INJUNCTION

L.A.S.C. - Northwest East

RECEIVED
OCT 14 2008

23
24
25
26
27
28

It appearing to this Court that Plaintiff, the People of the State of California, by and through Edmund G. Brown Jr., Attorney General, and Defendants Countrywide Financial Corporation, Countrywide Home Loans, Inc., and Full Spectrum Lending, Inc. have resolved the matters in controversy between them and have consented to the terms of this judgment without the taking of evidence, and good cause having been shown, the Court hereby enters this

1

STIPULATED JUDGMENT AND INJUNCTION

1  Stipulated Judgment and Injunction.

2      IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

3      1.     This Court has jurisdiction of the subject matter hereof and the parties hereto.

4      2.     Venue is proper in this Court.

5      3.     For purposes of this Stipulated Judgment and Injunction:

6          A.     *"Affiliate"* means, with respect to any company, any company that

7  controls, is under common control with, or is controlled by such company.

8          B.     *"Affordability Equation"* has the meaning given to such term in Section

9  6.3.4.

10         C.     *"Alt-A Residential Mortgage Loans"* means CFC Residential Mortgage

11  Loans that are (a) not owned by a GSE; (b) not Subprime; (c) not a Pay Option ARM; (d)

12  less than $400,000 in original principal amount, and (e) including documentation or other

13  characteristics that make such loans not Federal Eligible.

14         D.     *"Annual Increase"* means, with respect to any stated rate of interest, an

15  annual increase in the stated rate of interest such that the aggregate scheduled payments of

16  principal (if applicable) and interest in any year does not increase by more than 7.5% of

17  the aggregate scheduled payments of principal and interest in the preceding year, subject

18  to any stated interest rate cap.

19         E.     *"ARMs"* means adjustable rate first-lien residential mortgage loans.

20         F.     *"BAC"* means Bank of America Corporation.

21         G.     *"Borrower"* means, with respect to any owner-occupied CFC Residential

22  Mortgage Loan, the obligors(s) on such loan. No covenant or commitment herein is

23  intended to require a CFC Servicer to deal with more than one obligor on behalf of any

24  Borrower with respect thereto.

25         H.     *"CFC"* means Countrywide Financial Corporation.

26         I.     *"CFC-Originated"* means, with respect to any residential mortgage loan,

27  that such residential mortgage loan is a first-lien residential mortgage that was originated

28  on a retail basis directly or indirectly by CFC or its subsidiaries or through brokers in their

2

1   wholesale lending channels. **"CFC-Originated"** residential mortgage loans do not

2   include CFC Purchased Loans.

3       J.    *"CFC Purchased Loans"* means any first-lien residential mortgage loan

4   originated by unaffiliated third parties and directly or indirectly purchased by CFC or its

5   subsidiaries through their correspondent lending channels or otherwise, *provided* that such

6   loan is serviced by a CFC Servicer. *"CFC Purchased Loans"* do not include CFC-

7   Originated residential mortgage loans.

8       K.    *"CFC Residential Mortgage Loans"* means any (a) CFC-Originated first-

9   lien residential mortgage loans, or (b) CFC Purchased Loans, so long as, in each case,

10  such loans are serviced by a CFC Servicer.

11      L.    *"CFC Servicer"* means CFC or any Affiliate of CFC that services CFC

12  Residential Mortgage Loans.

13      M.    *"CLTV"* means, with respect to a first-lien residential mortgage loan as of

14  the time underwritten, the ratio of the sum of the unpaid principal balance of such

15  mortgage loan *plus* the unpaid principal balance on any second-lien mortgage to the

16  Market Value of the residential property that secures such mortgages.

17      N.    *"Commencement Date"* means October 6, 2008.

18      O.    *"Countrywide Defendants"* means Countrywide Financial Corporation,

19  Countrywide Home Loans, Inc., and Full Spectrum Lending, Inc.

20      P.    *"Delinquent Borrower"* means, with respect to any Borrower, that the

21  related CFC Residential Mortgage Loan (a) is Seriously Delinquent on or before the

22  Termination Date, or (b) is subject to an imminent reset or Recast and, in the reasonable

23  view of the CFC Servicer, as a result of such reset or Recast is reasonably likely to

24  become Seriously Delinquent on or before the Termination Date.

25      Q.    *"Eligible Borrower"* has the meaning given to such term in Section 6.3.1.

26      R.    *"Fannie Mae"* means Federal National Mortgage Association.

27

28

1         S.     *"Fannie Rate"* means, as of any date, the Fannie Mae 30-year fixed rate

2  60-day delivery required net yield as of such date or if such rate is for any reason not

3  available, a comparable rate published by another nationally recognized source.

4         T.     *"Federal Eligible"* means, with respect to any first-lien residential

5  mortgage loan that, at the time of origination, (a) such loan is or was eligible for sale to, or

6  guaranty or insurance by, a federal agency, GSE or comparable federally-sponsored entity

7  similar to a GSE, under then applicable guidelines of such agency, GSE or entity, or (b)

8  such loan was made in connection with a program intended to qualify for credit under the

9  Community Reinvestment Act of 1977.

10         U.     *"Foreclosure Avoidance Budget"* has the meaning given to such term in

11  Section 6.3.4(a).

12         V.     *"Foreclosure Relief Program"* means the program under which certain

13  Borrowers will be offered payments, as set forth in Section 6.5.

14         W.     *"Freddie Mac"* means Federal Home Loan Mortgage Corporation.

15         X.     *"GSE"* means a government-sponsored enterprise such as Fannie Mae or

16  Freddie Mac.

17         Y.     *"Interest Rate Floor"* means, with respect to modification of a Qualifying

18  Mortgage hereunder, (a) a rate of 3.5% per annum if the modification results in an

19  interest-only payment; or (b) a rate of 2.5% per annum if the modification results in a fully

20  amortizing payment.

21         Z.     *"LTV"* means, with respect to a first-lien residential mortgage loan as of

22  the time reviewed for eligibility for modification, the ratio of the unpaid principal balance

23  of such mortgage loan to the Market Value of the residential property that secures such

24  mortgage.

25         AA.     *"Market Value"* means, with respect to any residential mortgage loan, the

26  value of the residential property that secures such mortgage loan as determined by a

27  lender or servicer in reliance on an appraisal (whether based on a appraisal report prepared

28  not more than 180 days before the date of determination, broker price opinion prepared

1   not more than 120 days before the date of determination or automated valuation model

2   prepared not more than 90 days before the date of determination).

3       BB.   *"Pay Option ARMs"* means ARMs that, during an initial period (and

4   subject to Recast), permit the borrower to choose among two or more payment options,

5   including an interest-only payment and a minimum (or limited) payment.

6       CC.   *"Qualifying Mortgage"* has the meaning given to such term in Section

7   6.3.2.

8       DD.   *"Recast"* means, in the case of a Pay Option ARM, a contractual payment

9   recast based on a negative amortization trigger.

10      EE.   *"Relocation Assistance payment"* has the meaning given to such term in

11  Section 6.4.1.

12      FF.   *"Seriously Delinquent"* means, with respect to any residential mortgage

13  loan, that payments of interest or principal are 60 or more days delinquent.

14      GG.   *"Seriously Delinquent Borrower"* means, with respect to any Borrower

15  that, on or before the Termination Date, the related CFC Residential Mortgage Loan is

16  Seriously Delinquent.

17      HH.   *"Subprime 2, 3, 5, 7 and 10 Hybrid ARMs"* means Subprime Mortgage

18  Loans that are 2, 3, 5, 7 and 10 Hybrid ARMs.

19      II.   *"Subprime Mortgage Loans"* means first-lien residential mortgage loans

20  that (a) combine higher risk features (such as low or no documentation, low equity,

21  adjustable interest rates, prepayment penalties, cash-out financing) with higher risk

22  borrower profiles (lower FICO scores, recent bankruptcies/foreclosures, major derogatory

23  credit), resulting in a loan that could not reasonably be underwritten and approved as a

24  "prime" loan.  An existing CFC Residential Mortgage Loan would be a *"Subprime*

25  *Mortgage Loan"* if it is identified as such in connection with a securitization in which it is

26  part of the pool of securitized assets or, in the case of a CFC Residential Mortgage Loan

27  that is not included in a securitization, was classified as being "subprime" on the systems

28

1  of CFC and its subsidiaries on June 30, 2008. *"Subprime Mortgage Loans"* do not

2  include first-lien residential mortgage loans that are Federal Eligible.

3      JJ.    *"Termination Date"* means June 30; 2012.

4      4.    On July 1, 2008, Bank of America Corporation announced that it had completed its

5  purchase of Countrywide Financial Corporation, including Countrywide Home Loans. In

6  connection with the acquisition, Bank of America announced that the Countrywide Defendants

7  would suspend offering Subprime, higher-cost or nontraditional mortgages that may result in

8  negative amortization, including Pay Option ARMs. In addition, Bank of America also stated

9  that it would place restrictions on offering "low documentation" and "no documentation"

10  mortgage loans and set limits on mortgage broker compensation.

11      5.    All relief under Paragraphs 6 through 12 of this Judgment is ordered pursuant to

12  the Court's powers, including the Court's powers under sections 17203 and 17535 of the

13  California Business and Professions Code.

14      6.    *Agreements of the Parties.*

15      6.1    *CFC SOLE OBLIGOR ON ALL OBLIGATIONS IN THIS SECTION 6 OF*

16      *THIS STIPULATED JUDGMENT AND INJUNCTION.*

17      6.1.1   *Responsibility of CFC.* Until the Termination Date (or such earlier date as

18  is specified herein), CFC is responsible to the other parties hereto for performance of all

19  of the undertakings in Section 6 of this Stipulated Judgment and Injunction, including the

20  changes to the residential mortgage lending practices described in Section 6.2, the loan

21  modification programs described in Section 6.3, the Relocation Assistance payments

22  described in Section 6.4, the Foreclosure Relief Program described in Section 6.5 and the

23  reporting obligations described in Section 6.6.

24      6.1.2  *Absence of Defenses.* It is not a condition to the performance of the

25  obligations of CFC hereunder that it does not directly or indirectly engage in the business

26  of originating residential mortgage loans or in the business of servicing residential

27  mortgage loans. CFC is responsible for the conduct of CFC Affiliates and CFC Servicers

28  as specified hereunder whether or not it controls such CFC Affiliates or CFC Servicers

STIPULATED JUDGMENT AND INJUNCTION

1    and the absence of such control shall not be a defense to or otherwise excuse CFC's

2    failure to perform hereunder.

3        6.1.3   *Remedies for Failure of CFC to Cause Performance.*   If there is a

4    material failure to perform the obligations under the loan modification programs described

5    in Section 6.3, the Relocation Assistance payments described in Section 6.4, the

6    Foreclosure Relief Program described in Section 6.5 or the reporting obligations described

7    in Section 6.6 and such failure is not promptly cured after notice by the Office of the

8    Attorney General of the State of California, then the Office of the Attorney General may

9    terminate Section 6 of this Stipulated Judgment and Injunction and is no longer bound by

10   the release set forth in Section 10 of this Stipulated Judgment and Injunction.

11   6.2   *SERVICER PRACTICES.*

12   Until the Termination Date, CFC shall be responsible for the implementation of the

13   following by CFC Affiliates with respect to CFC Residential Mortgage Loans with respect to

14   Borrowers in the State of California:

15       6.2.1   *Enhanced Home Retention Practices.*

16           (a)   CFC Servicers will maintain robust processes for early

17   identification and contact with Borrowers who are having, or may have, trouble

18   making their payments on CFC Residential Mortgage Loans.   Under these

19   processes, when contact is made with Delinquent Borrowers, an individualized

20   evaluation of the Borrowers' economic circumstances will be made to determine if

21   alternatives to foreclosure are available, and consistent with the directions of the

22   investors, if applicable.

23           (b)   CFC Servicers will maintain the current practice of offering

24   Delinquent Borrowers who desire to remain in their homes and who can afford to

25   make reasonable mortgage payments loan modifications or other workout

26   solutions, subject to applicable investor guidance and approvals.

27

28

7

STIPULATED JUDGMENT AND INJUNCTION

1   (c)   CFC's reports to the State under this agreement will include
2   information on the numbers and types of workouts concluded on loans secured by
3   owner-occupied properties in the State of California.

4   (d)   CFC Servicers will continue the current practice of regularly
5   monitoring the delinquency characteristics of the entire portfolio of CFC
6   Residential Mortgage Loans, including Alt-A Residential Mortgage Loans, loans
7   with interest-only features, and other loans to prime borrowers, to identify high-
8   delinquency segments that may be appropriate for loan modification campaigns.
9   CFC shall be responsible for providing reports to the Office of the Attorney
10   General of the State of California on the delinquency characteristics of such loans,
11   as provided herein.

