UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GREENWICH FINANCIAL SERVICES
DISTRESSED MORTGAGE FUND 3, LLC, and
QED LLC, on behalf of themselves and all other
persons similarly situated,

                              Plaintiffs

              -against-

COUNTRYWIDE FINANCIAL CORPORATION
et al.,

                        Defendants.

08 Civ. 11343 (RJH)

**<u>MEMORANDUM OPINION
AND ORDER</u>**

       Plaintiffs Greenwich Financial Services Distressed Mortgage Fund 3, LLC and
QED LLC move to remand this case to state court for lack of subject matter jurisdiction.
Defendants Countrywide Financial Corporation ("Countrywide Financial"), Countrywide
Home Loans, Inc. ("Countrywide Home Loans"), and Countrywide Home Loans
Servicing LP ("Countrywide Servicing") (collectively, "Countrywide") respond that this
Court has jurisdiction under the Class Action Fairness Act of 2005, 28 U.S.C.
§§ 1332(d), 1453, 1711-15 ("CAFA"), because the parties are minimally diverse and the
amount sought is over $5 million, and under 28 U.S.C. § 1331 because plaintiffs' claims
raise substantial, disputed federal questions under the Truth-in-Lending Act, 15 U.S.C. §
1601 *et seq.* ("TILA").  For the reasons set forth below, the Court holds that neither
CAFA nor TILA provides a basis for subject matter jurisdiction over this case, and
therefore that the case must be remanded to state court.

## BACKGROUND

Plaintiffs bring this putative class action as holders of the now-infamous mortgage-backed securities whose decline in value has hobbled the financial markets. Specifically, plaintiffs allege that they hold certificates issued by various trusts, which own hundreds of thousands of mortgage loans.  (Notice of Removal, Ex. A. (the "Complaint" or "Compl.") ¶¶ 1, 12-14.)  The trusts' ownership of the loans entitles them to the borrowers' periodic interest and principal payments, and the certificates entitle plaintiffs to a share of those payments.  (*Id.* ¶ 25.)  The trusts, of course, did not issue the loans, nor did they possess any assets prior to purchasing the loans.  (*Id.* ¶¶ 23-24.)  The purchases were all made pursuant to certain agreements that comprised the "securitization", and the money with which the purchases were made was raised by selling the certificates—the securities in question.  (*Id.*)

Defendants were both the issuers and sellers of the mortgage loans currently owned by the trusts.  (*Id.* ¶¶ 1, 23.)  Because the trusts themselves had no expertise with lending and loan administration, defendant Countrywide Servicing remained as the "master servicer" for the loans under terms described in contracts known as Pooling and Servicing Agreements ("PSAs").  (*Id.* ¶¶ 26-27.)  As master servicer, Countrywide Servicing administers the loans on behalf of plaintiffs with authority delineated by the PSAs.  (*See, e.g.*, Murata Decl. Ex A, Series 2005-36 PSA.)

Plaintiffs' claims arise from actions taken by defendants with respect to these loans pursuant to the terms of a settlement with several state Attorneys General.  In the summer of 2008, the Attorneys General for seven states filed lawsuits accusing Countrywide of violating laws against predatory lending.  (Compl. ¶ 28.)  Among other

things, the states alleged that Countrywide made loans it had no reasonable basis to think borrowers could afford.  (*Id*.)  Countrywide later agreed to a multistate settlement, requiring it to modify the terms of numerous mortgage loans that it currently services—including at least some of the loans it services on behalf of plaintiffs.  (*Id*. ¶ 30.)  Plaintiffs allege that "[m]odifying a mortgage loan almost always means reducing or delaying payments due on that loan."  (*Id*. ¶ 32.)  Such modifications of the loans owned by the trusts could therefore reduce the cash flow into the trusts and thus "reduce[] the value of the certificates that those trusts sold to investors."  (*Id*.)

Plaintiffs responded to defendants' settlement with the state Attorneys General by filing this putative class action in New York State Supreme Court.  In their complaint, plaintiffs do not challenge Countrywide's authority under the PSAs to modify the loans, but rather seek declaratory judgments under N.Y. C.P.L.R. 3001 that the PSAs require Countrywide to purchase any loans it modifies at a price equal to the unpaid principal and accrued interest thereon.  (*Id*. ¶¶ 35, 38.)  Specifically, plaintiffs point to the following clause that is reproduced in sum and substance across all the PSAs:  "Countrywide may agree to a modification of any Mortgage Loan (the 'Modified Mortgage Loan') if . . . Countrywide purchases the Modified Mortgage Loan from the Trust Fund . . . ."  (*Id*. ¶¶ 34-35.)  Defendants promptly removed the action to this Court, and plaintiff moved to remand two weeks later.