12   (e)   With respect to Alt-A Residential Mortgage Loans, CFC
13   acknowledges that Office of the Attorney General of the State of California has
14   expressed concerns about future delinquencies, and agrees to provide the Office of
15   the Attorney General a notification whenever the nationwide rate at which
16   Borrowers on Alt-A Residential Mortgage Loans are 30 days or more delinquent
17   in their payments exceeds 150% of the delinquency rate for comparably-aged
18   FHA-insured loans serviced by CFC Servicers. If such notice is required, CFC
19   agrees to confer with the Office of the Attorney General concerning Alt-A
20   Residential Mortgage Loans delinquency trends, including whether delinquencies
21   are isolated in certain segments of the Alt-A Residential Mortgage Loans portfolio
22   (e.g., loans with interest-only features, loans originated at high CLTV), and
23   concerning the possible deployment of streamlined foreclosure avoidance
24   solutions for such Borrowers.

25   (f)   Through July 1, 2009, a minimum of 3900 personnel shall be
26   employed to assist Borrowers with loan modifications and other foreclosure
27   avoidance measures.

28

8

1    6.2.2  *Compliance.*  Understanding the circumstances and behaviors of lenders

2 and brokers that may have contributed, in part, to the current mortgage crises, CFC

3 recognizes its responsibility to ensure the very highest degree of ethical conduct on the

4 part of CFC's agents and employees. CFC shall ensure that (a) to the extent it resumes

5 subprime lending, it will design and implement an effective compliance management

6 program to provide reasonable assurance as to the identification and control of consumer

7 protection hazards associated with such subprime lending activities, and (b) to the extent

8 of its own lending activities (if any), it will create appropriate consumer safeguards to

9 avoid unfair or deceptive activities or practices arising in connection with its interaction

10 with brokers and other third parties.

11    6.3    *LOAN MODIFICATIONS FOR SERIOUSLY DELINQUENT BORROWERS*

12          *IN CERTAIN MORTGAGE PRODUCTS.*

13 Until the Termination Date, CFC shall be responsible for ensuring that CFC Servicers do

14 the following:

15    6.3.1  *Eligible Borrowers.*  An *"Eligible Borrower"* is a Borrower who has a

16 Qualifying Mortgage with a first payment date on or before December 31, 2007, that (a) is

17 secured by an owner-occupied 1-4 unit residential property, (b) is serviced by a CFC

18 Servicer, and (c) in the event that it is determined that a condition described in Section

19 6.3.10 has occurred, the applicable CFC Servicer has determined that such Borrower is in

20 financial distress. Eligible Borrowers are potentially eligible for loan modification relief

21 under this Section 6.3. A Borrower who does not occupy the 1-4 unit residential property

22 that secures the Qualifying Mortgage is not an *"Eligible Borrower."*

23    6.3.2  *Qualifying Mortgages.*  The following CFC Residential Mortgage Loans

24 are *"Qualifying Mortgages"* if the Borrower is an Eligible Borrower and the Borrower

25 meets one of the specified delinquency profiles:

26    (a)  *Subprime 2, 3, 5, 7 and 10 Hybrid ARMs.*  A Subprime 2, 3, 5, 7

27 and 10 Hybrid ARM shall be a Qualifying Mortgage if the Eligible Borrower

28

9

1    meets any one of the following delinquency profiles at the time considered for loan

2    modification:

3           *(1)*      The Eligible Borrower is a Seriously Delinquent Borrower

4      and the LTV is 75% or more; or

5           *(2)*      The Eligible Borrower is a Delinquent Borrower and the

6      LTV is 75% or more.

7       (b)      *Pay Option ARMs.* A Pay Option ARM shall be a Qualifying

8    Mortgage if the Eligible Borrower meets any one of the following delinquency

9    profiles at the time considered for loan modification:

10           *(1)*      The Eligible Borrower is Seriously Delinquent and the LTV

11      is 75% or more; or

12           *(2)*      The Eligible Borrower is a Delinquent Borrower and the

13      LTV is 75% or more.

14       (c)      *Subprime First Mortgage Loans (Other than Hybrid 2, 3, 5, 7 and*

15    *10 ARMs).* A Subprime CFC Residential Mortgage Loan shall be a Qualifying

16    Mortgage if the Eligible Borrower is a Seriously Delinquent Borrower and the

17    LTV is 75% or more.

18      6.3.3   *Loan Modifications to Be Considered.* Each Eligible Borrower shall be

19    considered for a range of affordable loan modification options with respect to his or her

20    Qualifying Mortgage. The loan modification options will include those described below

21    and existing modification options currently undertaken by CFC, and are subject, as

22    applicable, to approval of the investor who owns the Qualifying Mortgage consistent with

23    the Affordability Equation, as set forth in Section 6.3.4. Loan modification options for

24    each category of Qualifying Mortgages are as follows:

25       (a)      *Subprime Hybrid 2, 3, 5, 7 and 10 ARMs.* Qualifying Mortgages

26    that are Subprime Hybrid 2, 3, 5, 7 and 10 ARMs will be eligible for loan

27    modifications as follows:

28

1    *(1)*    To the extent the HOPE for Homeowners Program is available, an FHA refinancing under the HOPE for Homeowners Program under the underwriting criteria applicable to that program.

2    *(2)*    For Eligible Borrowers who are Delinquent Borrowers, an unsolicited (subject to Section 6.3.10) restoration of the introductory rate for five years, without new loan documentation or an evaluation of the Eligible Borrower's current income.  Communications to Eligible Borrowers informing them of this modification will invite Eligible Borrowers to contact the applicable CFC Servicer if they do not believe they will be able to afford the introductory rate in order to be considered for more extensive relief under Section 6.3.3(a)(3).

3    *(3)*    A streamlined, fully-amortizing loan modification subject to the Affordability Equation consisting of:

    (a)    until the fifth anniversary of the loan modification, a reduction of the interest rate to the (1) introductory rate or (2) lower (but not less than 3.5%); and

    (b)    on the fifth anniversary of the loan modification, an automatic conversion to a fixed rate mortgage for the remainder of the loan term at the higher of (1) the Fannie Rate and (2) the introductory rate.  If the Fannie Rate option applies and would not be affordable to the Eligible Borrower based on his or her income at the time of conversion, the Eligible Borrower will be considered for a single two year period of reduced-rate financing (in which case the conversion to a fixed rate mortgage will occur at the end of the seventh year).

    *(4)*    A streamlined loan modification subject to the Affordability Equation consisting of:

11

1                 (a)     modification of the Qualifying Mortgage to include a

2     ten-year interest-only period;

3                 (b)     reduction of the interest rate to a rate no lower than

4     the Interest Rate Floor, with an Annual Increase subject to an

5     interest-rate cap as provided below in Section 6.3.3(a)(4)(c); and

6                 (c)     an interest-rate cap for the remaining, fully-

7     amortizing term of the Qualifying Mortgage at an annual interest

8     rate equal to the introductory rate.

9         (b)    *Pay Option ARMs.*  Qualifying Mortgages that are Pay Option

10    ARMs are eligible for the following loan modifications:

11           (1)     To the extent the HOPE for Homeowners Program is

12    available, an FHA refinancing under the HOPE for Homeowners Program

13    under the underwriting criteria applicable to that program; or

14          (2)    A streamlined loan modification subject to the Affordability

15    Equation consisting of:

16                 (a)     elimination of the negative amortization feature;

17                 (b)     optional introduction of a ten-year interest-only

18     period on the loan;

19                 (c)     reduction of the interest rate to a rate no lower than

20     the Interest Rate Floor, with an Annual Increase subject to an

21     interest rate cap of 7%; and

22                 (d)     if the Eligible Borrower owns only one residential

23     property and the LTV is 95% or higher, a write down of the

24     principal balance of the Qualifying Mortgage (but any write down

25     of principal would not be in an amount greater than necessary to

26     achieve an LTV of 95%).

27

28

(c)     *Subprime Loans (Other than Hybrid 2, 3, 5, 7 and 10 ARMs)*. Qualifying Mortgages that are Subprime Loans (Other than Hybrid 2, 3, 5, 7 and 10 ARMs) are eligible for the following loan modifications:

(1)     To the extent the HOPE for Homeowners Program is available, an FHA refinancing under the HOPE for Homeowners Program under the underwriting criteria applicable to that program; or

(2)     A streamlined loan modification within the limits of the Affordability Equation consisting of:

(a)     optional introduction of a ten-year interest-only period on the loan;

(b)     reduction of the interest rate on the mortgage to a rate no lower than the Interest Rate Floor, with an Annual Increase subject to an interest rate cap as provided below in Section 6.3.3(c)(2)(c); and

(c)     an interest-rate cap for the remaining term of the Qualifying Mortgage at an annual interest rate equal to (i) the fixed interest rate *less* 200 basis points, in the case of fixed-rate loans, and (ii) the remainder of the sum of the contractual index amount *plus* spread immediately before the first loan modification, *minus* 200 basis points, in the case of an ARM.

6.3.4   *Affordability Equation*. Qualifying Mortgages will be considered for loan modifications in accordance with the following Affordability Equation, which establishes a Foreclosure Avoidance Budget that is a cap on the cost of the loan modification.

(a)     *Foreclosure Avoidance Budget*. Except for Eligible Borrowers who receive a streamlined reduction of their interest rates pursuant to Section 6.3.3(a)(2), a Foreclosure Avoidance Budget will be prepared with respect to the Eligible Borrower and the Qualifying Mortgage. The *"Foreclosure Avoidance Budget"* at any time is the difference between (i) the likelihood and severity of the

13

projected loss in a foreclosure sale and (ii) the likelihood and severity of the
projected loss in the event that there was a loan modification with respect to the
Qualifying Mortgage and a later foreclosure sale. For purposes of determining the
Foreclosure Avoidance Budget for a Qualifying Mortgage, the LTV will be based
on the Market Value.

(b) *Affordability Criteria.*

*(1)* Subject to the Foreclosure Avoidance Budget, if tax and
insurance escrows are maintained with respect to the Qualifying Mortgage,
the Eligible Borrower will be offered a loan modification that produces a
first-year payment of principal (if applicable), interest, taxes and insurance
equating to 34% of the Eligible Borrower's income, or as close to 34% of
the Eligible Borrower's income as the Foreclosure Avoidance Budget
permits without exceeding 42% of the Eligible Borrower's income.

*(2)* Subject to the Foreclosure Avoidance Budget, if tax and
insurance escrows are not maintained with respect to a Qualifying
Mortgage, the Eligible Borrower will be offered a loan modification that
produces a first-year payment of principal (if applicable) and interest
equating to 25% of the Eligible Borrower's income, or as close to 25% of
the Eligible Borrower's income as the Foreclosure Avoidance Budget
permits without exceeding 34% of the Eligible Borrower's income.

(c) *Borrowers Who Cannot Afford a Loan Modification.* There is no
obligation to offer loan modifications with respect to Qualifying Mortgages if the
Eligible Borrower cannot be qualified under the Affordability Equation. Such
Eligible Borrowers may be eligible for a Relocation Assistance payment or a
payment under the Foreclosure Relief Program, all as provided in Sections 6.4 and
6.5.

6.3.5 *Outreach to Borrowers at Risk of Delinquency.* Borrowers under
Subprime Mortgage Loans or Pay Option ARMs with first-payment due dates between

14

STIPULATED JUDGMENT AND INJUNCTION

1    January 1, 2004 and December 31, 2007, whose payments are scheduled to change as a

2    result of an interest-rate reset, Recast, or expiration of an interest-only term, will be sent a

3    communication approximately ninety (90) days before the payment change inviting them

4    to contact their CFC Servicer if they believe they will not be able to afford their new

5    payments. In the event that a borrower responds to this communication, the borrower will

6    be considered for loan modifications under the eligibility criteria in Section 6 of this

7    Stipulated Judgment and Injunction.

8        6.3.6   *Restrictions on Initiation or Advancement of Foreclosure Process for*

9    *Eligible Borrowers.*

10           (a)     The foreclosure process for a Qualifying Mortgage of an Eligible

11   Borrower will not be initiated or advanced for the period necessary to determine

12   such Eligible Borrower's interest in retaining ownership and ability to afford the

13   revised mortgage terms, as well as the investor's willingness to accept a loan

14   modification.

15           (b)     Any such foreclosure process will be initiated or advanced only if:

16               *(1)*     it is determined, based on communication with the Borrower

17   or based on the Borrower's abandonment of the residential property that

18   secures the mortgage loan, that the Borrower does not wish to retain

19   ownership of the residence that secured the mortgage loan;

20               *(2)*     it is or has been determined that the Borrower cannot be

21   qualified for, or has refused, a loan modification under Section 6 of this

22   Stipulated Judgment and Injunction within the limits of the Affordability

23   Equation, as applicable; or

24               *(3)*     despite reasonable efforts, servicing agents have been

25   unable to make contact with the borrower to determine his or her

26   preferences with regard to home ownership, or to obtain information

27   concerning his or her income and ability to afford a mortgage payment

28   under a modification.