## DISCUSSION

"If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded."  28 U.S.C. § 1447(c).  Here, defendants

3

argue that this Court has jurisdiction (1) under CAFA because plaintiffs seek certification

as a class action, the parties are minimally diverse, and the amount in controversy is over

$5 million, and (2) under 28 U.S.C. § 1331 because plaintiffs' claims present substantial

questions of federal law. Plaintiffs disagree, arguing that an exception to CAFA

jurisdiction applies and that their claims do not present federal questions. At best,

plaintiffs argue, defendants raise a federal defense, which is insufficient to establish

subject matter jurisdiction. The Court agrees with plaintiffs.

## I.    Jurisdiction under CAFA

CAFA provides that

> The district courts shall have original jurisdiction of any civil action in which the
> matter in controversy exceeds the sum or value of $5,000,000, exclusive of
> interests and costs, and is a class action in which . . . any member of a class of
> plaintiffs is a citizen of a State different from any defendant.

28 U.S.C. § 1332(d)(2). Plaintiffs do not dispute that the above requirements for

jurisdiction under CAFA have been met. (Tr. of Mar. 13, 2009 Hr'g at 3.) Rather,

plaintiffs argue that CAFA excepts certain suits from its jurisdictional reach and that this

case falls squarely within one of those exceptions. Specifically, plaintiffs cite CAFA's

provision that district courts do not have jurisdiction over a class action that "solely

involves a claim . . . that relates to the rights, duties (including fiduciary duties), and

obligations relating to or created by or pursuant to any security . . . ." 28 U.S.C. §

1332(d)(9)(C). Plaintiffs concede that it is their burden to persuade the Court that this

exception applies. (Tr. of Mar. 13, 2009 Hr'g at 3.)

While all statutory analysis begins with the text itself, CAFA's text poses a

variety of problems. Considering the same exception the Court does here, the Court of

Appeals declared that CAFA's text was both "cryptic" and "ambiguous". *Estate of*

*Barbara Pew v. Cardarelli*, 527 F.3d 25, 30, 32 (2d Cir. 2008) (finding that "the imperfect drafting of [CAFA] makes it ambiguous" and that the court is "forced . . . to construe CAFA's cryptic text") (citations and quotations omitted). Indeed, considering the general rule of statutory construction to read exceptions narrowly when the statute itself should be read broadly, *see C.I.R. v. Clark*, 489 U.S. 726, 739 (1989) ("In construing provisions . . . in which a general statement of policy is qualified by an exception, we usually read the exception narrowly in order to preserve the primary operation of the provision."), it is particularly difficult to read narrowly language that sweeps in any claim that "*relates* to the rights, duties (including fiduciary duties), and obligations *relating* to or created by or pursuant to *any* security." (emphasis added). Read too literally, this exception would encompass all securities claims, a result that would truly swallow the rule. *See Estate of Barbara Pew*, 527 F.3d at 32 ("Review of [Securities Litigation Uniform Standards Act] and CAFA confirms an overall design to assure that the federal courts are available for all securities cases that have national impact . . . ."); *New Jersey Carpenters Vacation Fund v. Harborview Mortgage Loan Trust*, 581 F. Supp. 2d 581, 588 (S.D.N.Y. 2008) ("Consistent with Congress's aim to interpret CAFA broadly, as reflected in the legislative history, all of CAFA's exceptions are to be interpreted narrowly.")

Fortunately, the Court of Appeals has already done the lion's share of the work interpreting this exception. In *Estate of Barbara Pew*, the Court of Appeals confronted the exception's scope in the context of a state consumer fraud claim. The plaintiffs in *Pew* were purchasers of money market certificates—unsecured, fixed-interest debt instruments—whose issuer had gone bankrupt. Plaintiffs brought suit in state court

against the issuer's officers and the issuer's auditor for fraudulently failing to disclose the issuer's insolvency.  Defendants removed to federal court under CAFA, and plaintiffs quickly moved to remand, arguing that the third exception in 28 U.S.C. § 1332(d)(9) applied.  The trial court agreed with plaintiffs, and defendants appealed pursuant to 28 U.S.C. § 1453(c).