6.3.7   *Miscellaneous Provisions Related to Loan Modification Program.*

(a)     *Commitment to Waive Late/Delinquency Fees.*   Any late/delinquency fees associated with overdue loan payments remaining unpaid as of the date immediately before modification of the Qualifying Mortgage under Section 6 of this Stipulated Judgment and Injunction will be waived.

(b)     *Commitment Not to Charge Loan Modification Fees.* Except to the extent required in connection with the HOPE for Homeowners Program, Eligible Borrowers will not be charged loan modification fees in connection with loan modifications of Qualifying Mortgages hereunder.

(c)     *Prepayment Penalty Waivers.*   Prepayment penalties will be waived in connection with any payoff or refinancing (even if refinanced by a person not Affiliated with CFC) of a Qualifying Mortgage that is a Subprime Mortgage Loan or Pay Option ARM that (i) had a first payment due date between January 1, 2004 and December 31, 2007, (ii) was directly or indirectly held by CFC on June 30, 2008, and (iii) which at the time of the payoff or refinancing is held by CFC or any Affiliate.   Investor owners or their representatives of Qualifying Mortgages that are Subprime Mortgage Loans or Pay Option ARMs serviced by a CFC Servicer will be encouraged to waive prepayment penalties in such circumstances.

(d)     *Commitment to Consider Additional Relief for Borrowers Receiving Modifications and Later Becoming Delinquent.*  Eligible Borrowers with respect to Qualifying Mortgages who have earlier received loan modifications or other workouts, whether or not pursuant to Section 6 of this Stipulated Judgment and Injunction, will be eligible to be considered for new loan modification offers under Section 6 of this Stipulated Judgment and Injunction if they otherwise satisfy the eligibility criteria.

(e)     *Representation Concerning Investor Delegation and Approval.* CFC represents that CFC Servicers currently have, or reasonably expect to obtain,

16

STIPULATED JUDGMENT AND INJUNCTION

discretion to pursue the foreclosure avoidance measures outlined in Section 6 of this Stipulated Judgment and Injunction for a substantial majority of Qualifying Mortgages. If CFC Servicers do not have discretion to pursue these foreclosure avoidance measures, best efforts will be used to obtain appropriate investor authorization.

6.3.8 *Commitment to Implement Relief Measures Authorized by Federal Government.*

(a) *Government Acquisition of Qualifying Mortgages.* To the extent the federal government acquires any Qualifying Mortgages and, as the owner of these mortgages, authorizes loan modifications that offer borrower benefits greater than those associated with the modifications outlined in Section 6 of this Stipulated Judgment and Injunction, relief measures will be pursued in modifying such Qualifying Mortgages to the full extent of such authorization.

(b) *Government-Issued Guidelines Relating to Loan Modifications.* To the extent any federal agency, in connection with its intervention in the secondary mortgage market or otherwise having jurisdiction, issues guidelines relating to modifications of delinquent mortgages, Section 6 of this Stipulated Judgment and Injunction will be implemented in a manner that, to the maximum extent feasible, produces modifications consistent with such guidelines.

6.3.9 *Timeframe for Loan Modification Process.* The loan modification process will be managed to ensure that offers of loan modifications under Section 6 of this Stipulated Judgment and Injunction (other than unsolicited interest rate reductions) are made to Eligible Borrowers, on average, no more than 60 days after such Eligible Borrowers make contact with the applicable CFC Servicer and provide any required information concerning a possible modification.

6.3.10 *Response to Intentional Nonperformance by Borrowers.* If CFC detects material levels of intentional nonperformance by Eligible Borrowers that appears to be attributable to the introduction of the loan modification program, it reserves the right to

17

require objective prequalification of Eligible Borrowers for loan modifications under the program by obtaining verification of all sources of income and the application of funds, and to take other reasonable steps. Such prequalification could result in the elimination of unsolicited interest rate reductions, inhibit streamlined solutions and could otherwise significantly slow implementation of the loan modification program.

6.3.11 *No Releases with Respect to Loan Modifications.* There will be no requirement that Eligible Borrowers release claims against CFC or any CFC Affiliate in connection with loan modifications offered under Section 6 of this Stipulated Judgment and Injunction.

6.3.12 *Number of Loan Modification Offers before March 31, 2009.* On or before March 31, 2009, loan modifications will be offered by CFC Servicers in accordance with Section 6 of this Stipulated Judgment and Injunction to not fewer than 50,000 Seriously Delinquent Borrowers on a nationwide basis. The Office of the Attorney General of the State of California may terminate Section 6 of this Stipulated Judgment and Injunction and no longer be bound by the release set forth in Section 10 of this Stipulated Judgment and Injunction if there is a material failure to satisfy this commitment. If the Office of the Attorney General terminates Section 6, any portion of the Foreclosure Relief Program allocation that has not been paid to Eligible Borrowers as provided in Section 6.5.2 of this Stipulated Judgment and Injunction will revert to CFC.

6.3.13 *Second or Junior Liens.* Loan modifications contemplated in Section 6 of this Stipulated Judgment and Injunction shall be made without consideration of second or junior liens on mortgaged properties. CFC does not expect that the presence of second or junior liens will impede Eligible Borrowers from receiving a loan modification offer under Section 6 of this Stipulated Judgment and Injunction.

6.4    *RELOCATION ASSISTANCE PROGRAM.*

Through the Termination Date, payments will be provided to borrowers who are unable to retain their homes in accordance with this Section 6.4.

18

STIPULATED JUDGMENT AND INJUNCTION

6.4.1  *Eligibility.*  Borrowers under CFC Residential Mortgage Loans that were serviced by a CFC Servicer on June 30, 2008 (whether or not they are Qualifying Mortgages), are currently serviced by a CFC Servicer and are subject to a foreclosure sale date on or before the Termination Date, will be offered an agreement under which they can receive a cash payment to assist with the Borrower's transition to a new place of residence ("*Relocation Assistance payment*") in exchange for voluntarily and appropriately surrendering the residence that secures the mortgage loan at the time of the foreclosure sale.  Borrowers who are eligible for, or receive, payments under the Foreclosure Relief Program may also receive a Relocation Assistance payment.

6.4.2  *Amount.*  The amount of Relocation Assistance payments offered to any Borrower will be in the discretion of CFC or its delegee according to its or their assessment of the individual circumstances of the Borrower (*e.g.*, number of dependents or amount of moving expenses).

6.4.3  *Timing of Payments.*  Relocation Assistance payments shall be made to a Borrower no later than fourteen days following the Borrower's voluntary and appropriate surrender of the residence that secures the mortgage loan.

6.4.4  *Payment Projection.*  CFC projects that, from October 1, 2008, through December 31, 2010, Relocation Assistance payments will be made to 35,000 borrowers on a nationwide basis in a total amount of more than $70,000,000.

6.5     **FORECLOSURE RELIEF PROGRAM.**

Payments shall be made available to borrowers who experienced a foreclosure sale, or who were 120 days or more delinquent in making mortgage payments soon after their loans were originated, in accordance with this Section 6.5.

6.5.1  *Payment.*  California is allocated $27,950,101.

6.5.2  *Individual Allocation.*  A Borrower will be eligible for payments under the Foreclosure Relief Program if the Borrower:

(a)     Has a CFC-Originated Residential Mortgage Loan secured by owner-occupied property;

19

(b)     The first payment on the CFC-Originated Residential Mortgage Loan was due between January 1, 2004 and December 31, 2007;

(c)     Six or fewer payments were made on the CFC-Originated Residential Mortgage Loan; and

(d)     The CFC-Originated Residential Mortgage Loan was foreclosed or is 120 days or more delinquent as of the Commencement Date.

6.5.3   *Expansion of the Foreclosure Relief Program.*   The Office of the Attorney General of the State of California may expand the Foreclosure Relief Program to cover additional Borrowers or limit the Foreclosure Relief Program to restrict the participation of Borrowers (provided that at least those borrowers who made three or fewer payments over the life of the CFC-Originated Residential Mortgage Loan are covered).

6.5.4   *Communications.* CFC and the Office of the Attorney General of the State of California shall consult as to the form of any communication sent to Borrowers who are to receive Foreclosure Relief Program payments.

6.5.5   *Unallocated Funds.*   Funds allocated to Borrowers in the State of California who choose not to participate in the Foreclosure Relief Program or who cannot be located after commercially reasonable efforts shall be available to the Office of the Attorney General for re-allocation to Borrowers under this program at the direction of the Office of the Attorney General.

6.5.6   *Release.*   In order to receive payments under the Foreclosure Relief Program, Borrowers will be required to execute a release in accordance with Section 6.7.1. Borrowers offered payments under this Foreclosure Relief Program whose loans have not yet been foreclosed shall be afforded at least a three month period to decide whether to execute the release to permit them to determine whether they wish to raise claims covered by the release.

6.6     *REPORTING REQUIREMENTS.*

6.6.1   *Eligible Borrowers in Qualifying Mortgages.*

20

(a)  . On a quarterly basis through June 30, 2010, CFC shall report the following information to the Office of the Attorney General of the State of California:

(1) . The names and addresses of Eligible Borrowers in the State of California in Qualifying Mortgages who received loan modification offers under Section 6 of this Stipulated Judgment and Injunction, and for whom loan modifications were concluded;

(2)    For all loan modifications under Section 6 of this Stipulated Judgment and Injunction concluded within the reporting period in the State of California, the original and modified loan terms, and the amounts of late/delinquency fees waived, loan modification fees waived, and prepayment penalties waived by CFC pursuant to Section 6 of this Stipulated Judgment and Injunction;

(3)    For a sample of Eligible Borrowers in Qualifying Mortgages for whom CFC was unable to procure a loan modification offer under Section 6 of this Stipulated Judgment and Injunction during the reporting period (which sample shall be no less than 5% of all such Eligible Borrowers), the factors preventing a loan modification offer;

(4)    The number and total amount of Relocation Assistance payments made to borrowers in the State of California during the reporting period;

(5)    Delinquency data on active loans with first payment due dates between January 1, 2004, and December 31, 2007, that are secured by owner occupied residential property in the State of California, broken down by type of loan; and

(6)    Aggregated delinquency data on all loans modified under Section 6 of this Stipulated Judgment and Injunction for Eligible Borrowers in the State of California.

21

STIPULATED JUDGMENT AND INJUNCTION

1        (b)    CFC shall provide annual reports to the Office of the Attorney

2        General of the State of California that include the information specified in Section

3        6.6.1(a) for the periods July 1, 2010 through June 30, 2011; and July 1, 2011

4        through June 30, 2012.

5        6.6.2 *Other Loan Modifications.* With the same frequency as specified in

6        Section 6.6.1, CFC will provide to the Office of the Attorney General of the State of

7        California a report detailing the numbers and types of modifications concluded on first-

8        lien residential mortgage loans secured by owner-occupied property in the State of

9        California (other than Qualifying Mortgages) and the total unpaid principal balance of

10       such modified loans.

11       6.6.3 *Compliance Monitor.* CFC will appoint an employee as the Compliance

12       Monitor for this agreement. The Compliance Monitor will be responsible for (a) making

13       reports to the Office of the Attorney General of the State of California under this

14       Stipulated Judgment and Injunction and (b) receiving and responding to complaints from

15       States or from individual borrowers concerning the operation of the loan modification

16       program.

17       6.7   **RELEASES**

18       6.7.1 *Releases from Borrowers.* Borrowers to whom payments under the

19       Foreclosure Relief Program are offered shall, as a condition of receiving such payments,

20       be required to execute and return to CFC a release of claims that includes the following

21       language:

22          In consideration for the payment we are to receive under the Foreclosure Relief

23          Program, we release Countrywide Financial Corporation and its affiliates and their

24          respective directors, officers, employees and agents (except brokers) from all civil

25          claims, causes of action, any other right to obtain any type of monetary damages

26          (including punitive damages), expenses, attorneys' and other fees, rescission,

27          restitution or any other remedies of whatever kind at law or in equity, in contract,

28          in tort (including, but not limited to, personal injury and emotional distress),

STIPULATED JUDGMENT AND INJUNCTION

arising under any source whatsoever, including any statute, regulation, rule, or common law, whether in a civil, administrative, arbitral or other judicial or non-judicial proceeding, whether known or unknown, whether or not alleged, threatened or asserted by us or by any other person or entity on our behalf, including any currently pending or future purported or certified class action in which we are now or may hereafter become a class member, that arise from or are in any way related to CFC Loan No. _____, including, without limitation, the origination of that loan (and any representations or omissions made during that origination process), the terms and conditions of that loan, and the servicing or administration of that loan following its origination.

6.8   *Miscellaneous.*

6.8.1   *No Third Party Beneficiaries Intended.*   Section 6 of this Stipulated Judgment and Injunction is not intended to confer upon any person any rights or remedies, including rights as a third party beneficiary. Section 6 of this Stipulated Judgment and Injunction is not intended to create a private right of action on the part of any person or entity other than the parties hereto.