   The Court of Appeals began by rejecting plaintiffs' argument that the exception covered all securities claims.  *Estate of Barbara Pew*, 527 F.3d at 31.  Such a reading, the court concluded, would render superfluous the phrase "the rights, duties (including fiduciary duties), and obligations relating to or created by or pursuant to", leaving the text no different than if it read simply "[any] claim . . . that relates to . . . any security." Furthermore, and perhaps more importantly, the court held that such a reading would collapse three CAFA exceptions into two, rendering superfluous the first exception involving claims "concerning a covered security as defined under 16(f)(3) of the Securities Act of 1933 . . . and section 28(f)(5)(E) of the Securities Exchange Act of 1934 . . . ."

   If the third exception did not apply to all claims relating to securities, what was the limiting principle?  For this, the Court of Appeals focused on the "rights", "duties", and "obligations" language.  Duties were owed by persons—whether human or artificial—and while obligations could be owed by persons or by instruments, to differentiate them from "duties", the term "obligations" should be read as "obligations created in instruments, such as a certificate of incorporation, an indenture, a note, or some other corporate document."  *Estate of Barbara Pew*, 527 F.3d at 31. Of course, the "rights" are "those of the security-holders (or their trustees or agents) to whom these

duties and obligations run." *Id*. Applying these distinctions, the Court of Appeals held that the exception was limited to suits seeking to enforce "the terms of the instruments that create and define securities" or the "duties imposed on persons who administer securities." *Id*. at 33.

The consumer fraud claims at issue in *Pew* did not fall into either of these categories. The plaintiffs' securities were simple debt instruments with fixed interest rates. Had plaintiffs sued over the issuer's obligation to make interest payments— obligations specified by the instruments themselves—the exception would have applied. But the right to sue for fraud is created by state law, not the terms of the securities. Hence, the exception did not apply, and the Court of Appeals reversed the trial court's remand order. *Id*. at 33.

Given *Pew*'s interpretation of Section 1332(d)(9), this Court concludes that CAFA's third exception applies to plaintiffs' claims because plaintiffs seek to enforce "the terms of the instruments that create and define [their] securities." *Id*. at 33. Indeed, despite defendants many arguments to the contrary, it is hard to see how the PSAs do not constitute instruments that create and define plaintiffs' certificates. In the sample PSA provided by defendants, "Article V" is devoted entirely to the certificates, including sections relating to their issuance, registration, mutilation, and ownership. (*See* Murata Decl. Ex A at 100-06.) Moreover, the PSAs are in many ways similar to indentures, documents specifically referred to by the Court of Appeals in *Pew*. *Estate of Barbara Pew*, 527 F.3d at 31. A bond indenture is a "contract between the borrowing company and the trustee (usually a bank) or trustees representing the bondholders." ENCYCLOPEDIC DICTIONARY OF BUSINESS FINANCE 313 (Prentice Hall, Inc. 1960). Bond

indentures "contain[] all of the provisions of the borrowing, the duties of the trustee and the relation of the trustee to the issuer and the bondholder." *Id*.; *accord* DICTIONARY OF FINANCE AND INVESTMENT TERMS 325 (6th ed. 2003). Hence, just as bondholders are beneficiaries of, but not parties to, indentures, so too are the certificateholders beneficiaries of, but not parties to, the PSAs. Where the indentures contain the details of the borrowing, the duties of the trustee, and the legal relationship between the trustee, borrower, and bondholders, the sample PSA provided by defendants sets out the distribution of mortgage principal and interest payments to the various certificate classes, (Murata Decl. Ex A at 84-99), the duties of the trustee, (*id*. at 113), and the legal relationship between the trustee, the master servicer, and the certificateholders, (*id*. at 65-84). But even if the PSAs are not sufficiently analogous to indentures, the Article of the PSA containing Section 3.11(b)—the provision on which plaintiffs sue—specifies that "[Countrywide Servicing] shall service and administer the Mortgage Loans in accordance with the terms of this agreement" "[f]or and on behalf of the Certificateholders", i.e., the plaintiffs. The PSAs' plain language creates obligations for defendants, relating to the securities, whose benefits run to the plaintiffs. Because defendants are suing on those obligations, they fall within the third exception to CAFA jurisdiction.