6.8.2   *Confidentiality.*   The Office of the Attorney General of the State of California agrees that all confidential information disclosed to it by BAC or CFC or any of their Affiliates shall be kept confidential, except to the extent required by law, regulation or court order (and in such case, only upon prior written notice to the disclosing party). The periodic reports to be provided pursuant to Section 6.6 of this Stipulated Judgment and Injunction shall be considered records of an investigation conducted by the Office of the Attorney General.

7.   Except to the extent an earlier date is specified or the provisions of Section 6 of this Stipulated Judgment and Injunction are earlier terminated according to the terms hereof, the obligations of CFC under Section 6 of this Stipulated Judgment and Injunction shall terminate on the Termination Date. Provided, however, that no termination of the obligations under Section 6 of this Stipulated Judgment and Injunction shall modify or terminate the terms of any

23

STIPULATED JUDGMENT AND INJUNCTION

1  loan modification entered into pursuant to Section 6.3 of this Stipulated Judgment and

2  Injunction.

3      8.      On entry of this Stipulated Judgment and Injunction, CFC shall pay the sum of

4  $1,700,000 to the Office of the Attorney General, to cover the costs of investigating and

5  prosecuting this matter.

6      9.      All documents and notices to be provided to any party under this Judgment are

7  sufficient if given by nationally recognized overnight courier service or personal delivery to the

8  named party at the address below:

9

10      A.      If to Defendants:

11  John Beisner
    Brian Boyle
12  O'MELVENY & MYERS LLP
    1625 Eye Street, N.W.
13  Washington, D.C. 20006

14

15      B.      If to the Attorney General:

16  Benjamin G. Diehl
    Office of the California Attorney General
17  300 S. Spring St., Ste. 1702
    Los Angeles, CA 90013

18

19  and

20  Kathrin Sears
    Office of the California Attorney General
21  455 Golden Gate Ave., Ste. 11000
    San Francisco, CA 94102

22  Notice is effective when delivered personally or on the business day after it is sent by nationally

23  recognized courier service for next day delivery. Any party may designate some other person to

24  receive Reports or notices or change its notice address by giving notice in accordance with this

25  paragraph.

26      10.      This Stipulated Judgment and Injunction constitutes a full resolution, complete

27  settlement, and release of all claims as between Plaintiff the People the State of California and

28  the Countrywide Defendants regarding the business practices identified in the above captioned

24

STIPULATED JUDGMENT AND INJUNCTION

1    action for events occurring before the entry of this Stipulated Judgment and Injunction. This

2    Stipulated Judgment and Injunction does not resolve or release, but instead specifically

3    preserves, any claims Plaintiff the People of the State of California may have as to Angelo

4    Mozilo or David Sambol.

5         11.    The Countrywide Defendants shall maintain and provide information to and

6    cooperate fully with the Attorney General in connection with the prosecution of the separate

7    action, *People of the State of California v. Countrywide Financial Corporation, et al.*, initially

8    filed in this court and assigned case number LC081846, as to defendants Angelo Mozilo and

9    David Sambol. This shall include, but is not necessarily limited to, attending depositions, trials

10   or hearings on 25-days notice, without the necessity of a subpoena or personal service;

11   providing any documents and other tangible things requested by the Attorney General on 30-

12   days notice, without the necessity of a subpoena or personal service and without objection; not

13   objecting to efforts by the Attorney General to obtain documents or other discovery from any

14   other named defendant to this action or any third party; and protecting, preserving and

15   maintaining all records and correspondence which are now in or later come into their

16   possession, custody or control, that were sent to, received from, or in any way relate to Angelo

17   Mozilo, David Sambol, or any of their representatives.

18        12.    Plaintiff and the Countrywide Defendants agree that nothing in this Stipulated

19   Judgment and Injunction as to such defendants is to be construed as a bar to Plaintiff continuing

20   its separate action against defendants Angelo Mozilo, David Sambol, and Does 1-100,

21   inclusive.

22        13.    Should any of the Countrywide Defendants resolve matters specifically set forth

23   in the allegations of the Complaint filed in this action for conduct which occurred before the

24   entry of this Stipulated Judgment and Injunction in actions brought by Attorneys General of

25   other states on terms that are different than those contained in this Stipulated Judgment and

26   Injunction (other than terms offered by CFC but not accepted by the Office of the Attorney

27   General of the State of California), the Countrywide Defendants will provide a copy of those

28   terms to the Office of the Attorney General for review. If, after review, the Office of the

25

STIPULATED JUDGMENT AND INJUNCTION

1  Attorney General determines the terms of such resolutions are, taken as a whole, more

2  favorable than those contained in this Stipulated Judgment and Injunction, then the

3  Countrywide Defendants shall stipulate that this Stipulated Judgment and Injunction shall be

4  amended to reflect all of such terms in place of the terms hereof.

5       14.    Nothing in this Stipulated Judgment and Injunction shall be construed as

6  relieving any of the parties subject to this Stipulated Judgment and Injunction of their obligation

7  to comply, or as prohibiting any of those parties from complying, with all applicable state and

8  federal laws, regulations or rules, nor shall any of the provisions of this Stipulated Judgment

9  and Injunction be deemed to be permission to engage in any acts or practices prohibited by such

10  laws, regulations, or rules.

11       15.    This Court shall retain jurisdiction over this matter for the purposes of (a)

12  enabling the Attorney General to apply, at any time, for enforcement of any provisions of this

13  Stipulated Judgment and Injunction and for sanctions or other punishment for any violation of

14  this Stipulated Judgment and Injunction; and (b) enabling any party to this Stipulated Judgment

15  and Injunction to apply, upon giving 45 days written notice to all other parties, for such further

16  orders and directions as might be necessary or appropriate either for the construction or

17  carrying out of this Stipulated Judgment and Injunction or for the modification or termination of

18  one or more injunctive provisions of this Stipulated Judgment and Injunction.

19       16.    This Stipulated Judgment and Injunction shall take effect immediately upon

20  entry by the clerk, and the clerk is ordered to enter it forthwith.

21

22  Dated:    OCT 2 0 2008

23                         Hon. _____
                       Judge, California Superior Court

24                            RICHARD B. WOLFE
                            JUDGE

25

26

27

28

STIPULATED JUDGMENT AND INJUNCTION

# EXHIBIT H

EXHIBIT G

Atty. No. 99000

## IN THE CIRCUIT COURT OF COOK COUNTY, STATE OF ILLINOIS
### COUNTY DEPARTMENT – CHANCERY DIVISION

THE PEOPLE OF THE STATE OF
ILLINOIS,
        Plaintiff,

v.

COUNTRYWIDE FINANCIAL
CORPORATION, a Delaware
corporation; COUNTRYWIDE HOME
LOANS, INC., a New York
corporation also d/b/a Full Spectrum
Lending; FULL SPECTRUM
LENDING, Inc., a California
corporation formerly doing business in
Illinois; and COUNTRYWIDE HOME
LOANS SERVICING, LP, a Texas
partnership,
        Defendants.

( 
( 
( 
( 
( 
( 
( 
( 
( 
( 
( 
( 
( 
( 
( 
( 
( 
( 
( 
(

Case No.

08 CH 40569



### FINAL JUDGMENT AND CONSENT DECREE

Plaintiff, the People of the State of Illinois, by and through Lisa Madigan, Attorney

General of the State of Illinois, and Defendants COUNTRYWIDE FINANCIAL

CORPORATION, COUNTRYWIDE HOME LOANS, INC., FULL SPECTRUM LENDING,

Inc., and COUNTRYWIDE HOME LOANS SERVICING, LP have agreed to entry of this Final

Judgment and Consent Decree by the Court without trial or adjudication of any issue of fact or

law, and without admission of any of the violations of the statutes as alleged in the Complaint.

DC1:760439.4

## I.  PARTIES

1.    Plaintiff, THE PEOPLE OF THE STATE OF ILLINOIS, by LISA MADIGAN, Attorney General of the State of Illinois, is charged, inter alia, with the enforcement of the Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.* and the Illinois Fairness in Lending Act, 815 ILCS 120/1 *et seq.*

2.    Defendant COUNTRYWIDE FINANCIAL CORPORATION is a thrift holding company.

3.    Defendant COUNTRYWIDE HOME LOANS, INC., a wholly-owned subsidiary of Defendant COUNTRYWIDE FINANCIAL CORPORATION, is a registered foreign corporation in the State of Illinois and holds Illinois mortgage banker license MB.0000139, which is issued by the Illinois Department of Financial and Professional Regulations, Division of Banking.

4.    Defendant FULL SPECTRUM LENDING, INC. was a registered foreign corporation in the State of Illinois from October 3, 1996 through April 25, 2005. FULL SPECTRUM LENDING, INC. was a licensed Illinois mortgage bank, holding mortgage banker license MB.0004910, which was issued by the Illinois Department of Professional Regulations, Division of Banking. Defendant FULL SPECTRUM LENDING, INC. became a division of Defendant COUNTRYWIDE HOME LOANS, INC. in 2004. In April 2005, FULL SPECTRUM LENDING, INC. withdrew as a registered foreign corporation and began operating in Illinois as Full Spectrum Lending, a division of COUNTRYWIDE HOME LOANS, INC.

5.    COUNTRYWIDE HOME LOANS SERVICING, L.P., is a Texas limited partnership engaged exclusively in servicing loans, and, as of the date of this Final Judgment and Consent Decree, is a wholly-owned subsidiary of Bank of America, National Association.

6.    For purposes of this Consent Decree, "CFC" means Defendant COUNTRYWIDE FINANCIAL CORPORATION, and "Countrywide" means Defendants CFC, COUNTRYWIDE

HOME LOANS, INC., FULL SPECTRUM LENDING, INC., and COUNTRYWIDE HOME
LOANS SERVICING, LP, and their respective successors.

## II.   BACKGROUND

1.     The State of Illinois, by and through Lisa Madigan, the Attorney General of the State of
Illinois, filed a Complaint for a permanent injunction and other relief against Defendants
Countrywide Financial Corporation, Countrywide Home Loans, Inc., Full Spectrum Lending,
Countrywide Home Loans Servicing, LP, and Angelo R. Mozilo, individually and in his capacity
as Chief Executive Officer of Defendant Countrywide Financial Corporation.[1]

2.     On July 1, 2008, Bank of America Corporation announced that it had completed its
purchase of Countrywide Financial Corporation, which included Countrywide Home Loans, Inc.,
Full Spectrum Lending, and Countrywide Home Loans Servicing, LP.  In connection with the
acquisition, Bank of America Corporation announced that it would suspend offering subprime or
higher-priced mortgages or nontraditional forward mortgages that may result in negative
amortization – such as pay option ARMs.  Bank of America Corporation also stated that it would
place restrictions on offering "low documentation" and "no documentation" mortgage loans and
set limits on mortgage broker compensation.

3.     The State of Illinois and Countrywide have agreed to entry of this Final Judgment and
Consent Decree to resolve all matters of dispute alleged in the Complaint.

---

[1] On June 25, 2008, the State of Illinois filed its initial Complaint in the Circuit Court of Cook County, Illinois
against Defendants Countrywide Financial Corporation, Countrywide Home Loans, Inc., Full Spectrum Lending,
Inc., Countrywide Home Loans Servicing, LP, and Angelo R. Mozilo, individually and in his capacity as Chief
Executive Officer of Defendant Countrywide Financial Corporation (Case No. 08 CH 22994).  On July 24, 2008,
these Defendants removed Illinois' Complaint to the United States District Court for the Northern District of Illinois
(Case No. 08-cv-04210).  The Judicial Panel on Multi-District Litigation subsequently consolidated Illinois' action
with other cases pending against Defendants and transferred the cases to the United States District Court for the
Southern District of California (MDL No. 1988).  After settlement negotiations, Illinois voluntarily dismissed
Defendants Countrywide Financial Corporation, Countrywide Home Loans, Inc., Full Spectrum Lending, Inc., and
Countrywide Home Loans Servicing, LP, from the pending federal court action for the purpose of re-filing its
Complaint against these Defendants in the Circuit Court of Cook County, Illinois, where this Final Judgment and
Consent Decree would be entered.

## III.   FINDINGS

1.      On October 28, 2008, the State of Illinois filed its Complaint in this case pursuant to the

provisions of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS

505/1 *et seq.*, and the Illinois Fairness in Lending Act, 815 ILCS 120/1, *et seq.*

2.      The Illinois Attorney General is charged with, among other things, the responsibility of

enforcing the Consumer Fraud and Deceptive Business Practices Act and the Illinois Fairness in

Lending Act.