Defendants make three arguments to try to avoid this conclusion—all of which fail. First, defendants try to further narrow the scope of CAFA's third exception by selectively, and misleadingly, quoting from *Pew*. In particular, defendants argue that *Pew*'s requirement that the claims be "grounded in the terms of the security itself", *Estate of Barbara Pew*, 527 F.3d at 32, should be read as restricting CAFA's third exception to claims based on language contained in the four corners of the certificates. (Def. Br. at 6-

8.)  Because plaintiffs are not suing on the language contained in the certificates themselves but rather on the PSAs—contracts to which plaintiffs are not parties— Countrywide contends that their motion to remand must fail.  (*Id*.)  Only if plaintiffs brought claims concerning "how interest rates are to be calculated" or the proper recourse when the issuer "default[s] on principle", would the claims qualify for the exception. (*See id*. (citing *Estate of Barbara Pew*, 527 F.3d at 31-32).)

In making this argument, however, defendants make no attempt to reconcile their interpretation with the language in *Pew* that finds the exception applicable when plaintiffs are seeking to enforce "the terms of the instruments that *create and define securities*".  *Id*. at 33 (emphasis added).  They similarly ignore *Pew*'s references to documents outside of the four corners of the securities such as "a certificate of incorporation" or "an indenture".  In fact, the only acknowledgement of this language by defendants came at oral argument when counsel argued that the reference to "articles of incorporation" in *Pew* was during a discussion of CAFA's second exception in Section 1332(d)(9)(B).  (Tr. of Mar. 13, 2009 Hr'g at 17.)  *Pew*, however, never discusses the scope of the second exception.  Moreover, to the extent defendants are relying on other courts for their interpretation, they have misread the case law.  *See New Jersey Carpenters Vacation Fund*, 581 F. Supp. 2d at 590 (interpreting *Pew* to hold that CAFA's third exception should apply to "disputes over the meaning of the terms of a security, which is spelled out in some formative document of the business enterprise, such as a certificate of incorporation"); *Katz v. Gerardi*, 552 F.3d 558, 563 (7th Cir. 2009) (interpreting *Pew* to hold that CAFA's exception "applies to suits asserting that the promises made in securities have not been honored" where the promises include those made in the

"Declaration of Trust").  Finally, even if defendants' construction were correct, they would still lose because the PSAs are expressly incorporated into the certificates themselves.  (*See* Pl. Reply Br. at 3 & n.2.)  Unlike bonds, which traditionally contain interest rates and principal, the certificates do not have fixed interest rates printed on them, referencing the PSAs for their calculation.  Plaintiffs cannot sue over the calculation of payment under the certificates without suing under the PSAs.

Defendants' second argument is that even if the terms of the certificates are implicated by plaintiffs' claims, they are not "solely" implicated and, therefore, do not fall with the third CAFA exception.  In support of this argument, defendants discuss at length a series of cases interpreting the word "solely" in other contexts.  (Def. Br. at 8-11.)  They then cite two aspects of plaintiffs' claims that they claim go beyond the terms of the securities, namely:  (1) plaintiffs' naming of Countrywide Financial as a defendant under an alter-ego theory; and (2) plaintiffs' failure to include in their claim the "no-action" clauses in the PSAs, a necessary hurdle for plaintiffs to bring suit.  (Def. Br. at 11-13.)  Suffice to say, the word "solely" cannot be read to limit the third exception to substantive claims that raise no collateral issues.  Every plaintiff bringing a contract claim under state law must rely on the state's procedural rules, rules of evidence, and the substantive law of contract, and the law of alter-ego liability is no less collateral to the merits of plaintiffs' claim than these bodies of law.  If pleading alter-ego liability excluded plaintiffs' claims from an exception otherwise squarely on point, no suit would ever fall under the exception.  As for plaintiffs' failure to include the "no-action" clauses in their claims, defendants confuse plaintiffs' invocation of law in their claims with defendants' own invocation of law in their defense.  The fact that defendants plan to

argue that the "no-action" clauses bar plaintiffs' claims—or that any other PSA provision or body of law bars plaintiffs' claims[1]—does not take plaintiffs' claim outside the scope of CAFA's third exception.

Defendants' third and final argument attempts to re-write CAFA to grant jurisdiction over all cases having a "national-impact". The Court concedes that CAFA was designed to relocate a large portion of class action litigation into federal court from state court, but Congress did not grant this Court jurisdiction over all class actions having a "national impact". If it had, it would not have needed to include the requirements of minimal diversity and at least $5 million dollars in controversy. Moreover, had Congress believed that disputes with national impact trumped CAFA's third exception, it would have said so.

In sum, none of defendants' arguments overcome a common sense reading of *Pew* and the text of CAFA itself. As interesting, timely, and important as this case may be, the Court holds that it does not have jurisdiction under CAFA.