3.      Countrywide Financial Corporation, Countrywide Home Loans, Inc. and Full Spectrum

Lending, Inc. have, at all times relevant hereto, engaged in trade and commerce within the

meaning of the Consumer Fraud and Deceptive Business Practices Act in the State of Illinois,

including, but not limited to, Cook County, in that they advertised, solicited, offered for sale, and

provided residential mortgages to Illinois consumers. The State of Illinois, by and through its

Complaint, has alleged that Countrywide Home Loans Servicing, LP has, at all times relevant

hereto, engaged in trade and commerce within the meaning of the Consumer Fraud and

Deceptive Business Practices Act in the State of Illinois, including, but not limited to, Cook

County, in that it provided services associated with residential mortgages to Illinois consumers.

4.      The State of Illinois, by and through its Complaint, has alleged that Countrywide has

engaged in unfair and deceptive acts or practices in the conduct of trade and commerce, in

violation of Section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act, and

has engaged in equity stripping in violation of Section 4 of the Illinois Fairness in Lending Act.

Countrywide denies the allegations of the Complaint, denies that it engaged in unfair and

deceptive acts or practices in the conduct of trade and commerce or in equity stripping in

violation of these statutes and denies that it engaged in any wrongful or inappropriate conduct.

DC1:760439.4

4

5.      Entry of this Final Judgment and Consent Decree does not constitute a finding of liability against Countrywide and Countrywide denies any and all allegations. To avoid the delay, expense, inconvenience and uncertainty of protracted litigation of the State of Illinois' claim for injunctive and other relief, Countrywide has consented to the entry of the instant Consent Decree for the purposes of this settlement only, without this Consent Decree constituting evidence against or any admission by any Defendant, and without trial of any issue of fact or law on the issues specifically addressed and released herein.

6.      This Court has jurisdiction over the subject matter of the Complaint filed herein and over the parties to this Final Judgment and Consent Decree.

## IV.     INJUNCTIVE RELIEF REGARDING LENDING PRODUCTS OFFERED BY COUNTRYWIDE

NOW THEREFORE, on the basis of these findings, and for the purpose of effecting this Final Judgment and Consent Decree,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED as follows:

1.      DEFINITIONS.

*1.1.     Usage.* The following rules apply to the construction of Article IV of this Final Judgment and Consent Decree:

> *(a)*     the singular includes the plural and the plural includes the singular;
>
> *(b)*     "include" and "including" are not limiting;
>
> *(c)*     the headings of the Sections and subsections are for convenience and shall not constitute a part of Article IV of this Final Judgment and Consent Decree, and shall not affect the meaning, construction or effect of the applicable provision of Article IV of this Final Judgment and Consent Decree;

NOTE

*(d)*     a reference in Article IV of this Final Judgment and Consent Decree or any Schedule to an Section, Exhibit, or Schedule without further reference is a reference to the relevant Section, Exhibit, or Schedule to Article IV of this Final Judgment and Consent Decree; and

*(e)*     words such as "hereunder", "hereto", "hereof" and "herein" and other words of like import shall, unless the context clearly indicates to the contrary, refer to the whole of Article IV of this Final Judgment and Consent Decree and not to any particular Section, subsection or clause hereof.

**1.2.**     *Defined Terms.* The following capitalized terms shall have the following meanings in Article IV of this Final Judgment and Consent Decree unless otherwise required by the context or defined:

"*Affiliate*" means, with respect to any company, any company that controls, is under common control with, or is controlled by such company.

"*Affordability Equation*" has the meaning given to such term in Section IV.4.4.

"*Alt-A Residential Mortgage Loans*" means CFC Residential Mortgage Loans that are (a) not owned by a GSE; (b) not Subprime; (c) not a Pay Option ARM; (d) less than $400,000 in original principal amount, and (e) including documentation or other characteristics that make such loans not Federal Eligible.

"*Annual Increase*" means, with respect to any stated rate of interest, an annual increase in the stated rate of interest such that the aggregate scheduled payments of principal (if applicable) and interest in any year does not increase by more than

7.5% of the aggregate scheduled payments of principal and interest in the preceding year, subject to any stated interest rate cap.

"*ARMs*" means adjustable rate first-lien residential mortgage loans.

"*BAC*" means Bank of America Corporation.

"*Borrower*" means, with respect to any owner-occupied CFC Residential Mortgage Loan, the obligors(s) on such loan. No covenant or commitment herein is intended to require a CFC Servicer to deal with more than one obligor on behalf of any Borrower with respect thereto.

"*CFC*" means Countrywide Financial Corporation.

"*CFC-Originated*" means, with respect to any residential mortgage loan, that such residential mortgage loan is a first-lien residential mortgage that was originated on a retail basis directly or indirectly by CFC or its subsidiaries or through brokers in their wholesale lending channels. "*CFC-Originated*" residential mortgage loans do not include CFC Purchased Loans.

"*CFC Purchased Loans*" means any first-lien residential mortgage loan originated by unaffiliated third parties and directly or indirectly purchased by CFC or its subsidiaries through their correspondent lending channels or otherwise, *provided* that such loan is serviced by a CFC Servicer. "*CFC Purchased Loans*" do not include CFC-Originated residential mortgage loans.

"*CFC Residential Mortgage Loans*" means any (i) CFC-Originated first-lien residential mortgage loans, or (ii) CFC Purchased Loans, so long as, in each case, such loans are serviced by a CFC Servicer.

"*CFC Servicer*" means CFC or any Affiliate of CFC that services CFC
Residential Mortgage Loans.

"*CLTV*" means, with respect to a first-lien residential mortgage loan as of the
time underwritten, the ratio of the sum of the unpaid principal balance of such
mortgage loan *plus* the unpaid principal balance on any second-lien mortgage to
the Market Value of the residential property that secures such mortgages.

"*Commencement Date*" means the date on which this Consent Decree is entered
by the Court.

"*Delinquent Borrower*" means, with respect to any Borrower, that the related
CFC Residential Mortgage Loan (a) is Seriously Delinquent on or before the
Termination Date, or (b) is subject to an imminent reset or Recast and, in the
reasonable view of the CFC Servicer, as a result of such reset or Recast is
reasonably likely to become Seriously Delinquent on or before the Termination
Date.

"*Eligible Borrower*" has the meaning given to such term in Section IV.4.1.

"*Fannie Mae*" means Federal National Mortgage Association.

"*Fannie Rate*" means, as of any date, the Fannie Mae 30-year fixed rate 60-day
delivery required net yield as of such date or if such rate is for any reason not
available, a comparable rate published by another nationally recognized source.

"*Federal Eligible*" means, with respect to any first-lien residential mortgage loan
that, at the time of origination, (a) such loan is or was eligible for sale to, or
guaranty or insurance by, a federal agency, GSE or comparable federally-
sponsored entity similar to a GSE, under then applicable guidelines of such

8

agency, GSE or entity, or (b) such loan was made in connection with a program

intended to qualify for credit under the Community Reinvestment Act of 1977.

*"Foreclosure Avoidance Budget"* has the meaning given to such term in Section

IV.4.4(a).

*"Foreclosure Relief Program"* means the program under which certain

Borrowers will be offered payments, as set forth in Section IV.6.

*"Freddie Mac"* means Federal Home Loan Mortgage Corporation.

*"GSE"* means a government-sponsored enterprise such as Fannie Mae or Freddie

Mac.

*"Interest Rate Floor"* means, with respect to modification of a Qualifying

Mortgage hereunder, (a) a rate of 3.5% per annum if the modification results in an

interest-only payment; or (b) a rate of 2.5% per annum if the modification results

in a fully amortizing payment.

*"LTV"* means, with respect to a first-lien residential mortgage loan as of the time

reviewed for eligibility for modification, the ratio of the unpaid principal balance

of such mortgage loan to the Market Value of the residential property that secures

such mortgage.

*"Market Value"* means, with respect to any residential mortgage loan, the value

of the residential property that secures such mortgage loan as determined by a

lender or servicer in reliance on an appraisal (whether based on a appraisal report

prepared not more than 180 days before the date of determination, broker price

opinion prepared not more than 120 days before the date of determination or

automated valuation model prepared not more than 90 days before the date of determination).

"*Pay Option ARMs*" means ARMs that, during an initial period (and subject to Recast), permit the borrower to choose among two or more payment options, including an interest-only payment and a minimum (or limited) payment.

"*Qualifying Mortgage*" has the meaning given to such term in Section IV.4.2.

"*Recast*" means, in the case of a Pay Option ARM, a contractual payment recast based on a negative amortization trigger.

"*Relocation Assistance Payment*" has the meaning given to such term in Section IV.5.1.

"*Seriously Delinquent*" means, with respect to any residential mortgage loan, that payments of interest or principal are 60 or more days delinquent.

"*Seriously Delinquent Borrower*" means, with respect to any Borrower that, on or before the Termination Date, the related CFC Residential Mortgage Loan is Seriously Delinquent.

"*Subprime 2, 3, 5, 7 and 10 Hybrid ARMs*" means Subprime Mortgage Loans that are 2, 3, 5, 7 and 10 Hybrid ARMs.

"*Subprime Mortgage Loans*" means first-lien residential mortgage loans that (a) combine higher risk features (such as low or no documentation, low equity, adjustable interest rates, prepayment penalties, cash-out financing) with higher risk borrower profiles (lower FICO scores, recent bankruptcies/foreclosures, major derogatory credit), resulting in a loan that could not reasonably be underwritten and approved as a "prime" loan. An existing CFC Residential

Mortgage Loan would be a "*Subprime Mortgage Loan*" if it is identified as such in connection with a securitization in which it is part of the pool of securitized assets or, in the case of a CFC Residential Mortgage Loan that is not included in a securitization, was classified as being "subprime" on the systems of CFC and its subsidiaries on June 30, 2008. "*Subprime Mortgage Loans*" do not include first-lien residential mortgage loans that are Federal Eligible.

"*Termination Date*" means June 30, 2012.

2.    CFC SOLE OBLIGOR ON ALL OBLIGATIONS IN ARTICLE IV OF THIS FINAL JUDGMENT AND CONSENT DECREE.

**2.1.    *Responsibility of CFC.*** Until the Termination Date (or such earlier date as is specified herein), CFC is responsible to the other parties hereto for performance of all of the undertakings in Article IV of this Final Judgment and Consent Decree, including the changes to the residential mortgage lending practices described in Section IV.3, the loan modification programs described in Section IV.4, the Relocation Assistance Payments described in Section IV.5, the Foreclosure Relief Program described in Section IV.6 and the reporting obligations described in Section IV.8.

**2.2.    *Absence of Defenses.*** It is not a condition to the performance of the obligations of CFC hereunder that it does not directly or indirectly engage in the business of originating residential mortgage loans or in the business of servicing residential mortgage loans. CFC is responsible for the conduct of CFC Affiliates and CFC Servicers as specified hereunder whether or not it controls such CFC

Affiliates or CFC Servicers and the absence of such control shall not be a defense
to or otherwise excuse CFC's failure to perform hereunder.

*2.3. Remedies for Failure of CFC to Cause Performance.* If there is a
material failure to perform the obligations under the loan modification programs
described in Section IV.4, the Relocation Assistance Payments described in
Section IV.5, the Foreclosure Relief Program described in Section IV.6 or the
reporting obligations described in Section IV.8 and such failure is not promptly
cured after notice by the State of Illinois, then the State of Illinois may seek
enforcement of this Final Judgment and Consent Decree under Section IV.10.8,
or, in the alternative, terminate this Final Judgment and Consent Decree. If the
State of Illinois elects to terminate this Final Judgment and Consent Decree, it
shall no longer be bound by the release set forth in Section IV.9.2.

3.  SERVICER PRACTICES.

Until the Termination Date, CFC shall be responsible for the implementation of the
following by CFC Affiliates with respect to CFC Residential Mortgage Loans with respect to
Borrowers in the State of Illinois:

*3.1. Enhanced Home Retention Practices.*

*(a)* . CFC Servicers will maintain robust processes for early
identification and contact with Borrowers who are having, or may have,
trouble making their payments on CFC Residential Mortgage Loans.
Under these processes, when contact is made with Delinquent Borrowers,
an individualized evaluation of the Borrowers' economic circumstances

will be made to determine if alternatives to foreclosure are available, and consistent with the directions of the investors, if applicable.

*(b)* CFC Servicers will maintain the current practice of offering Delinquent Borrowers who desire to remain in their homes and who can afford to make reasonable mortgage payments loan modifications or other workout solutions, subject to applicable investor guidance and approvals.

*(c)* CFC's reports to the State under this Final Judgment and Consent Decree will include information on the numbers and types of workouts concluded on loans secured by owner-occupied properties in the State of Illinois.

*(d)* CFC Servicers will continue the current practice of regularly monitoring the delinquency characteristics of the entire portfolio of CFC Residential Mortgage Loans, including Alt-A Residential Mortgage Loans, loans with interest-only features, and other loans to prime borrowers, to identify high-delinquency segments that may be appropriate for loan modification campaigns. CFC shall be responsible for providing reports to the State of Illinois on the delinquency characteristics of such loans, as provided herein.