## II.    Substantial Question of Federal Law

Courts have jurisdiction under 28 U.S.C. § 1331 over actions "arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. "A case aris[es] under federal law within the meaning of § 1331 . . . if a well-pleaded complaint establishes either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law." *Empire Healthchoice Assurance, Inc. v. McVeigh*, 547 U.S. 677, 689-90 (2006) (quotations and citations omitted). Defendants do not argue that plaintiffs' complaint pleads a federal

---

[1] *See* discussion in Part II.B below.

cause of action, indirectly conceding that plaintiffs' claims sound in the state common

law of contract.[2]  Defendants instead argue that the Court has "arising under" jurisdiction

over plaintiffs' state law claims because they "implicate[] substantial, disputed issues of

federal law."  (Def. Br. at 2.)  For this argument, they rely heavily on *Grable & Sons*

*Metal Prods. v. Darue Eng'g & Mfg.*, 545 U.S. 308 (2005).

### A.    *Grable* and its Progeny

Commentators have cited *Grable* for bringing some clarity to the question of

federal jurisdiction over state law claims.[3]  In *Grable*, the petitioner had originally

brought a quiet title action in Michigan State court.  Five years before the suit, the IRS

had seized the petitioner's property to satisfy federal tax delinquencies, served notice of

the seizure on the petitioner by certified mail, and sold the property to respondent.

Petitioner's suit against respondent claimed that petitioner had retained title because 26

U.S.C. § 6335, the statute that governed service of the seizure notice, required personal

service, not service by certified mail.  Respondent removed the case to federal court, and

petitioner challenged removal for lack of subject matter jurisdiction.

The *Grable* Court held that "[the] case warrants federal jurisdiction", explaining

that "[w]hether Grable was given notice within the meaning of the federal statute is . . .

an essential element of its quiet title claim . . . ."  *Id*. at 314-15.  Michigan law required

plaintiffs bringing an action to quiet title to specify "the facts establishing the superiority

of [their] claim," and Grable had sought to satisfy this element of its claim by

---

[2] While technically brought as applications for declaratory judgment, plaintiffs' underlying claims seek relief under the PSAs.  (Compl. ¶¶ 33-34.)

[3] An earlier Supreme Court decision, *Merrell Dow Pharmaceuticals Inc. v. Thompson*, 478 U.S. 804 (1986), had created "considerable uncertainty about when § 1331 conferred jurisdiction in the absence of a federal cause of action."  RICHARD H. FALLON, JR., DANIEL J. MELTZER, & DAVID L. SHAPIRO, HART AND WECHSLER'S FEDERAL COURTS AND THE FEDERAL SYSTEM 101 (5th ed. Supp. 2006).  *Grable* resolved a split in the lower courts concerning the proper interpretation of *Merrell Dow*.  *Id*. at 102.

establishing the "failure by the IRS to give it adequate notice, as defined by federal law". *Id*. at 314. Consequently, while state law created the rights Grable sought to vindicate, Grable bore the burden of proving an application of federal law that was favorable to his claim. Indeed, the adequacy of notice under 26 U.S.C. § 6335 "appear[ed] to be the only legal or factual issue contested in the case." *Id*. at 315.

The Court also stressed that Grable's claim satisfied two additional hurdles necessary for federal jurisdiction. First, the federal issue was a "substantial" one because the federal government "ha[d] a strong interest in the prompt and certain collection of delinquent taxes." *Id*. (quotations omitted). Second, upholding federal jurisdiction was "consistent with congressional judgment about the sound division of labor between state and federal courts governing the application of § 1331." *Id*. at 313-14. In particular, the Court held that "because it will be the rare state title case that raises a contested matter of federal law, federal jurisdiction to resolve genuine disagreement over federal tax title provisions will portend only a microscopic effect on the federal-state division of labor." *Id*. at 315.

The Supreme Court noted the narrow scope of *Grable* only a year later in *Empire Healthchoice Assurance, Inc. v. McVeigh*, 547 U.S. 677 (2006). The petitioner in *Empire* was a health insurance carrier that had contracted with the federal government to provide health care plans for government employees. Respondent was administrator of the estate of Joseph McVeigh, a former enrollee in one of petitioner's plans. McVeigh had been injured in a car accident and received payments from petitioner for medical care. Respondent later commenced an action in tort against the parties allegedly responsible for McVeigh's injuries—which ultimately led to his death—and settled for a substantial sum

of money.  Upon learning of the settlement, petitioner commenced suit against respondent in federal court for reimbursement of its payments to McVeigh based on a clause in his health care plan.  Respondent moved to dismiss for lack of subject matter jurisdiction, and the trial court granted the motion.