*(e)* With respect to Alt-A Residential Mortgage Loans, CFC acknowledges that the State of Illinois has expressed concerns about future delinquencies, and agrees to provide the State of Illinois a notification whenever the nationwide rate at which Borrowers on Alt-A Residential Mortgage Loans are 30 days or more delinquent in their payments exceeds

150% of the delinquency rate for comparably-aged FHA-insured loans serviced by CFC Servicers. If such notice is required, CFC agrees to confer with the State of Illinois concerning Alt-A Residential Mortgage Loans delinquency trends, including whether delinquencies are isolated in certain segments of the Alt-A Residential Mortgage Loans portfolio (*e.g.*, loans with interest-only features, loans originated at high CLTV), and concerning the possible deployment of streamlined foreclosure avoidance solutions for such Borrowers.

(f)     Through July 1, 2009, a minimum of 3900 personnel shall be employed to assist Borrowers with loan modifications and other foreclosure avoidance measures.

3.2.    *Compliance.*  Understanding the circumstances and behaviors of lenders and brokers that may have contributed, in part, to the current mortgage crises, CFC recognizes its responsibility to ensure the very highest degree of ethical conduct on the part of CFC's agents and employees. CFC shall ensure that, (a) to the extent it resumes subprime lending, it will design and implement an effective compliance management program to provide reasonable assurance as to the identification and control of consumer protection hazards associated with such subprime lending activities, and (b) to the extent of its own lending activities (if any), it will create appropriate consumer safeguards to avoid unfair or deceptive activities or practices arising in connection with its interaction with brokers and other third parties.

4. **LOAN MODIFICATIONS FOR DELINQUENT BORROWERS IN CERTAIN MORTGAGE PRODUCTS.**

Until the Termination Date, CFC shall be responsible for ensuring that CFC Servicers do the following:

4.1. *Eligible Borrowers.* An *"Eligible Borrower"* is a Borrower who has a Qualifying Mortgage with a first payment date on or before December 31, 2007, that (a) is secured by an owner-occupied 1-4 unit residential property, (b) is serviced by a CFC Servicer, and (c) in the event that it is determined that a condition described in Section IV.4.10 has occurred, the applicable CFC Servicer has determined that such Borrower is in financial distress. Eligible Borrowers are potentially eligible for loan modification relief under this Section IV.4. A Borrower who does not occupy the 1-4 unit residential property that secures the Qualifying Mortgage is not an *"Eligible Borrower."*

4.2. *Qualifying Mortgages.* The following CFC Residential Mortgage Loans are *"Qualifying Mortgages"* if the Borrower is an Eligible Borrower and the Borrower meets one of the specified delinquency profiles:

(a) *Subprime 2, 3, 5, 7 and 10 Hybrid ARMs.* A Subprime 2, 3, 5, 7 and 10 Hybrid ARM shall be a Qualifying Mortgage if the Eligible Borrower meets any one of the following delinquency profiles at the time considered for loan modification:

(i) The Eligible Borrower is a Seriously Delinquent Borrower and the LTV is 75% or more; or

*(ii)* The Eligible Borrower is a Delinquent Borrower and the LTV is 75% or more.

*(b)* **Pay Option ARMs.** A Pay Option ARM shall be a Qualifying Mortgage if the Eligible Borrower meets any one of the following delinquency profiles at the time considered for loan modification:

*(i)* The Eligible Borrower is Seriously Delinquent and the LTV is 75% or more; or

*(ii)* The Eligible Borrower is a Delinquent Borrower and the LTV is 75% or more.

*(c)* **Subprime First Mortgage Loans (Other than Hybrid 2, 3, 5, 7 and 10 ARMs).** A Subprime CFC Residential Mortgage Loan shall be a Qualifying Mortgage if the Eligible Borrower is a Seriously Delinquent Borrower and the LTV is 75% or more.

*4.3.* **Loan Modifications to Be Considered.** Each Eligible Borrower shall be considered for a range of affordable loan modification options with respect to his or her Qualifying Mortgage. The loan modification options will include at least those described below and existing modification options currently undertaken by CFC, and are subject, as applicable, to approval of the investor who owns the Qualifying Mortgage consistent with the Affordability Equation, as set forth in Section IV.4.10. Loan modification options for each category of Qualifying Mortgages are as follows:

16

*(a)*   *Subprime Hybrid 2, 3, 5, 7 and 10 ARMs.* Qualifying Mortgages that are Subprime Hybrid 2, 3, 5, 7 and 10 ARMs will be eligible for loan modifications as follows:

*(i)*   To the extent the HOPE for Homeowners Program is available, an FHA refinancing under the HOPE for Homeowners Program under the underwriting criteria applicable to that program.

*(ii)*   For Eligible Borrowers (A) who become Seriously Delinquent following a reset or Recast, or (B) who are subject to an imminent reset or Recast and, in the reasonable view of the CFC Servicer, as a result of such reset or Recast are reasonably likely to become Seriously Delinquent on or before the Termination Date (even though they are not Seriously Delinquent at the time of the modification), an unsolicited (subject to Section IV.4.10) restoration of the introductory rate for five years, without new loan documentation or an evaluation of the Eligible Borrower's current income.   Communications to Eligible Borrowers informing them of this modification will invite Eligible Borrowers to contact the applicable CFC Servicer if they do not believe they will be able to afford the introductory rate in order to be considered for more extensive relief under Sections IV.4.3(a)(iii) and IV.4.3(a)(iv).

*(iii)*   A streamlined, fully-amortizing loan modification subject to the Affordability Equation consisting of:

(A)    until the fifth anniversary of the loan modification, a reduction of the interest rate to the (1) introductory rate or (2) lower (but not less than 3.5%); and

(B)    on the fifth anniversary of the loan modification, an automatic conversion to a fixed rate mortgage for the remainder of the loan term at the higher of (1) the Fannie Rate and (2) the introductory rate. If the new payment amount would not be affordable to the Eligible Borrower based on his or her income at the time of conversion, the Eligible Borrower will be considered for a single two year period of reduced-rate financing (in which case the conversion to a fixed rate mortgage will occur at the end of the seventh year).

*(iv)*    A streamlined loan modification subject to the Affordability Equation consisting of:

(A)    modification of the Qualifying Mortgage to include a ten-year interest-only period;

(B)    reduction of the interest rate to a rate no lower than the Interest Rate Floor, with an Annual Increase subject to an interest-rate cap as provided below in Section IV.4.3(a)(iv)(C); and

(C)     an interest-rate cap for the remaining, fully-amortizing term of the Qualifying Mortgage at an annual interest rate equal to the introductory rate.

*(b)*     ***Pay Option ARMs.***   Qualifying Mortgages that are Pay Option ARMs are eligible for the following loan modifications:

(i)     To the extent the HOPE for Homeowners Program is available, an FHA refinancing under the HOPE for Homeowners Program under the underwriting criteria applicable to that program; or

(ii)     A streamlined loan modification subject to the Affordability Equation consisting of:

(A)     elimination of the negative amortization feature;

(B)     optional introduction of a ten-year interest-only period on the loan;

(C)     reduction of the interest rate to a rate no lower than the Interest Rate Floor, with an Annual Increase subject to an interest rate cap of 7%; and

(D)     if the Eligible Borrower owns only one residential property and the LTV is 95% or higher, a write down of the principal balance of the Qualifying Mortgage (but any write down of principal would not be in an amount greater than necessary to achieve an LTV of 95%).

(c)     *Subprime Loans (Other than Hybrid 2, 3, 5, 7 and 10 ARMs)*.
Qualifying Mortgages that are Subprime Loans (Other than Hybrid 2, 3, 5,
7 and 10 ARMs) are eligible for the following loan modifications:

> *(i)*     To the extent the HOPE for Homeowners Program is
> available, an FHA refinancing under the HOPE for Homeowners
> Program under the underwriting criteria applicable to that program;
> or

> *(ii)*     A streamlined loan modification within the limits of the
> Affordability Equation consisting of:

>> (A)     optional introduction of a ten-year interest-only
>> period on the loan;

>> (B)     reduction of the interest rate on the mortgage to a
>> rate no lower than the Interest Rate Floor, with an Annual
>> Increase subject to an interest rate cap as provided below in
>> Section IV.4.3(c)(ii)(C); and

>> (C)     an interest-rate cap for the remaining term of the
>> Qualifying Mortgage at an annual interest rate equal to (i)
>> the fixed interest rate *less* 200 basis points, in the case of
>> fixed-rate loans, and (ii) the remainder of the sum of the
>> contractual index amount *plus* spread immediately before
>> the first loan modification, *minus* 200 basis points, in the
>> case of an ARM.

*4.4.    Affordability Equation.*  Qualifying Mortgages will be considered for loan modifications in accordance with the following Affordability Equation, which establishes a Foreclosure Avoidance Budget that is a cap on the cost of the loan modification.

   *(a)    Foreclosure Avoidance Budget.*  Except for Eligible Borrowers who receive a streamlined reduction of their interest rates pursuant to Section IV.4.3(a)(ii), a Foreclosure Avoidance Budget will be prepared with respect to the Eligible Borrower and the Qualifying Mortgage. The *"Foreclosure Avoidance Budget"* at any time is the difference between (i) the likelihood and severity of the projected loss in a foreclosure sale and (ii) the likelihood and severity of the projected loss in the event that there was a loan modification with respect to the Qualifying Mortgage and a later foreclosure sale.  For purposes of determining the Foreclosure Avoidance Budget for a Qualifying Mortgage, the LTV will be based on the Market Value.

   *(b)*    Affordability Criteria.

      *(i)*    Subject to the Foreclosure Avoidance Budget, if tax and insurance escrows are maintained with respect to the Qualifying Mortgage, the Eligible Borrower will be offered a loan modification that produces a first-year payment of principal (if applicable), interest, taxes and insurance equating to 34% of the Eligible Borrower's income, or as close to 34% of the Eligible

Borrower's income as the Foreclosure Avoidance Budget permits
without exceeding 42% of the Eligible Borrower's income.

*(ii)*    Subject to the Foreclosure Avoidance Budget, if tax and
insurance escrows are not maintained with respect to a Qualifying
Mortgage, the Eligible Borrower will be offered a loan
modification that produces a first-year payment of principal (if
applicable) and interest equating to 25% of the Eligible Borrower's
income, or as close to 25% of the Eligible Borrower's income as
the Foreclosure Avoidance Budget permits without exceeding 34%
of the Eligible Borrower's income.

*(c)*    ***Borrowers Who Cannot Afford a Loan Modification.***  There is no
obligation to offer loan modifications with respect to Qualifying
Mortgages if the Eligible Borrower cannot be qualified under the
Affordability Equation.  Such Eligible Borrowers may be eligible for a
Relocation Assistance Payment or a payment under the Foreclosure Relief
Program, all as provided in Sections IV.5 and IV.6.

*4.5.*    ***Outreach to Borrowers at Risk of Delinquency.***    Borrowers with
Subprime Mortgage Loans or Pay Option ARMs with first-payment due dates
between January 1, 2004 and December 31, 2007, whose payments are scheduled
to change as a result of an interest-rate reset, Recast, or expiration of an interest-
only term, will be sent a communication approximately ninety (90) days before
the payment change inviting them to contact their CFC Servicer if they believe
they will not be able to afford their new payments.  In the event that a borrower

responds to this communication, the borrower will be considered for loan modifications under the eligibility criteria in Article IV of this Final Judgment and Consent Decree.

**4.6.** Restrictions on Initiation or Advancement of Foreclosure Process for Eligible Borrowers.

    *(a)* The foreclosure process for a Qualifying Mortgage of an Eligible Borrower will not be initiated or advanced for the period necessary to determine such Eligible Borrower's interest in retaining ownership and ability to afford the revised mortgage terms, as well as the investor's willingness to accept a loan modification.

    *(b)* Any such foreclosure process will be initiated or advanced only if:

        *(i)* it is determined, based on communication with the Borrower or based on the Borrower's abandonment of the residential property that secures the mortgage loan, that the Borrower does not wish to retain ownership of the residence that secured the mortgage loan;

        *(ii)* it is or has been determined that the Borrower cannot be qualified for, or has refused, a loan modification under Section IV.4 of this Stipulated Judgment and Injunction within the limits of the Affordability Equation, as applicable; or

        *(iii)* despite reasonable efforts, servicing agents have been unable to make contact with the borrower to determine his or her preferences with regard to home ownership, or to obtain

information concerning his or her income and ability to afford a
mortgage payment under a modification.

4.7.    Miscellaneous Provisions Related to Loan Modification Program.

(a)    *Commitment to Waive Late/Delinquency Fees.*   Any
late/delinquency fees associated with overdue loan payments remaining
unpaid as of the date immediately before modification of the Qualifying
Mortgage under Article IV of this Final Judgment and Consent Decree
will be waived.

(b)    *Commitment Not to Charge Loan Modification Fees.*  Except to
the extent required in connection with the HOPE for Homeowners
Program, Eligible Borrowers will not be charged loan modification fees in
connection with loan modifications of Qualifying Mortgages hereunder.