On certiorari, the Supreme Court rejected the argument, pressed by the United States as *amicus curiae*, that jurisdiction was proper under *Grable* because interpreting McVeigh's health care plan required application of the Federal Employees Health Benefits Act of 1959 ("FEHBA"), 5 U.S.C. § 8901 *et seq.* (2000).  FEHBA provided that "[t]he provisions of any contract under this chapter which relate to the nature or extent of coverage or benefits . . . shall supersede and preempt any State or local law, any regulation issued thereunder, which relates to health insurance or plans . . . ."  5 U.S.C. § 8901(m)(1).  The Supreme Court held that even if FEHBA was a necessary element of petitioner's claim, in all other respects the "case [was] poles apart from *Grable*."  *Id*. at 700.  The Court observed that unlike the case before it, *Grable* involved the actions of a federal agency, and the question involved was a pure issue of law applicable to numerous other cases.  While admitting that the United States had "an overwhelming interest in attracting able workers to the federal workforce" and in "the health and welfare of the federal workers upon whom it relies to carry out its functions", the Court rejected the notion that these interests warranted turning a discrete matter of state law into a "federal case".  *Id*. at 701.  The Court concluded by noting that "*Grable* emphasized that it takes more than a federal element to open the 'arising under' door" and that the case before it "[could not] be squeezed into the slim category *Grable* exemplifies."  *Id*.

Courts in this Circuit have not hesitated to reject arguments that attempt to apply *Grable* too broadly in breach of contract actions. *See, e.g.*, *Citigroup, Inc. v. Wachovia Corp.*, No. 08 Civ. 8668 (SAS), 2009 WL 749864, at *6 & n.72 (S.D.N.Y. Mar. 20, 2009) (no jurisdiction under *Grable* for an action for breach of an exclusivity agreement when the FDIC directs the parties to enter the agreement); *D.B. Zwirn Special Opportunities Fund, L.P. v Tama Broad., Inc.*, 550 F. Supp. 2d 481, 487-88 (S.D.N.Y. 2008) (no jurisdiction under *Grable* for action to appoint a temporary receiver under parties' contract when transfer of some of the assets to the receiver required approval of the FCC); *Elmira Teachers Assoc. v. Elmira City Sch. Dist.*, No. 05 Civ. 6513 (CJS), 2006 WL 240552, at *6 (W.D.N.Y. Jan. 27, 2006) (no jurisdiction under *Grable* for a breach of contract action when defendants were required to maintain a retirement plan consistent with Internal Revenue Code § 403(b)). The Court of Appeals did, however, find jurisdiction under *Grable* in *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187 (2d Cir. 2005). In *Broder*, plaintiff alleged that Cablevision had violated their contract's provision subjecting "all of [Cablevision's] rates and any changes in those rates" to "applicable law" by violating 47 U.S.C. 543(d), which provided for uniform rates in a geographic area. Because the federal statute was incorporated by reference into the contract, was the basis for one of plaintiff's claims, raised a substantial issue of federal law, and did not threaten to disturb the federal/state allocation of jurisdiction, the Court of Appeals held that jurisdiction was appropriate under *Grable*.

## B.    *Grable* Does Not Provide for Jurisdiction over Plaintiff's Claims

Defendants argue that TILA, as amended by the Housing and Economic Recovery Act of 2008 ("HERA"), Pub. L. 110-289 (July 10, 2008), and most recently by the

Helping Families Save Their Homes Act of 2009 ("Homes Act"), Pub. L. 111-22 (May 23, 2009), is a necessary element of plaintiff's claim, and therefore that jurisdiction under *Grable* is appropriate.  Specifically, defendant points to 15 U.S.C. § 1639a, as amended by the Homes Act:

> (a) In general.—Notwithstanding any other provision of law, whenever a servicer of residential mortgages agrees to enter into a qualified loss mitigation plan with respect to 1 or more residential mortgages originated before the date of enactment of the Helping Families Save Their Homes Act of 2009, including mortgages held in a securitization or other investment vehicle—
>
> (1) to the extent that the servicer owes a duty to investors or other parties to maximize the net present value of such mortgages, the duty shall be construed to apply to all such investors and parties, and not to any individual party or group of parties; and
>
> (2) the servicer shall be deemed to have satisfied the duty set forth in paragraph (1) if, before December 31, 2012, the servicer implements a qualified loss mitigation plan that meets [certain enumerated criteria]
>
> . . .
>
> (b) No liability.—A servicer that is deemed to be acting in the best interests of all investors or other parties under this section shall not be liable to any party who is owed a duty under subsection (a)(1), and shall not be subject to any injunction, stay, or other equitable relief to such party, based solely upon the implementation by the servicer of a qualified loss mitigation plan.
>
> (c) Standard industry practice.—The qualified loss mitigation plan guidelines issued by the Secretary of the Treasury under the Emergency Economic Stabilization Act of 2008 shall constitute standard industry practice for purposes of all Federal and State laws.

Defendants argue as follows.  To prove their claim, plaintiffs must establish that the PSAs, properly interpreted, require defendants to buy back the mortgage loans if defendants modify them.  To establish this, plaintiffs rely on Section 3.11 of the PSAs, which states that "The Master Servicer may agree to a modification of any Mortgage Loan . . . if (i) the modification is in lieu of a refinancing . . . and (iii) the Master Servicer purchases the Modified Mortgage Loan from the Trust Fund . . . ."  (Murata Decl. Ex A at 78.)  Plaintiffs, however, fail to mention that Section 3.11 applies only to modifications

effected "in lieu of a refinancing" and therefore incorrectly infer that no other sections in the PSAs authorize the servicer to make modifications. (Def. Br. at 14-15.) Defendants argue that Section 3.01, for example, authorizes Countrywide Servicing to modify loans as part of its general administrative function in keeping with the "customary and usual standards of practice of prudent mortgage loan servicers." (Def. Ltr., dated May 27, 2009, at 2.) Which sections govern Countrywide's modification of the loans pursuant to its settlement with the Attorneys General is a matter of contract construction. But 15 U.S.C. § 1639a, defendants maintain, supplies a rule of construction for documents such as the PSAs. (*Id*. at 15.) Assuming that Countrywide's modifications constitute a "qualified loss mitigation plan" under the statute—and plaintiff does not contest this point in its papers—the statute provides that Countrywide "shall not be liable" for modifications effected pursuant to its duty to investors "to maximize the net present value of [the] mortgages". (Def. Br. at 15; Def. Ltr., dated May 27, 2009, at 2.) The statute itself defines this duty to investors and even provides that the Treasury shall define what constitutes "standard industry practice". (Def. Ltr., dated May 27, 2009, at 2-3.) According to defendants, these provisions create a federal presumption against liability when servicers modify loans, and plaintiffs bear the burden of overcoming this presumption. (Def. Br. at 16.) Because plaintiffs bear this burden, federal law is a necessary element of their claim and therefore a federal forum is required under *Grable*. (*Id*. at 17-18.)

Simply put, the Court disagrees. As an initial matter, it is not obvious to the Court why any part of 15 U.S.C. § 1639a is a necessary element of plaintiffs' claims. The Court agrees that plaintiffs bear the burden of demonstrating that the PSAs *as a*

*whole* require defendants to buy back the modified mortgage loans—i.e., it is not sufficient to merely single out a particular clause. *See S. Road Assocs. v. Intern. Bus. Machs. Corp.*, 4 N.Y.3d 272, 277 (2005) ("It is also important to read the document as a whole to ensure that excessive emphasis is not placed upon particular words or phrases"); NY JUR. (CONTRACTS) § 248 ("Because the intention of parties to a contract is ascertained, not from one provision or particular words or phrases, but from the entire instrument, in the construction of contracts, the entire contract must be considered."). At least as a logical matter, the Court further agrees that provisions other than Section 3.11 could provide for modification of the loans without repurchase. Plaintiffs' position, however, is, not surprisingly, that Section 3.11 was the only provision that could have authorized defendants' modifications under the circumstances, and that whatever other provisions grant such authority do not apply. Nothing in this position requires an interpretation of federal law. TILA is not incorporated by reference in the PSAs, *see Broder*, 418 F.3d at 195, and plaintiff does not rely on TILA to satisfy its burden of proof, *see Grable & Sons Metal Prods.*, 545 U.S. at 314-15.

To the extent defendants are arguing that plaintiffs are "artfully pleading" their claim to avoid TILA, they misunderstand the law. If the defendant in *Grable* had never removed the case to federal court and never mentioned the federal statute at issue, the plaintiff would still have required a favorable interpretation of federal law to succeed on its quiet title claim. In contrast, if defendants had never raised TILA as an issue in this case, plaintiffs would not have required an interpretation of federal law in order to succeed on their claims.