(c)    *Prepayment Penalty Waivers.*  Prepayment penalties will be
waived in connection with any payoff or refinancing (even if refinanced
by a person not Affiliated with CFC) of a Qualifying Mortgage that is a
Subprime Mortgage Loan or Pay Option ARM that (i) had a first payment
due date between January 1, 2004 and December 31, 2007, (ii) was
directly or indirectly held by CFC on June 30, 2008, and (iii) which at the
time of the payoff or refinancing is held by CFC or any Affiliate. Investor
owners or their representatives of Qualifying Mortgages that are Subprime
Mortgage Loans or Pay Option ARMs serviced by a CFC Servicer will be
encouraged to waive prepayment penalties in such circumstances.

24

(d) *Commitment to Consider Additional Relief for Borrowers Receiving Modifications and Later Becoming Delinquent.* Eligible Borrowers with respect to Qualifying Mortgages who have earlier received loan modifications or other workouts, whether or not pursuant to Article IV of this Final Judgment and Consent Decree, will be eligible to be considered for new loan modification offers under Article IV of this Final Judgment and Consent Decree if they otherwise satisfy the eligibility criteria.

(e) *Representation Concerning Investor Delegation and Approval.* CFC represents that CFC Servicers currently have, or reasonably expect to obtain, discretion to pursue the foreclosure avoidance measures outlined in Article IV of this Final Judgment and Consent Decree for a substantial majority of Qualifying Mortgages. If CFC Servicers do not have discretion to pursue these foreclosure avoidance measures, best efforts will be used to obtain appropriate investor authorization.

4.8. *Commitment to Implement Relief Measures Authorized by Federal Government.*

(a) *Government Acquisition of Qualifying Mortgages.* To the extent the federal government acquires any Qualifying Mortgages and, as the owner of these mortgages, authorizes loan modifications that offer borrower benefits greater than those associated with the modifications outlined in Article IV of this Final Judgment and Consent Decree, relief

measures will be pursued in modifying such Qualifying Mortgages to the full extent of such authorization.

*(b)*      *Government-Issued Guidelines Relating to Loan Modifications.* To the extent any federal agency, in connection with its intervention in the secondary mortgage market or otherwise having jurisdiction, issues guidelines relating to modifications of delinquent mortgages, Article IV of this Final Judgment and Consent Decree will be implemented in a manner that, to the maximum extent feasible, produces modifications consistent with such guidelines.

*4.9.*      *Timeframe for Loan Modification Process.*    The loan modification process will be managed to ensure that offers of loan modifications under Article IV of this Final Judgment and Consent Decree (other than unsolicited interest rate reductions) are made to Eligible Borrowers, on average, no more than 60 days after such Eligible Borrowers make contact with the applicable CFC Servicer and provide any required information concerning a possible modification.

*4.10.*      *Response to Intentional Nonperformance by Borrowers.* If CFC detects material levels of intentional nonperformance by Eligible Borrowers that appears to be attributable to the introduction of the loan modification program, it reserves the right to require objective prequalification of Eligible Borrowers for loan modifications under the program by obtaining verification of all sources of income and the application of funds and to take other reasonable steps. Such prequalification could result in the elimination of unsolicited interest rate

reductions, inhibit streamlined solutions and could otherwise significantly slow implementation of the loan modification program.

*4.11. No Releases with Respect to Loan Modifications.* There will be no requirement that Eligible Borrowers release claims against CFC or any CFC Affiliate in connection with loan modifications offered under Article IV of this Final Judgment and Consent Decree.

*4.12. Number of Loan Modification Offers before March 31, 2009.* On or before March 31, 2009, loan modifications will be offered by CFC Servicers in accordance with Article IV of this Final Judgment and Consent Decree to not fewer than 50,000 Delinquent Borrowers on a nationwide basis. The State of Illinois may terminate this Final Judgment and Consent Decree and no longer be bound by the release set forth in Section IV.9.2 of this Final Judgment and Consent Decree if there is a material failure to satisfy this commitment. If the State of Illinois terminates this Final Judgment and Consent Decree, the State of Illinois will repay to CFC any portion of the Foreclosure Relief Program allocation that the State has directed be paid to it or on its behalf (other than to Eligible Borrowers) as provided in Section IV.6.

*4.13. Second or Junior Liens.* Loan modifications contemplated in Section IV.4.3 of this Stipulated Judgment and Injunction shall be made without consideration of second or junior liens on mortgaged properties. CFC does not expect that the presence of second or junior liens will impede Eligible Borrowers from receiving a loan modification offer under Article IV of this Final Judgment and Consent Decree.

5.    RELOCATION ASSISTANCE PROGRAM.

Through the Termination Date, payments will be provided to borrowers who are unable
to retain their homes in accordance with this Section IV.5.

> *5.1.*    *Eligibility.*  Borrowers under CFC Residential Mortgage Loans that were
> serviced by a CFC Servicer on June 30, 2008 (whether or not they are Qualifying
> Mortgages), are currently serviced by a CFC Servicer and are subject to a
> foreclosure sale date on or before the Termination Date, will be offered an
> agreement under which they can receive a cash payment to assist with the
> Borrower's transition to a new place of residence ("*Relocation Assistance
> Payment*") in exchange for voluntarily and appropriately surrendering the
> residence that secures the mortgage loan at the time of the foreclosure sale.
> Borrowers who are eligible for, or receive, payments under the Foreclosure Relief
> Program may also receive a Relocation Assistance Payment.
>
> *5.2.*    *Amount.*  The amount of Relocation Assistance Payments offered to any
> Borrower will be in the discretion of CFC or its delegee according to its or their
> assessment of the individual circumstances of the Borrower (*e.g.*, number of
> dependents or amount of moving expenses).
>
> *5.3.*    *Timing of Payments.*  Relocation Assistance Payments shall be made to a
> Borrower no later than fourteen days following the Borrower's voluntary and
> appropriate surrender of the residence that secures the mortgage loan.
>
> *5.4.*    *Payment Projection.*  CFC projects that, from October 1, 2008, through
> December 31, 2010, Relocation Assistance Payments will be made to 35,000
> borrowers in a total amount of more than $70,000,000 on a nationwide basis.

### 6.    FORECLOSURE RELIEF PROGAM.

Payments shall be made available to borrowers who experienced a foreclosure sale, or who were 120 days or more delinquent in making mortgage payments soon after their loans were originated or after an interest rate reset, in accordance with this Section IV.6.

> **6.1.    Payment.**   CFC will make available $8,481,307 to the Office of the Illinois Attorney General for allocation under this Foreclosure Relief Program.
>
> **6.2.    Individual Allocation.**   A Borrower may be eligible for payments under the Foreclosure Relief Program if the Borrower:
>
>> **(a)**    Has a CFC-Originated Residential Mortgage Loan secured by owner-occupied property;
>>
>> **(b)**    The first payment on the CFC-Originated Residential Mortgage Loan was due between January 1, 2004 and December 31, 2007;
>>
>> **(c)**    Six or fewer payments were made on the CFC-Originated Residential Mortgage Loan; and
>>
>> **(d)**    The CFC-Originated Residential Mortgage Loan was foreclosed or is 120 days or more delinquent as of the Commencement Date.

The State of Illinois may expand the Foreclosure Relief Program to cover additional Borrowers or limit the Foreclosure Relief Program to restrict the participation of Borrowers (provided that at least those borrowers who made three or fewer payments over the life of the CFC-Originated Residential Mortgage Loan are covered). The Office of the Illinois Attorney General may reserve as much as 25% of the $8,481,307 for foreclosure relief, foreclosure mitigation or related programs other than payments to defaulted borrowers.

**6.3.** **Release.** In order to receive payments under the Foreclosure Relief Program, Borrowers will be required to execute a release in accordance with Section IV.9.1. Borrowers offered payments under this Foreclosure Relief Program whose loans have not yet been foreclosed shall be afforded at least a three month period to decide whether to execute the release to permit them to determine whether they wish to raise claims covered by the release.

**6.4.** **Unallocated Funds.** Funds allocated to Borrowers in the State of Illinois who choose not to participate in the Foreclosure Relief Program or who cannot be located after commercially reasonable efforts shall be available to the Office of the Illinois Attorney General for re-allocation to Borrowers under this program at the direction of the Office of the Illinois Attorney General.

**6.5.** **Communications to Borrowers.** CFC and the State of Illinois shall consult as to the form of any communication sent to Borrowers who are to receive Foreclosure Relief Program payments.

7. BANK OF AMERICA FOUNDATION COMMUNITY INVESTMENT ACTIVITIES.

The Office of the Illinois Attorney General understands that, while the Bank of America Foundation is not a party to this agreement, it intends to work actively with non-profits, community development corporations, and others in addressing the adverse effects of the current housing crisis, particularly by promoting community redevelopment and facilitating the application of Housing and Economic Recovery Act funds to beneficial usage of real estate owned properties. CFC commits to collaborate in good faith with the Office of the Illinois

Attorney General to identify ways in which it can support or complement the Foundation's efforts.

8.  REPORTING REQUIREMENTS.

   *8.1.* Eligible Borrowers in Qualifying Mortgages.

   *(a)* On a quarterly basis through June 30, 2010, CFC shall report the following information to the State of Illinois:

   *(i)* The names and addresses of Eligible Borrowers in the State of Illinois in Qualifying Mortgages who received loan modification offers under Article IV of this Final Judgment and Consent Decree, and for whom loan modifications were concluded;

   *(ii)* For all loan modifications under Article IV of this Final Judgment and Consent Decree concluded within the reporting period in the State of Illinois, the original and modified loan terms, and the amounts of late/delinquency fees waived, loan modification fees waived, and prepayment penalties waived by CFC pursuant to Article IV of this Final Judgment and Consent Decree;

   *(iii)* For a sample of Eligible Borrowers in Qualifying Mortgages for whom CFC was unable to procure a loan modification offer under Article IV of this Final Judgment and Consent Decree during the reporting period (which sample shall be no less than 5% of all such Eligible Borrowers), the factors preventing a loan modification offer;

*(iv)*   The number and total amount of Relocation Assistance Payments made to borrowers in the State of Illinois during the reporting period;

*(v)*   Delinquency data on active loans with first payment due dates between January 1, 2004, and December 31, 2007, that are secured by owner occupied residential property in the State of Illinois, broken down by type of loan; and

*(vi)*   Aggregated delinquency data on all loans modified under Article IV of this Final Judgment and Consent Decree for Eligible Borrowers in the State of Illinois.

*(b)*   CFC shall provide annual reports to the State of Illinois that include the information specified in Section IV.8.1(a) for the periods July 1, 2010 through June 30, 2011, and July 1, 2011 through June 30, 2012.

**8.2.   *Other Loan Modifications.*** With the same frequency as specified in Section IV.8.1, CFC will provide to the State of Illinois a report detailing the numbers and types of modifications concluded on first-lien residential mortgage loans secured by owner-occupied property in the State of Illinois (other than Qualifying Mortgages) and the total unpaid principal balance of such modified loans.

**8.3.   *Compliance Monitor.*** CFC will appoint an employee as the Compliance Monitor for this Final Judgment and Consent Decree. The Compliance Monitor will be responsible for (i) making reports to the State of Illinois under this Final Judgment and Consent Decree and (ii) receiving and responding to complaints

from the State of Illinois or from individual borrowers concerning the operation of
the loan modification program.

9.    RELEASES; MORE FAVORABLE SETTLEMENTS.

    *9.1.    Releases from Borrowers.*    Borrowers to whom payments under the
Foreclosure Relief Program are offered shall, as a condition of receiving such
payments, be required to execute and return to CFC a release of claims that
includes the following language:

> In consideration for the payment we are to receive under the Foreclosure
> Relief Program, we release Countrywide Financial Corporation and its
> affiliates and their respective directors, officers, employees and agents
> (except brokers) from all civil claims, causes of action, any other right to
> obtain any type of monetary damages (including punitive damages),
> expenses, attorneys' and other fees, rescission, restitution or any other
> remedies of whatever kind at law or in equity, in contract, in tort.
> (including, but not limited to, personal injury and emotional distress),
> arising under any source whatsoever, including any statute, regulation,
> rule, or common law, whether in a civil, administrative, arbitral or other
> judicial or non-judicial proceeding, whether known or unknown, whether
> or not alleged, threatened or asserted by us or by any other person or entity
> on our behalf, including any currently pending or future purported or
> certified class action in which we are now or may hereafter become a class
> member, that arise from or are in any way related to CFC Loan No.
> _____, including, without limitation, the origination of that loan.

(and any representations or omissions made during that origination process), the terms and conditions of that loan, and the servicing or administration of that loan following its origination.