Although defendants deny it, by arguing that TILA requires a different interpretation of the contract, defendants are raising a federal defense. A federal defense has never been sufficient for federal question jurisdiction. *Franchise Tax Bd. of CA v. Const. Laborers Vacation Trust*, 463 U.S. 1, 2 (1989) ("Under the 'well-pleaded complaint' rule, a defendant may not remove such a case to federal court unless the plaintiff's complaint establishes that the case 'arises under' federal law within the meaning of § 1331, and it may not be removed on the basis of a federal defense, including the defense of pre-emption, even if the defense is anticipated in the complaint and both parties admit that the defense is the only question truly at issue."); *Fleet Bank, Nat. Ass'n v. Burke*, 160 F.3d 883, 886 (2d Cir. 1998) ("[the well-pleaded complaint] rule requires a complaint invoking federal question jurisdiction to assert the federal question as part of the plaintiff's claim, and precludes invoking federal question jurisdiction merely to anticipate a federal defense") (citations omitted). An argument constitutes an affirmative defense if it is the defendant's burden to prove the facts essential to the argument. Because plaintiffs' claims depend only on the PSAs and the various common law principles of contract interpretation, it follows that defendants bear the burden of demonstrating why TILA bars plaintiffs' claims. Defendants attempt to avoid this conclusion by arguing that TILA actually modified the state law of contract to require application of a particular rule of construction. But even if TILA does set forth the rule of construction that defendants allege, there is no evidence that TILA modified the common law cause of action for breach of contract to require the rule's application, and the Court declines defendants' invitation to impose such an interpretation on TILA.

Furthermore, while plaintiffs' claims might meet *Grable*'s other criteria—that the federal issue be "substantial" and that jurisdiction not upset the federal/state division of judicial labor—defendants' insistence on this point misses the overarching principle governing any interpretation of 18 U.S.C. § 1331: legislative intent. Considering that Congress enacted HERA and the Homes Act in response to a growing crisis in the American economy, there is little doubt that interpretation of these amendments raises a "substantial" federal issue. Furthermore, finding jurisdiction would not invite a flood of new lawsuits to federal court because, as plaintiffs concede, Countrywide's PSAs are unique in the industry. (Tr. of Mar. 13, 2009 Hr'g at 2.) But here the Court is not discerning Congress's intent regarding the federal/state division of labor in a vacuum. Congress could have expressly granted the federal courts jurisdiction over this cause of action, but it didn't. *See* 28 U.S.C. § 1332(d); *Empire Healthchoice Assurance, Inc.*, 547 U.S. at 696. It also could have done so implicitly by displacing all state law concerning loan modifications or by completely eliminating all liability associated with loan modifications. *See Empire Healthchoice Assurance, Inc.*, 547 U.S. at 697-99. Congress did neither of these things. In fact, previous drafts of both HERA and the Homes Act proposed more sweeping immunity for loan servicers, but Congress ultimately rejected this language in favor of the current text. *See* 154 Cong. Rec. S. 3306, 3306 (2008) (draft of HERA providing that "[Servicers] shall not be liable under any law or regulation of the United States, any State or any political subdivision of any State, for entering into a qualified loan modification or workout plan"); H.R. 1106 (draft of the Homes Act passed by the House) ("Notwithstanding any other provision of law, and notwithstanding any investment contract between a servicer and a securitization vehicle or investor, a servicer

(i) shall not be limited in the ability to modify mortgages . . . and (ii) shall not be obliged to repurchase loans . . . on account of modification [if the modification meets certain criteria].")

It is tempting to find federal jurisdiction every time a multi-billion dollar case with national implications arrives at the doorstep of a federal court.  The jurisdiction of the federal district courts, however, is left to Congress, not to the discretion of the courts themselves.  In this case, Congress passed two statutes within a year of each other to address the mortgage crisis.  In neither of these statutes did Congress federalize the case before this Court.  Considering the eminently predictable nature of this suit, the Court finds that Congressional intent weighs against fitting this case in *Grable*'s "slim category" of federal jurisdiction.

## CONCLUSION

For the reasons stated, plaintiffs' motion to remand is GRANTED. The Clerk of

the Court is directed to close this case.

SO ORDERED.

Dated: New York, New York
       August 1 2009

Richard J. Holwell
United States District Judge