**9.2.    *Release from the Illinois Attorney General's Office.*** As to Countrywide and its Affiliates, this Consent Decree effects a full resolution, complete settlement, and release by the Illinois Attorney General's Office of all claims relating to the business practices alleged in the Complaint in this matter for conduct occurring before entry of this Consent Decree that are within the authority of the Attorney General to release, except for (i) any claims that the State of Illinois might have as an investor in Countrywide securities; (ii) any regulatory or enforcement proceedings by or on behalf of another State officer or agency; (iii) any claims or investigations identified to Countrywide by the Illinois Attorney General; and (iv) any criminal investigations or proceedings. This Consent Decree does not resolve or release, but instead specifically preserves, any claims the State of Illinois may have against Angelo Mozilo.

**9.3.    *More Favorable Terms.*** Should Countrywide resolve matters specifically set forth in the allegations of the Complaint filed in this action for conduct which occurred before the entry of this Consent Decree in actions brought by Attorneys General of other states on terms that are different than those contained in this Consent Decree (other than terms offered by the Countrywide but not accepted by the State of Illinois), Countrywide will provide a copy of those terms to the Illinois Attorney General for review. If, after review, the Illinois Attorney General determines the terms of such resolutions are, taken as a whole, more

favorable than those contained in this Consent Decree, then Countrywide shall stipulate that this Consent Decree shall be amended to reflect all of such terms in place of the terms hereof.

**10.    MISCELLANEOUS**

*10.1.    No Third Party Beneficiaries Intended.* Article IV of this Final Judgment and Consent Decree is not intended to confer upon any person any rights or remedies, including rights as a third party beneficiary. Article IV of this Final Judgment and Consent Decree is not intended to create a private right of action on the part of any person or entity other than the parties hereto.

*10.2.    Confidentiality.* The State of Illinois agrees that all information marked as confidential and disclosed to it by BAC or CFC or any of their Affiliates, including but not limited to any such information included in the periodic reports that will be provided pursuant to Section IV.8, shall be kept confidential, except to the extent required by law, regulation or court order (and in such case, only upon prior written notice to the disclosing party).

*10.3.    Termination.* Except to the extent an early date is specified or the provisions of Article IV of this Final Judgment and Consent Decree are earlier terminated according to the terms hereof, the obligations of CFC under Article IV of this Final Judgment and Consent Decree shall terminate on the Termination Date. Provided, however, that no termination of the obligations under Article IV of this Final Judgment and Consent Decree shall change or terminate the terms of any loan modification entered into pursuant to Section IV.4 of this Final Judgment and Consent Decree.

**10.4.** *Notices.* All documents and notices to be provided to any party under this Judgment are sufficient if given by nationally recognized overnight courier service or personal delivery to the named party at the address below:

If to Defendants:

John Beisner
Brian Boyle
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C. 20006

If to the Attorney General:

Veronica Spicer
Office of the Illinois Attorney General
Consumer Fraud Bureau
100 West Randolph St., 12th Floor
Chicago, IL 60601

Notice is effective when delivered personally or on the business day after it is sent by nationally recognized courier service for next day delivery. Any party may designate some other person to receive Reports or notices or change its notice address by giving notice in accordance with this paragraph.

**10.5.** *Payment.* Within ten days of the Commencement Date, CFC shall pay $1.7 million to the Office of the Illinois Attorney General, to cover attorney's fees and investigative costs, consumer education, litigation, public protection, consumer protection purposes or local consumer aid funds or any other purpose permitted by state law at the sole discretion of the Illinois Attorney General. CFC will pay this amount to the "Attorney General Court-Ordered and Voluntary Compliance Payment Project Fund."

DC1:760439 4

36

*10.6.  Ongoing Litigation.*  CFC and Countrywide Home Loans, Inc. shall maintain and provide information to and cooperate fully with the Attorney General in connection with the prosecution of the separate action, *People of the State of Illinois v. Countrywide Financial Corporation, et al.*, initially filed in this court and assigned case number 08 CH 22994, as to Defendant Angelo Mozilo. This shall include, but is not necessarily limited to, attending depositions, trials or hearings with 25 days notice (without the necessity of a subpoena or personal service); providing any documents and other tangible things requested by the Attorney General on 30-days notice (without the necessity of a subpoena or personal service and without objection); not objecting to efforts by the Attorney General to obtain documents or other discovery from any other named defendant to this action or any third party; and protecting, preserving and maintaining all records and correspondence which are now in or later come into its possession, custody or control, that were sent to, received from, or in any way relate to Angelo Mozilo or any of his representatives.

*10.7.*  Nothing in this Consent Decree is to be construed as a bar to the State of Illinois continuing its separate action against Defendant Angelo Mozilo.

*10.8.*  This Court shall retain jurisdiction over this matter to and including December 31, 2012 for the purposes of (a) enabling the Attorney General to apply, at any time, for enforcement of any provision of this Consent Decree and for sanctions or other punishment for any violation of this Consent Decree; and (b) enabling any party to this Consent Decree to apply, upon giving 45 days written notice to all other parties, for such further orders and directions as might be necessary or appropriate either for the

construction or carrying out of this Consent Decree or for the modification or

termination of one or more injunctive provisions of this Consent Decree.

APPROVED:

PLAINTIFF, The People of the State of Illinois

DEFENDANTS Countrywide Financial Corporation, Countrywide Home Loans, Inc., Full Spectrum Lending, Inc., and Countrywide Home Loans Servicing, LP

By: _____
James D. Kole, Bureau Chief
Illinois Attorney General's Office
Consumer Fraud Bureau
100 West Randolph
Chicago, IL 60601

By: _____
Counsel for Defendants Countrywide Financial Corporation, Countrywide Home Loans, Inc., Full Spectrum Lending, Inc., and Countrywide Home Loans Servicing, LP

Date Entered:_____

_____
JUDGE

**ENTERED**
JUDGE MARY ANNE MASON·1810

OCT 3 1 2008

DOROTHY BROWN
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL
DEPUTY CLERK_____

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

GREENWICH FINANCIAL SERVICES
DISTRESSED MORTGAGE FUND 3, LLC,
and QED LLC, on behalf of themselves and all
other persons similarly situated,

        Plaintiffs,

        -against-

COUNTRYWIDE FINANCIAL
CORPORATION, COUNTRYWIDE HOME
LOANS, INC., and COUNTRYWIDE HOME
LOANS SERVICING LP,

        Defendants.

Index No. 650474/2008

**AFFIDAVIT OF SERVICE
BY MAIL**

STATE OF NEW YORK   )
                      ss:
COUNTY OF NEW YORK )

      GINA NEGRIN, being duly sworn, deposes and says:

I am over 18 years of age and not a party to this action. On December 9, 2008, I served the
SUMMONS and COMPLAINT, STATEMENT OF SERVICE BY MAIL and
ACKNOWLEDGMENT OF RECEIPT BY MAIL OF SUMMONS AND COMPLAINT,
COURT NOTICE REGARDING AVAILABILITY OF ELECTRONIC FILING, CONSENT
TO E-FILING SUPREME COURT CASE, STIPULATION AND CONSENT TO E-FILING,
and e-mail confirming assignment of an index number upon Countrywide Financial Corporation,
a Defendant in this proceeding, by mailing a true copy of the attached papers, enclosed and
properly sealed in a postpaid envelope, which I deposited in an official depository under the
exclusive care and custody of the United States Postal Services within the State of New York
addressed to The Prentice-Hall Corporation System, Inc., the registered agent of Countrywide
Financial Corporation at: 2730 Gateway Oaks Drive, Sacramento, CA 95833.

                                      GINA NEGRIN

Sworn to before me this
10th day of December, 2008

SUSANNE M. SULLIVAN
NOTARY PUBLIC, State of New York
No. 01SU6194258
Qualified in New York County
Commission Expires 09/28/20__

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

GREENWICH FINANCIAL SERVICES
DISTRESSED MORTGAGE FUND 3, LLC,
and QED LLC, on behalf of themselves and all
other persons similarly situated,

        Plaintiffs,

        -against-

COUNTRYWIDE FINANCIAL
CORPORATION, COUNTRYWIDE HOME
LOANS, INC., and COUNTRYWIDE HOME
LOANS SERVICING LP,

        Defendants.

Index No. 650474/2008

**AFFIDAVIT OF SERVICE
OF SUMMONS AND
COMPLAINT**
(Personal Delivery)

STATE OF NEW YORK    )
                    ss:
COUNTY OF NEW YORK  )

        SUSANNE M. SULLIVAN, being duly sworn, deposes and says:

        I am over 18 years of age and not a party to this action.

        At 10:40 a.m., on December 10, 2008, at 111 Eighth Avenue in the County of New York,
City of New York, I served the SUMMONS and COMPLAINT, STATEMENT OF SERVICE
BY MAIL and ACKNOWLEDGMENT OF RECEIPT BY MAIL OF SUMMONS AND
COMPLAINT, COURT NOTICE REGARDING AVAILABILITY OF ELECTRONIC FILING,
CONSENT TO E-FILING SUPREME COURT CASE, STIPULATION AND CONSENT TO
E-FILING, and e-mail confirming assignment of an index number in this matter on Countrywide
Home Loans, Inc., by delivering the said SUMMONS to: Elena Bou, known to me to be the
Process Specialist of the CT Corporation System, the registered agent of Countrywide Home
Loans, Inc.

| Description of Individual Served in Person: | | |
|---|---|---|
| Sex: __F__ | Color of Skin: __White__ | Color of Hair: __Blond__ |
| Approximate Age: __32__ | Approximate Weight: __120 lbs.__ | Approximate Height: __5'7"__ |

                                    *Susanne M Sullivan*
                                  SUSANNE M. SULLIVAN

Sworn to before me this
10th day of December, 2008

*Molly L. Pease*

MOLLY L. PEASE
NOTARY PUBLIC, State of New York
No. 02PE6199058
Qualified in Westchester County
Commission Expires July 18, 2012

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

GREENWICH FINANCIAL SERVICES
DISTRESSED MORTGAGE FUND 3, LLC,
and QED LLC, on behalf of themselves and all
other persons similarly situated,

Index No. 650474/2008

Plaintiffs,

**AFFIDAVIT OF SERVICE
BY MAIL**

-against-

COUNTRYWIDE FINANCIAL
CORPORATION, COUNTRYWIDE HOME
LOANS, INC., and COUNTRYWIDE HOME
LOANS SERVICING LP,

Defendants.

STATE OF NEW YORK    )
                                            ss:
COUNTY OF NEW YORK  )

GINA NEGRIN, being duly sworn, deposes and says:

I am over 18 years of age and not a party to this action. On December 9, 2008, I served the
SUMMONS and COMPLAINT, STATEMENT OF SERVICE BY MAIL and
ACKNOWLEDGMENT OF RECEIPT BY MAIL OF SUMMONS AND COMPLAINT,
COURT NOTICE REGARDING AVAILABILITY OF ELECTRONIC FILING, CONSENT
TO E-FILING SUPREME COURT CASE, STIPULATION AND CONSENT TO E-FILING,
and e-mail confirming assignment of an index number upon Countrywide Home Loans Servicing
LP, a Defendant in this proceeding, by mailing a true copy of the attached papers, enclosed and
properly sealed in a postpaid envelope, which I deposited in an official depository under the
exclusive care and custody of the United States Postal Services within the State of New York
addressed to CT Corporation System, the registered agent of Countrywide Home Loans
Servicing LP, at: 350 North St. Paul Street, Dallas, TX 75201.

GINA NEGRIN

Sworn to before me this
10ᵗʰ day of December, 2008

SUSANNE M. SULLIVAN
NOTARY PUBLIC, State of New York
No. 01SU6184268
Qualified in New York County
Commission Expires 09/29/2012

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

GREENWICH FINANCIAL SERVICES
DISTRESSED MORTGAGE FUND 3, LLC,
and QED LLC, on behalf of themselves and all
other persons similarly situated,

        Plaintiffs,

        -against-

COUNTRYWIDE FINANCIAL
CORPORATION, COUNTRYWIDE HOME
LOANS, INC., and COUNTRYWIDE HOME
LOANS SERVICING LP,

        Defendants.

---

08 CV 11343 (RJH) (KNF)

**NOTICE OF MOTION
TO REMAND**

---

PLEASE TAKE NOTICE that, upon the Complaint, Notice of Removal, and all previous papers and proceedings in this action, plaintiffs Greenwich Financial Services Distressed Mortgage Fund 3, LLC, and QED LLC will move this Court at the Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, New York, New York 10007, at a date and time to be set by the Court, for an order pursuant to 28 U.S.C. § 1447 remanding this case to the Supreme Court of the State of New York, County of New York, and granting such other and further relief as the Court deems just and proper.

Dated: New York, New York
      January 13, 2009

                    Respectfully submitted,

                    GRAIS & ELLSWORTH LLP

                    *David J. Grais*

                    _____
                        David J. Grais (DG-7118)
                        J. Bruce Boisture*
                        Owen L. Cyrulnik

                    70 East 55th Street
                    New York, New York 10022
                    (212) 755-0100
                    (212) 755-0052 (fax)

                    Attorneys for Plaintiffs

---

* Admitted only in Connecticut.